Slip Op. 20-130

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CYBER POWER SYSTEMS (USA) INC.,<br><br>                Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>                Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 20-00124 |

**OPINION and ORDER**

[Plaintiff's motion for preliminary injunction denied.]

Dated: September 2, 2020

    John M. Peterson, Patrick Brady Klein, and Richard F. O'Neill, Neville Peterson, LLP of New York, NY for Plaintiff Cyber Power Systems (USA) Inc.

    Beverly A. Farrell and Brandon A. Kennedy, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of New York, NY for Defendant United States. With them on the brief were Ethan P. Davis, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Justin R. Miller, Attorney-In-Charge. Of counsel on the brief was Yelena Slepak, Office of Assistant Chief Counsel, U.S. Customs and Border Protection of New York, NY.

    **Gordon, Judge:** In this action Plaintiff Cyber Power (USA) Inc. challenges the denial by U.S. Customs and Border Protection ("Customs" or "CBP") of Plaintiff's protest of Customs' deemed exclusion of Plaintiff's subject merchandise (five models of uninterruptible power supplies and one model of surge voltage protectors) for country of origin marking "made in Philippines" instead of "made in China." Plaintiff argues its merchandise is substantially transformed in the Philippines and requests an order directing Customs to enter Plaintiff's merchandise as marked "made in Philippines."

Before the court is Plaintiff's request for a preliminary injunction that seeks the ultimate relief in the action. For the reasons set forth below, the court denies Plaintiff's motion.

## Background

Before the subject entry was detained and deemed excluded, Cyber Power made a verbal prior disclosure to Customs in the summer of 2019, arising from a consumer affairs journalist who identified an over-label on packaging of imported Cyber Power surge voltage protectors and uninterruptible power supplies. The over-label stated that the good was "made in Philippines" but, when the reporter removed the label, the printing on the packaging stated "made in China."

In September 2019, Customs sent an initial Request for Information to Cyber Power seeking general information and certain production records. Customs followed up with another request in October 2019 again seeking production records. Cyber Power provided Customs with its Final Prior Disclosure in November 2019, in which Cyber Power explained that the disclosure related to the country of origin designation of certain imported merchandise "spanning from November 2018 to the present [November 27, 2019]." Among other things, Cyber Power stated that it believed the use of over-labels on pre-printed packaging was reasonable and compliant with 19 U.S.C. § 1304 and that the goods met the substantial transformation test. Cyber Power further explained that it had conducted an internal review of its certificate of origin declaration and marking practices.

In January 2020, Customs determined that the country of origin of certain Cyber Power uninterruptible power supplies and surge voltage protectors was China, not the Philippines. In February 2020, Customs sent a Notice of Action to Cyber Power on

CBP Form 29 informing it of a rate advance. Plaintiff, through counsel, responded to the rate advance, disclosing, among other things, that the production country for the batteries and the circuit boards for the goods had changed. This contradicted the information in Cyber Power's November 2019 Final Prior Disclosure. In March 2020, Cyber Power advised its Customs broker that it intended to make only pen and ink changes to its Philippine invoices and that it would continue marking all items as "made in Philippines."

On April 10, 2020, Customs detained the subject entry for inspection. Customs sent Cyber Power and its Customs broker a notice of detention accompanied by a notice to mark and/or redeliver. See Compl., ECF No. 13-1, Exs. A-1 and A-2. The notice to mark states:

> Cyber Power, council [sic] for Cyber Power, John Peterson, and broker C.H. Robinson were all advised by Import Specialist Horacek, in writing, back in February 2020 that Cyber Power is required to claim country of origin China on all Uninterruptible power supplies (UPS) and surge protectors and no exemption was given for marking purposes. All UPS and surge protectors must be entered as Chinese goods and marked made in China.

See Compl., Ex. A-2 at 4.

Plaintiff refused to change the marking on the goods and their packages, and on May 3, 2020, the subject merchandise was deemed excluded by operation of 19 U.S.C. § 1499(c)(5). On May 21, 2020, Plaintiff filed Protest No. 3501-20-101425 challenging Customs' deemed exclusion. Plaintiff asserted that the imported products were manufactured in Cyber Power Systems Inc.'s plant in the Philippines through processes involving the assembly of hundreds of discrete components that originated primarily in China, but also in other countries. Plaintiff argued that the processes performed in the

Court No. 20-00124 Page 4

Philippines resulted in the "substantial transformation" of such components into new and different articles of Philippine origin, having a name, character, or use different than those constituent components. According to Plaintiff, the imported products were of Philippine origin, and the products and their packages were properly marked pursuant to 19 U.S.C. § 1304(a).

