Slip Op. 22-17

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CYBER POWER SYSTEMS (USA) INC.,<br><br>              Plaintiff,<br><br>   v.<br><br>UNITED STATES,<br><br>              Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 20-00124 |

**OPINION and ORDER**

[Denying parties' cross-motions for summary judgment.]

Dated: February 24, 2022

    John M. Peterson, Richard F. O'Neill, and Patrick B. Klein, Neville Peterson LLP, of New York, N.Y., for the Plaintiff Cyber Power Systems (USA) Inc.

    Brandon Kennedy, Trial Counsel, and Beverly A. Farrell, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States. With them on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Justin R. Miller, Attorney-in-Charge. Of counsel was Yelena Slepak, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

    **Gordon, Judge:** This action began with a prior disclosure about a "Made in Philippines" over-label on packaging that was also marked "Made in China." U.S. Customs and Border Protection ("Customs" or "CBP") determined that the country of origin was China, not the Philippines. In response, Plaintiff, Cyber Power Systems (USA) Inc. ("Cyber Power"), advised its customs broker that it would continue marking all items as "Made in Philippines." Customs subsequently detained the subject entry for inspection. Customs sent Cyber Power and its customs broker a notice of detention

accompanied by a notice to mark and/or redeliver.  After Cyber Power refused to change the marking on the merchandise, it was deemed excluded by operation of 19 U.S.C. § 1499(c)(5).  Cyber Power filed a protest challenging Customs' deemed exclusion, arguing that the processes performed in the Philippines resulted in a "substantial transformation" of its merchandise into Philippine origin, having a name, character, and use different from its Chinese components.  Customs denied the protest, concluding that "[i]nsufficient documentation was provided by the protestant to change the country of origin from China to the Philippines for marking and classification purposes.  All information, both verbal and written, was considered by this office.  The country of origin marking for this shipment should remain 'made in China'."  See Protests & Entries from the Port of Minneapolis, MN at p. 2, ECF No. 20-1.

Cyber Power then commenced this action.  The subject entry covers five models of uninterruptible power supplies ("UPS") and one model of surge voltage protector ("SVP").  With respect to four of the UPS products, and with regard to the single SVP product, it is undisputed that the majority of components, including the printed circuit board assemblies ("PCBAs"), were produced in China.  In the case of one UPS unit— UPS Model No. CP600LCDa—Plaintiff maintains, and Defendant disputes, that its printed circuit board was produced in the Philippines, although the parties agree that various other components are made in China.  Additionally, Plaintiff maintains that all of the subject merchandise is assembled, connected, and tested at its facility in the Philippines.

Cyber Power sought a preliminary injunction that the court denied because it requested the ultimate relief.  See Slip Op. & Order, ECF No. 30.  Plaintiff subsequently

moved to compel depositions of two Government officials, as well as to compel the production of any notes or reports made by those officials regarding their July 23, 2020 inspection of the Cyber Power Philippines plant. See Pl.'s Mot. to Compel, ECF No. 31. In response, the Government moved for a protective order based on the investigatory files privilege to prevent disclosure of the materials and depositions. See Def.'s Resp. to Mot. to Compel & Cross-Mot. for Protective Order, ECF No. 36. Finding no basis for the Government's assertion of an investigatory files privilege, the court summarily denied the Government's motion for a protective order and granted Cyber Power's motion to compel. See Mem. & Order, ECF No. 46. Presently before the court are the parties' cross-motions for summary judgment. See Pl.'s Mot. for Summ. J., ECF No. 48 ("Pl.'s MSJ"); Pl.'s R. 56.3 Stmt. of Material Facts Not in Dispute, ECF No. 48-5 ("Pl.'s 56.3 Stmt."); Def.'s Cross-Mot. for Summ. J. & Mot. to Strike, ECF No. 60 ("Def.'s XMSJ"); Def.'s R. 56.3 Stmt. of Material Facts as to Which There Are No Genuine Issues to be Tried, ECF No. 60-1 ("Def.'s 56.3 Stmt."); see also Def.'s Resp. to Pl.'s R. 56.3 Stmt., ECF No. 60-2; Pl.'s Reply & Resp. in Opp'n to Def.'s Cross-Mot. for Summ. J. & Mot. to Strike, ECF No. 67 ("Pl.'s Reply"); Pl.'s Resp. to Def.'s R. 56.3 Stmt., ECF No. 67-5; Def.'s Revised Reply, ECF No. 87 ("Def.'s Reply").