In connection with the protest, Cyber Power did not provide information and documents specific to the five models of uninterruptible power supplies and one model of surge voltage protectors at issue, but instead explained that "Manufacturing operations for representative units are described. Bills of materials and manufacturing processes for each model are available to Customs on request." Declaration of Linda Horacek at ¶ 5, Attach. to ECF No. 27 ("Horacek Decl."); see also ECF No. 20-1 at 5. Customs requested all the records relating to the subject merchandise. Horacek Decl. at ¶ 6. In reviewing Cyber Power's protest, Customs discovered discrepancies in the information provided. For example, Cyber Power states that of the 188 discrete components needed to make CP600LCDa, "approximately 118 of those components, consisting of various electronic microcomponents are combined in Taiwan to manufacture the main printed circuit board assembly for the power supply." Id. at ¶ 9. However, the process flow chart submitted contradicted this claim and alleged that circuit boards were being soldered in the Philippines. Id. Although Cyber Power claimed the main board of model CBN50048A-1 was soldered in the Philippines, a document (Exhibit H to the Horacek Decl.) showed that all main board assemblies were soldered in China. Id. at ¶ 13.

In response to a question from Customs about when Philippine-soldered components were first used on models OR500LCDRM1U and SX650U, Cyber Power admitted that information in the protest needed to be corrected to reflect that the boards were of Chinese origin. Id. at ¶ 12. Ultimately, Customs learned that only model CP600LCDa was claimed to possess a main board of Philippine origin. Id. at ¶ 14. However, work orders for circuit boards that were alleged to be contained in this model were completed either one day before, the day of, or two days after the model had been packed for export. Id. at ¶ 15.

After reviewing Plaintiff's submissions in support of the protest, Customs denied the protest on June 19, 2020, concluding that: "Insufficient documentation was provided by the protestant in order to change the country of origin from China to the Philippines for marking and classification purposes. All information, both verbal and written, was considered by this office. The country of origin marking for this shipment should remain 'made in China'." See ECF No. 20-1 at 2.

This action, and Cyber Power's motion for a preliminary injunction followed. After considering the parties' respective proposed scheduling orders for expedited litigation, the court entered a Scheduling Order on July 14, 2020.

## Discussion

In an action under 28 U.S.C. § 1581(a), Plaintiff bears the burden of proof on contested factual issues that arise from the protest decision. 28 U.S.C. § 2639(a)(1) (2000); Universal Elecs., Inc. v. United States, 112 F.3d 488, 492 n.2 (Fed. Cir. 1997); Chrysler Corp. v. United States, 33 CIT 90, 97, 601 F. Supp. 2d 1347, 1353-54 (2009),

aff'd, 592 F.3d 1330 (Fed. Cir. 2010). Plaintiff therefore carries the burden to prove by a preponderance of the evidence that its subject merchandise is substantially transformed in the Philippines and not made in China.

Section 304(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1304(a), requires that all merchandise imported into the United States be marked permanently, legibly, indelibly, and in a conspicuous place, to indicate the English name of the product's country of origin. 19 C.F.R. § 134.1(b) defines the term "country of origin" as "the country of manufacture, production, or growth of any article of foreign origin entering the United States." Section 134.1(b) explains that "[f]urther work or material added to an article in another country must effect a substantial transformation in order to render such other country the 'country of origin' within the meaning of this part." Where goods are not properly marked to show their country of origin, they are considered "restricted" merchandise, which Customs may exclude from entry into the United States. See 19 U.S.C. § 1304(j); see also 19 C.F.R. § 134.3(a).

A substantial transformation occurs "when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." United States v. Gibson-Thomsen Co., Inc., 27 C.C.P.A. 267, C.A.D. 98 (1940); Anheuser Busch Brewing Ass'n v. United States, 207 U.S. 556, 562 (1908); Belcrest Linens v. United States, 741 F.2d 1368, 1372 (Fed. Cir. 1984); Superior Wire v. United States, 867 F.2d 1409, 1414 (Fed. Cir. 1989).

.

## Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." <u>Winter v. Natural Res. Def. Council</u>, 555 U.S. 7, 20 (2008).