## I. Standard of Review

USCIT Rule 56 permits summary judgment when "there is no genuine issue as to any material fact." USCIT R. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On the question of genuineness, the standard for determining a genuine issue "mirrors the standard for a directed verdict[,] ... which is that the trial judge must

direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.... In essence, ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 248–52; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23. (1986) (Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). In considering whether material facts are genuinely in dispute, the evidence must be considered in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Anderson, 477 U.S. at 261 n.2.

## II. Discussion

### A. Background

In this action involving country of origin marking, Plaintiff must establish by a preponderance of the evidence that its subject merchandise is substantially transformed in the Philippines and not made in China. See 28 U.S.C. § 2639(a)(1); Universal Elecs., Inc. v. United States, 112 F.3d 488, 492 n.2 (Fed. Cir. 1997) (plaintiff bears burden of proof on contested factual issues arising from underlying protest decision).

A "substantial transformation" occurs "when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." Torrington, Co. v. United States, 764 F.2d 1563, 1568 (Fed. Cir. 1985) (citing Texas Instruments, Inc. v. United States, 681 F.2d

778, 782 (C.C.P.A. 1982)); see also Gibson-Thomsen Co., Inc. v. United States, 27 C.C.P.A. 267, 273 (1940) (clarifying that marking statute did not "require that an imported article, which is to be used in the United States as material in the manufacture of a new article having a new name, character, and use, and which, when so used, becomes an integral part of the new article, be so marked as to indicate to the retail purchaser of the new article that such imported article or material was produced in a foreign country"). "Substantial transformation" determinations are fact-specific and made on a case-by-case basis. It is a disjunctive test; only a change in one of the three criteria—name, character, or use—is required. See Koru N. Am. v. United States, 12 CIT 1120, 1126, 701 F. Supp. 229, 234 (1988). However, a change in name is generally considered the least persuasive factor. See id. (citing Nat'l Juice Prods. Ass'n v. United States, 10 CIT 48, 59–60, 628 F. Supp. 978, 989 (1986)).

In the most recent iterations of the substantial transformation test, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has required that there be a "new and different" article which emerges from a manufacturing process. See, e.g., Acetris Health LLC v. United States, 949 F.3d 719 (Fed. Cir. 2020); Zuniga v. United States, 996 F.2d 1203 (Fed. Cir. 1993); Azteca Milling Co. v. United States, 890 F.2d 1150 (Fed. Cir. 1989). Some courts have also considered additional factors in evaluating whether a change in name, character, or use has occurred, such as the cost or value added by specified processes, see, e.g., Ferrostaal Metals Corp. v United States, 11 CIT 470, 664 F. Supp. 535 (1987); Superior Wire Inc. v. United States, 11 CIT 608, 669 F. Supp. 472 (1987); Uniroyal, Inc. v. United States, 3 CIT 220, 542 F. Supp. 1026 (1982); or whether there

has been a transformation from a "producer's good" to a "consumer good," see, e.g., SDI Techs. Inc. v. United States, 21 CIT 895, 977 F. Supp. 1235, 1240 (1997); Midwood Indus. Inc. v. United States, 64 Cust. Ct. 499, 313 F. Supp. 951 (1970), appeal dismissed, 57 C.C.P.A. 141 (1970).

As the court noted previously and as this brief summary of relevant precedent illustrates, the substantial transformation test is not straightforward to apply. See Slip Op. & Order at 9–11, ECF No. 30. To facilitate the application of that test in this matter, the court encouraged the parties to focus their arguments regarding substantial transformation in light of the "underlying statutory and regulatory purposes" at issue, and whether those purposes would be served by a finding of substantial transformation. Id. at 11.