## Public Interest

The court begins with consideration of the public interest because the requested preliminary injunction seeks Plaintiff's permanent, ultimate relief, rather than temporary or preliminary relief. Pl.'s Proposed Order accompanying App. for Prelim. Inj., ECF No. 21 (Attach. 1) (requesting that Customs "release the goods which are the subject of this action to Plaintiff . . . without first requiring Plaintiff to change country of origin marking on the merchandise or its packaging."). There is nothing preliminary or temporary about releasing Plaintiff's merchandise for entry as marked. It is the permanent relief Plaintiff seeks. Plaintiff's merchandise is presently excluded from entry, which is the status quo. Once the court releases the goods into the flow of commerce marked "made in Philippines" as Plaintiff requests, the court upsets the status quo, and the court cannot mitigate the harm to the public if, after a trial on the merits, the court concludes the merchandise should be marked "made in China."

The marking statute, 19 U.S.C. § 1304(a), allows the purchasing public to buy or not, "if such marking should influence their will." <u>United States v. Friedlaender & Co.</u>, 27 C.C.P.A. 297, 302 (1940). And while any corollary governmental interests in marking-

related duties, 19 U.S.C. § 1304(i), and any Section 301 duties on Chinese goods, may be potentially safeguarded by a bond, there is simply no way to compensate the ultimate purchaser—no bond to indemnify the interests affected—if the court improvidently grants the preliminary injunction releasing the goods as marked. These eggs cannot be unscrambled. "A preliminary injunction should be denied if it will adversely affect the public or other interested parties for which, even temporarily, an injunction bond cannot compensate." Associated Dry Goods Corp. v. United States, 1 CIT 306, 310, 515 F. Supp. 775, 779 (1981). "The court should withhold such relief until a final determination of the controversy, even though the delay may be burdensome to the plaintiff." Id.; see also Ferrostaal Metals Corp. v. United States, 11 CIT 470, 471, 664 F. Supp. 535, 536 (1987) (preliminary injunction denied in "substantial transformation" case on ground that injunction granted ultimate relief sought; court consolidated preliminary injunction motion with trial on merits and ordered expedited review, ultimately issuing judgment for plaintiff). The public interest therefore discourages issuance of a preliminary injunction in this case. The best course is instead to proceed expeditiously on the merits toward a final judgment.

**Likelihood of Success**

As noted above, Plaintiff bears the burden to establish by a preponderance of the evidence that the subject merchandise is substantially transformed in the Philippines. Plaintiff's likelihood of success therefore depends on its development of the factual record before the court. In seeking a preliminary injunction, though, Plaintiff argues that the court should weaken its rules of evidence and procedure—basically, consider otherwise inadmissible evidence. See Pl.'s Mot. for Hr'g on App. for Prelim. Inj. at 5–6, ECF No. 29.

This elevates its attempt to obtain its ultimate relief in the form of a preliminary injunction to a bold, if not questionable, litigation stance. Whatever its characterization, it is not a persuasive posture for Plaintiff's likelihood of success. It implies that Plaintiff is not yet prepared to make the evidentiary proffer required at trial. That posture, coupled with Defendant's point that Plaintiff submitted inconsistent/incorrect information about its manufacturing processes to Customs (explained above), means that Plaintiff simply asks too much of the court to conclude that Plaintiff has a likelihood of success. All the court can conclude at this stage of the litigation is that Plaintiff appears to still be formulating the theory of its case and trying to figure out what admissible evidence it can marshal in support of its claims.

In addition to Plaintiff's factual hurdles, Plaintiff acknowledges that the substantial transformation analysis the court applies (to finished articles comprised of components) may prove dispositive. Pl.'s Mot. for Hr'g on App. for Prelim. Inj. at nn. 4 & 5. With 80 years of application in various contexts (country of origin marking, government procurement, voluntary restraint agreements, Generalized System of Preferences eligibility, drawback eligibility), the substantial transformation test should, one would anticipate, be fairly straightforward to apply. It is not.

Take, for example, Energizer Battery Inc. v. United States, 40 CIT ___, 190 F. Supp, 3d 1308 (2016), a government procurement case. In Energizer Battery, 50 components were imported and assembled into a flashlight in the state of Vermont. The court granted summary judgment for the Government that the flashlight was not substantially transformed in Vermont, an outcome that seems somewhat counterintuitive

because on a practical level a finished flashlight does have a different name, character, and use than a pile of 50 unassembled constituent components. Following a component-by-component name, character, and use analysis developed in prior court decisions, the Energizer Battery court concluded that the flashlight components (the lens, etc.) all retained their specific names, character, and use when assembled in the finished flashlight. Energizer Battery, 40 CIT at ___, 190 F. Supp. 3d at 1321 ("whether there has been a substantial transformation depends on whether there has been a change in the name or use of the components").