### B. Analysis

### 1. Marking Statute

The parties dispute the underlying statutory purpose of the marking statute at issue. The court must resolve this dispute before turning to whether Plaintiff has demonstrated that the subject merchandise has undergone a "substantial transformation" in the Philippines. Section 304(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1304(a), requires that all merchandise imported into the United States be marked permanently, legibly, indelibly, and in a conspicuous place, to indicate to the ultimate purchaser the English name of the product's country of origin. 19 C.F.R. § 134.1(b) defines the term "country of origin" as "the country of manufacture, production, or growth of any article of foreign origin entering the United States." Section 134.1(b) explains that

"[f]urther work or material added to an article in another country must effect a <u>substantial transformation</u> in order to render such other country the 'country of origin' within the meaning of this part." (emphasis added).

Simply stated, imported merchandise originates for marking purposes in the last country it underwent a "substantial transformation" prior to importation into the United States. Merchandise not properly marked with country of origin is considered "restricted" and may be excluded by Customs from entry into the United States. <u>See</u> 19 U.S.C. § 1304(j); <u>see also</u> 19 C.F.R. § 134.3(a). Additionally, effective July 6, 2018, the Office of the United States Trade Representative imposed an additional tariff on certain products from China that are classified in the subheadings enumerated in Section XXII, Chapter 99, Subchapter III U.S. Note 20(b), Harmonized Tariff Schedule of the United States ("Section 301 tariffs"). "When determining the country of origin for purposes of applying current trade remedies under Section 301, Section 232, and Section 201, the substantial transformation analysis is applicable." Def.'s XMSJ at 24 (quoting HQ H301619 (Nov. 6, 2018)). The merchandise at issue here would be covered by those Section 301 tariffs if they originate in China as opposed to the Philippines.

Cyber Power argues that the consumer disclosure provisions of the marking statute, 19 U.S.C. §1304(a), are to advise a retail purchaser where a UPS or SVP were made. "The consumer is interested in knowing the country where the workmanship was put into the product to create it, where the electrical testing and quality control processes were performed, where UL certification experts examined it and held it to be in compliance with its consumer safety standard." Pl.'s MSJ at 17.

The Government argues that the main purpose of the country-of-origin marking statute is to inform the consumer where the majority of an article's parts are manufactured. See Def.'s XMSJ at 23–25 ("The consumer of a good would likely be surprised that a product marked as a product of country X is comprised almost entirely of parts manufactured in country Y."). The Government also contends that the Section 301 tariffs "would be thwarted if almost all the parts of an article could be manufactured in China, then sent to a non-Section 301 country for assembly and processing into the article to be exported, and then have the country of origin of such article be the country of assembly." Id.

Cyber Power argues, however, that disclosure of the origin of an article's parts is not required by 19 U.S.C. § 1304(a), and that where Congress wishes to direct a merchant to identify the country of origin of components or materials used in production of an article, it knows how to craft legislation for that purpose. See Pl.'s MSJ at 9–10 (citing The American Automotive Labeling Act, 49 U.S.C. § 32304; 49 C.F.R. Part 583; and Section 13(p) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., as amended by Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act).

Furthermore, the purpose of the imposition of the Section 301 tariffs was to promote a change in the "government of China's acts, policies and practices related to technology transfer, intellectual property and innovation." See Pl.'s Reply at 20 (citing Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related

to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 28,711 (U.S.T.R. June 20, 2018)). Additionally, the Section 301 tariffs were intended to encourage a partial de-coupling of China's economy from that of the United States, by discouraging investment in, and trade with, China. See id.

Here, Plaintiff, a Taiwanese company, appears to have in fact de-coupled from China, moving some of its production from China to the facility established in the Philippines in 2018, when the Section 301 tariffs were first imposed. Id. Plaintiff emphasizes that it "moved significant capital equipment from China to the Philippines, expanding and integrating its production with the establishment of the Phisonic facility to manufacture PCBAs, and using Philippine labor instead of Chinese labor (all the foregoing at significantly higher cost)." Id. Plaintiff persuasively argues that "[d]isregarding this investment, the extensive manufacturing operations being conducted in the Philippines and the creation of new articles of commerce in the Philippines, and focusing solely on the source of parts, rather than the place where the finished article is produced, sets the Section 301 policy on its ear, and would produce enormous trade distortions." Id.