The court in Energizer Battery also relied upon those same prior decisions that held the assembly of components for a pre-determined use could not constitute a change in use for the finished article in the country of assembly. 40 CIT at ___, 190 F. Supp. 3d at 1319; see Nat'l Hand Tool Corp. v. United States, 16 CIT 308, 311–312 (1992) (post-importation processing primarily consisted of assembly process, having one pre-determined end-use at time of importation); see also Ran–Paige Co., Inc. v. United States, 35 Fed. Cl. 117, 121–122 (1996) (post-importation processing consisted primarily of attaching handles to pans with predetermined use at time of importation); Uniroyal, Inc. v. United States, 3 CIT 220, 226, 542 F. Supp. 1026, 1031 (1982) (imported shoe upper underwent no physical change and was attached to outsole for predetermined use).

The above component-by-component approach to the substantial transformation test would seem to make it practically insurmountable for subsequent-country, pre-determined assembly to ever constitute further work/substantial transformation of an article. And this does not bode well for Plaintiff's likelihood of success. Under these

precedents, however, it appears Plaintiff may still be able to prevail despite failing the component-by-component name, character, and use test if it can establish that the Philippine processing is "sufficiently complex" to justify a substantial transformation in the finished articles. Energizer Battery, 40 CIT at ___ – ___, 190 F. Supp. 3d at 1319–20. Exactly what constitutes "sufficiently complex" is a bit of a mystery though.

Plaintiff hangs its hopes on a recent Federal Circuit decision that appears to eschew the component-by-component substantial transformation analysis. See Pl's Mem. in Supp. of Prelim. Inj. at 13, ECF No. 21-2 (citing Acetris Health, LLC v. United States, 949 F.3d 719, 731 (Fed. Cir. 2020) ("it is clear . . . that the 'product' is the final product that is procured—here, the pill itself—rather than the ingredients of the pill.")). This Court would add that the Court of International Trade in Uniden America Corp. v. United States, 24 CIT 1191, 1195–98, 120 F. Supp.2d 1091, 1095–1099 (2000) expressly rejected a component-by-component analysis in reviewing whether articles were substantially transformed.

Perhaps the only way to make sense of these seemingly disparate substantial transformation cases is to concentrate on the courts' analysis of the underlying statutory and regulatory purposes, and the courts' conclusions about whether those purposes were served by a finding of substantial transformation. Compare Ferrostaal Metals Corp. v. United States, 11 CIT 470, 471, 664 F. Supp. 535, 536 (1987) (DiCarlo J.) (finding substantial transformation in subsequent country, New Zealand, in context of voluntary restraint agreement with originating country, Japan) with Nat'l Hand Tool Corp. v. United States, 16 CIT 308, 311–312 (1992) (DiCarlo C.J.) (finding no substantial transformation

for assembly operations in United States for product and components originating in Taiwan).

The court cannot yet say whether Plaintiff will succeed or not. The court will have to see how the record develops and evaluate the parties' arguments about the statutory and regulatory purposes of the marking statute and Section 301 duties, and whether Plaintiff's Philippine activities advance those purposes or not.

## Balance of Equities

Plaintiff submitted incorrect and misleading information to Customs that undermines its equitable stance. Plaintiff's pursuit of its ultimate relief in the form of a preliminary injunction rather than proceeding expeditiously on the merits slows the litigation down, and adds unnecessary cost, expense, and delay. The equities therefore do not favor Plaintiff.

## Irreparable Injury

Cyber Power alleges harm that is both reparable and subsumed in the expected costs of voluntarily engaging in the importation of foreign merchandise. See Def's. Resp. to Pl.'s Mot. for Prelim. Inj. at 16–20, ECF No. 27. The court notes that by requesting a preliminary injunction that seeks its ultimate relief, Plaintiff has added unnecessary expenditure of time and energy for all parties and the court. The best course for Plaintiff to obtain its desired relief is to proceed expeditiously to a trial on the merits.

## Conclusion

For the reasons set forth above, a preliminary injunction granting Plaintiff its ultimate relief is not appropriate in this action. Accordingly, it is

Court No. 20-00124 Page 13

**ORDERED** that Plaintiff's application for a preliminary injunction is denied; and it is further

**ORDERED** that Plaintiff's request for a hearing on its motion for a preliminary injunction is denied as moot.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: September 2, 2020
New York, New York