In consideration of the above, the court does not agree with Defendant that the purpose of the marking statute is to inform the consumer about the country-of-origin as to the component parts of the merchandise. See U.S. Customs & Border Protection, Marking of Country of Origin on U.S. Imports, Informed Compliance Publication, Pub. No. 1150-0620 (non-binding guidance stating, "**What is the purpose of marking?** To inform the ultimate purchaser in the United States of the country in which the imported

article was made."). The court also does not agree with Defendant that the purpose of the Section 301 tariffs imposed on imports from China would be frustrated by concluding that goods with components made in China that are assembled, connected, tested, and finished in the Philippines are made in the Philippines for country-of-origin marking purposes. To the contrary, Cyber Power's deliberate de-coupling from China, and its development of Philippine facilities used to make the subject merchandise, appears to be precisely in line with the intended consequences of the Section 301 tariffs. Given this background and understanding of the underlying statutory provisions, the court turns to the parties' arguments as to whether the Chinese-origin components are "substantially transformed" by Plaintiff's Philippine operations such that the country-of-origin of the subject merchandise should be for purposes of applying the marking statute and assessing the applicability of Section 301 duties.

### 2. Substantial Transformation

There is no dispute that a "simple assembly" does not substantially transform merchandise. See, e.g., Ran–Paige Co., Inc. v. United States, 35 Fed. Cl. 117, 121–122 (1996) (attaching handles to pans); Uniroyal, Inc. v. United States, 3 CIT at 226, 542 F. Supp. at 1031 (imported shoe upper attached to outsole); SDI Techs., Inc. v. United States, 21 CIT 895, 900, 977 F. Supp. 1235, 1241 (1997), aff'd, 155 F.3d 568 (Fed. Cir. 1998) (incorporation of stereo chassis into stereo rack system). There is dispute, however, as to what constitutes a "simple assembly." Compare Def.'s XMSJ at 24 (arguing that "where all the materials needed to produce a particular article are manufactured in one country, simply exporting them to another country to produce

the article will not result in that article being a product of the second country where less than substantial or significant work or additional materials are added in that second country"), with Pl.'s Reply at 18–21 (highlighting that Government's position is contradicted by its regulations, including 19 C.F.R. § 102.1(p), which defines "simple assembly" in another context to involve "five or fewer" component parts).

The court does not agree with the Government's suggestion that the Philippine operations regarding the subject merchandise constitute "simple assembly" since such a definition of "simple assembly" appears to be overbroad and conflicts with CBP regulations in other circumstances. However, Defendant highlights that its position is supported by a couple of prior decisions by this Court. See Def.'s XMSJ at 22 (citing Nat'l Hand Tool Corp. v. United States, 16 CIT 308 (1992), aff'd per curiam, 989 F.2d 1201 (Fed. Cir. 1993) and Energizer Battery Inc. v. United States, 40 CIT ___, 190 F. Supp. 3d 1308 (2016)). The subject merchandise consists of various models of UPS and one SVP, which are each comprised of at least a dozen components (and in many cases, several dozens). See Pl.'s 56.3 Stmt. at ¶¶ 23-89. Beyond mere assembly of these components, Plaintiff also maintains that it programs the subject UPS devices with firmware and performs final function testing on all of the subject merchandise as part of its Philippine operations. Id. Taking the totality of the above into consideration, the court cannot conclude at this stage that Plaintiff's Philippine operations regarding the subject merchandise constitute a "simple assembly" rather than "substantial transformation."

Defendant suggests that the court's substantial transformation analysis should focus on the PCBAs of the subject merchandise, maintaining that "[t]he critical component

of the subject merchandise is its main board PCBA because it provides the device with its principal function or the essence of the finish article." See Def.'s XMSJ at 10; see also id. at 20–21 (arguing that "[s]ome courts will consider "the 'essence' of a completed article to determine whether an imported article has undergone a change in character as a result of post-importation processing." (quoting Energizer, 190 F. Supp. 3d at 1318)). Plaintiff disagrees, contending that there is no legal basis for Defendant's suggested "essence" test, and that such a test appears to have been rejected in a prior decision. See Pl.'s Reply at 12–14 (quoting Ferrostaal Metals Corp., 11 CIT at 474, 664 F. Supp. at 538 ("The Court finds that there is no basis in caselaw for the essence test as offered by defendant. Defendant cites no case where the name, character and use criteria were satisfied, yet no substantial transformation was found to have occurred.")).

Plaintiff also emphasizes that even in the hypothetical application of a "critical component" or "essence" test, the Government's position has no merit as the PCBA cannot provide the "principal function" of a UPS device, namely the provision of an emergency source of power. See id. at 13 ("The 'principal function' of a UPS device is to supply battery electrical power to a connected device in the event a power source fails. This is a function the main PCBA cannot perform. For one thing, it lacks a battery, which is the source of emergency power. For another thing, it is incapable of connecting either to (1) a power source; or (2) a device to be protected."). The court agrees with Plaintiff that Defendant's proposed focus on the PCBA and the application of an "essence" or "critical component" test here is without merit. The Government's suggestion to focus solely on the PCBA components of the subject merchandise may well

undermine the objective of the "substantial transformation" test, namely to focus on a change in name, character, or use. Accordingly, the court will consider the totality of the evidence, without a focus on any particular "critical component," in evaluating whether Plaintiff has substantially transformed the subject merchandise.

Defendant also argues that "[w]hen constituent parts are assembled without a change in the shape or material composition of those components, and the components do not lose their individual names, then the completed article does not undergo a substantial transformation when those components are combined for their pre-determined end use." Def.'s XMSJ at 22. Defendant further maintains that, in considering the "use" factor, to determine whether substantial transformation has occurred, "courts find a change in use where the end-use of an imported article is not interchangeable with the end-use of the article after post-importation processing." Def.'s Reply at 15 (citing Energizer & Nat'l Hand Tool). The court disagrees as the very authority on which Defendant relies undercuts its argument. See Nat'l Hand Tool, 16 CIT at 312 ("The fact that there was only one predetermined use of imported article does not preclude the finding of substantial transformation." (emphasis added) (citing Torrington Co. v. United States, 764 F.2d 1563 (Fed. Cir. 1985))). While the intended use of components may provide some insight as to whether the assembly of those components into the finished merchandise accomplishes a change in use that indicates a "substantial transformation," such a consideration is but one of many for the court to consider as part of the "totality of the evidence." See id. (citing Ferrostaal Metals Corp., 11 CIT at 478, 664 F. Supp. at 541; National Juice Prods. Ass'n, 10 CIT at 61, 628 F. Supp. at 991).

Here, the court is not convinced by Defendant's argument that the pre-determined use of the Chinese PCBAs for inclusion in Plaintiff's UPS and SVP products precludes a finding that subject merchandise underwent a substantial transformation as a result of Plaintiff's Philippine operations.

As the court noted in its prior decision denying Plaintiff's motion for a preliminary injunction, there is conflicting precedent by this Court and the Federal Circuit as to whether a component-by-component analysis is appropriate for determining whether substantial transformation has occurred. See Slip Op. & Order at 10–12, ECF No. 30 (citing Acetris Health, 949 F.3d at 731 and Uniden Am. Corp. v. United States, 24 CIT 1191, 1195–98, 120 F. Supp. 2d 1091, 1095–1099 (2000)). As explained above, the court does not agree that a component-by-component analysis assists in the determination of whether the subject merchandise at issue here underwent a substantial transformation in the Philippines for purposes of determining the country of origin under 19 U.S.C. § 1304(a). If, as Defendant argues, components assembled for a pre-determined use may never constitute substantial transformation, then, for all practical purposes, there can never be a substantial transformation because there will always be a pre-determined use. There would be no Belcrest Linens v. United States, 741 F.2d 1368, 1372 (Fed. Cir. 1984) (substantial transformation resulted from cutting bolt of cloth, scalloping, and sewing into pre-determined use of pillowcases); or Ferrostaal Metals Corp., 11 CIT at 471, 664 F. Supp. at 536 (substantial transformation as result of continuous hot-dip galvanizing process into pre-determined use for resulting product). It is one thing to say that the attachment of a handle to a pan, or a sole to a shoe, is too

mundane for a substantial transformation; it is another to suggest that all parts (however many) assembled into a "pre-determined" product may never result in a substantial transformation. That is not, and cannot be, the law.[1]

Here, Plaintiff explains the production process at its Philippine facility for each of the subject merchandise, detailing their component parts, assembly, and finishing processes. See Pl.'s 56.3 Stmt. ¶¶ 23–92. Defendant, for its part, fails to demonstrate that Plaintiff's Philippine operations constitute a "simple assembly" that cannot qualify as a substantial transformation. Defendant's witness, Karl Moosbrugger, offers little more than his opinions on the ultimate issue. See ECF No. 61-6. While Plaintiff presents compelling and detailed evidentiary support for its motion, given the parties' dispute as to certain factual issues, the court is unable to conclude at this stage that the subject merchandise undergoes a substantial transformation in the Philippines.

The fact-intensive nature of the substantial transformation analysis in this matter is clear from any attempt to evaluate whether Plaintiff's Philippine operations result in a change in the name, character, or use of the subject merchandise. See Gibson-Thomsen Co., Inc., 27 C.C.P.A. 267. With respect to the "name" criterion, there does not

---

[1] Even if the court accepted Defendant's argument that assembly of components with a pre-determined use should not qualify as substantial transformation under the rationale of Energizer, the court notes that Energizer acknowledged that exceptions may exist and that substantial transformation may be found where the operations at issue were "sufficiently complex." See Energizer, 40 CIT at ___, 190 F. Supp. 3d at 1318. While Energizer did not offer guidance as to what the phrase "sufficiently complex" may mean, it would seem that making such a determination in this matter would require analyzing contested issues of material fact. Accordingly, even if this Court adopted the component-by-component analysis applied in Energizer, it does not appear that the Government would be entitled to prevail on summary judgment.

appear to be any dispute that all of the subject merchandise at issue undergoes a change in "name" as none of the components share a name with the finished subject merchandise. See Pl.'s Reply at 11 (citing Def.'s XMSJ at 26). There is also no dispute that under the "name, character, and use" analysis, a change in name is generally considered to be the least compelling factor in support of a finding of substantial transformation. See Def.'s XMSJ at 20 (citing Sassy, Inc. v. United States, 24 CIT 700, 704 (2000), and Ferrostaal Metals Corp., 11 CIT at 478, 664 F. Supp. at 541 ("The name criterion is generally considered the least compelling of the factors which will support a finding of substantial transformation.")). While the satisfaction of the name criterion in this matter lends some support to Plaintiff's claim, this change in name alone does not appear sufficient to constitute a "substantial transformation" of the subject merchandise. The court must therefore consider whether changes in the "character" and/or "use" of the merchandise as part of Plaintiff's Philippine operations have effected a "substantial transformation" of the subject merchandise. See Precision Specialty Metals, Inc. v. United States, 24 CIT 1016, 1029–30, 116 F. Supp. 2d 1350, 1364 (2000) (noting that courts generally focus on character and use criteria in assessing whether substantial transformation has occurred).

      Without objective standards, such as cost, or a working definition of "simple assembly," the court is left to arbitrarily apply its own subjective standards. Without workable, objective standards, one court's "mere assembly", see, e.g., Nat'l Hand Tool, 16 CIT at 311–312; Energizer, 40 CIT at ___, 190 F. Supp. 3d at 1324–25, can just as easily be another court's complex process. Moreover, there are factual disputes as to

Court No. 20-00124								Page 17

the extent of Plaintiff's Philippine operations that are critical for determining whether the subject merchandise undergoes a change in "character" and "use." Compare Pl.'s MSJ at 14–16 (arguing that Philippine firmware instillation changes the character of the subject USP devices), with Def.'s XMSJ at 29–30 (arguing that "documents produced in this litigation undermine plaintiff's claim that firmware is installed on the PCBAs in the Philippines"); see also infra at 18 (highlighting genuine issue of material fact as to country of manufacture of the PCBA for subject Model No. CP600LCDa devices). For purposes of resolving the present matter, the court concludes that a determination as to the resulting "character" and "use" of the subject merchandise after production at Plaintiff's Philippine facility requires analysis and adjudication of contested issues of material fact. Accordingly, the court cannot conclude at this stage that Plaintiff's Philippine operations do not effect a "substantial transformation" for purposes of determining country of origin, and consequently denies Defendant's cross-motion for summary judgment.

The court now turns to the question of whether Plaintiff may prevail on its own motion for summary judgment. Plaintiff has submitted detailed documentary and testimonial evidence as to the nature and extent of its Philippine operations and the production of subject merchandise. See Pl.'s 56.3 Stmt.; see also Affidavits in Support of Pl.'s Mot., ECF No. 48-4; Supplemental Exhibits for Pl.'s R. 56.3 Stmt., ECF No. 49. Defendant challenges not only the merits of Plaintiff's position, but also a variety of evidentiary and admissibility issues. See Def.'s XMSJ at 14–15 (arguing that "Plaintiff's Evidence Has Not Been Authenticated And/Or Is Inadmissible"); Def.'s Resp. to

Court No. 20-00124                                                                                                    Page 18

Pl.'s R. 56.3 Stmt., ECF No. 60-2.  Plaintiff, for its part, maintains that Defendant's "evidentiary and technical objections lack merit," and argues that the submission of additional affirmations by Plaintiff's witnesses resolve Defendant's evidentiary objections such that the court can adjudicate this matter in Plaintiff's favor on summary judgment.  See Pl.'s Reply at 2–6.

Taking all reasonable factual inferences in favor of the non-movant, the court concludes that there remain genuine issues of material fact that preclude the entry of summary judgment for Plaintiff.  If the underlying facts as to the nature and extent of Plaintiff's operations on the subject merchandise in the Philippines were not in dispute, the court would be inclined to grant summary judgment for Plaintiff; however, that is not the situation here as the parties dispute several critical facts.  One example of a triable issue of fact here is the parties' dispute as to the country of manufacture for the printed circuit board used in the UPS Model No. CP600LCDa.  As described above, the PCBA is a critical component in the subject merchandise, and the factual details as to where this component is manufactured, as well as where and how it is assembled and installed into the subject merchandise, may assist the court in its substantial transformation determination.  While Plaintiff contends that the printed circuit board for the UPS Model No. CP600LCDa is manufactured in the Philippines, Defendant maintains that Plaintiff cannot prove this factual claim.  Compare Pl.'s MSJ at 3, with Def.'s Reply at 14.

More generally, the factual details as to the extent and nature of Cyber Power's operations regarding the subject merchandise in the Philippines also remain in dispute. See Pl.'s Reply at 21–23 (responding to "speculative declaration" from CBP witness that

Court No. 20-00124 Page 19

called into question extent of Cyber Power's Philippine operations). While Plaintiff argues that its representations as to the nature and extent of its operations in the Philippines are supported by documentary evidence and statements by witnesses with personal knowledge, the court cannot conclude that the subject merchandise was "substantially transformed" in the Philippines without finding facts or assessing the credibility of witnesses. Given that determinations of issues of fact and credibility are inappropriate at summary judgment, Plaintiff's motion for summary judgment is denied.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment are denied; and it is further

**ORDERED** that the parties shall submit a proposed scheduling order on or before March 7, 2022 at 2:00 PM that includes (1) a date for submission of the order governing preparation for trial, (2) a date for the submission of the pretrial order, (3) a date for the pretrial conference, and (4) a proposed trial date.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: February 24, 2022
        New York, New York