**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. LEO M. GORDON, SENIOR JUDGE**
-------------------------------------------------------------------- X

CYBER POWER SYSTEMS (USA) INC.      :
     :
        **Plaintiff,**      :
     :
        *v.*      :        **No. 20-cv-00124**
     :
THE UNITED STATES,      :
     :
        **Defendant.**      :
-------------------------------------------------------------------- X

## PLAINTIFF'S PRETRIAL MEMORANDUM

NEVILLE PETERSON LLP
*Counsel to Plaintiff Cyber Power Systems*
*(USA) Inc.*

John M. Peterson
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
701 Fifth Ave
Suite 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

Dated:  August 1, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF MATERIAL FACTS TO BE ESTABLISHED AT TRIAL ............................3

DESCRIPTION OF THE EVIDENCE PLAINTIFF INTENDS TO INTRODUCE AT TRIAL
SUPPORTING THE MATERIAL FACTS .............................................................................5

ARGUMENT .....................................................................................................................9

I.      Requirements of the Country of Origin Marking Statute, 19 U.S.C. § 1304. ....................9

II.     The Subject UPS and SVP Devices are Properly Marked as Products of The
        Philippines...........................................................................................................11

        A.      The UPS and SVP Devices Acquire New Names as a Result of the
                Manufacturing Operations Performed by CPSMI in the Philippines. ..................12

        B.      The Imported UPS and SVP Devices Have a Different Character Than Any of
                the Components Imported Into the Philippines. .....................................................14

        C.      The UPS and SVP Devices Acquire a New "Use" by Reason of the Operations
                Performed by CPSMI in the Philippines.................................................................16

III.    The Disjunctive Test Articulated in *Energizer Battery* is Not Appropriate in This Case.
        .............................................................................................................................19

CONCLUSION...................................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Adolphe Schwob, Inc. v. United States*, 62 Treas. Dec. 248, T.D. 45908 (1933) ........................ 14

*Anheuser-Busch Brewing Assn. v. United States*, 207 U.S. 556 (1908) .......................... 10, 11, 18

*Carlson Furniture Industries v. United States*, 65 Cust. Ct. 474 (1970) ...................................... 17

*Chen-Oyster v. Goldman, Sachs & Co.*, 114 F.Supp. 3d. 110 (S.D.N.Y. 2015) ........................... 8

*Corp. Fin Inc. v. Principal Life Ins. Co.*, 2006 U.S. Dist. LEXIS 84541 (S.D. Fla. Nov. 20, 2006) ................................................................................................................................... 7

*Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347 (Ct. Int'l Trade 2022) ........................................................................................................................... 2, 3, 19

*Cyber Power Sys. (USA) v. United States*, 471 F. Supp. 3d 1371 (Ct. Int'l Trade 2020)............. 13

*Data General Corp. v. United States*, 4 C.I.T. 182 (1982) ....................................................... 16

*Energizer Battery Inc. v. United States,* 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016) ......... 11, 15, 19

*Ferrostaal Metals Corp. v. United States*, 664 F. Supp. 535 (Ct. Int'l Tr. 1987)............. 10, 11, 14

*Friedlaender & Co., v. United States*, 27 C.C.P.A. 297 (1940) .................................................. 11

*Hartmann Trunk Co. v. United States*, 27 C.C.P.A. 254 (1940)................................................. 13

*Hess v. White Castle Sys. Inc.*, 2020 U.S. Dist. LEXIS 55720 (S.D. Ill. March 31, 2020) ........... 8

*Hi-Tech Rockfall Constr. v. County of Maui*, 2009 U.S. Dist. LEXIS 146098 (D. Haw. Mar. 12, 2009) .......................................................................................................................... 7

*Koru North America v. United States*, 12 C.I.T. 1120 (1988) ..................................................... 11

*LeBlanc v. Mr. Bult's, Inc.*, 2019 U.S. Dist. LEXIS 134937 (N.D. Ill. Aug. 12, 2019)................ 8

*Mahaska Bottling v. Pepsico Inc.* 2019 U.S. Dist. LEXIS 230681 (S.D. Iowa Apr. 9, 2019) ................................................................................................................................... 7

*Midwood Industries Inc. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970).......... 11, 13, 14, 18

*Nat'l Hand Tool Corp. v. United States,* 16 C.I.T. 308 (1992)..................................................... 14

*Nat'l Hand Tool Corp. v. United States*, 989 F.2d 1201 (Fed. Cir. 1983)................................... 14

*National Juice Products Assn. v. United States*, 10 C.I.T. 48 (1986)........................................... 11

*Peters v. Butler,* 2021 U.S. Dist. LEXIS 48914 (S.D. Ill. Mar. 16, 2021) ................................... 9

*Sassy, Inc. v. United States*, 24 C.I.T. 700 (2000) ......................................................... 13, 14, 16

*SDI Techs Inc. v. United States*, 977 F. Supp. 1235 (Ct. Int'l Tr. 1997) ............................... 14, 18

*Superior Wire Inc. v. United States*, 11 C.I.T. 608 (1987) ................................................... 10, 11

*Swan v. Arthur*, 103 U.S. 594 (1881)....................................................................................... 13

*Texas Instruments Co. v. United States*, 69 C.C.P.A. 151 (1982) ............................................... 14

*Torrington Co. v. United States*, 764 F.2d 1543 (Fed. Cir. 1985) ......................................... 10, 14

*Tropicana Products Inc. v. United States*, 16 C.I.T. 155 (1992) ................................................ 10

*Uniroyal, Inc. v. United States*, 3 C.I.T. 220 (1982)................................................................. 11

*United States v. Gibson-Thomsen Inc.,* 27 C.C.P.A. 267 (1940)...................................... 2, 10, 18

*United States v. International Paint Inc.*, 35 C.C.P.A. 87 (1948) ............................................... 13

*United States v. Murray*, 621 F.2d 1163 (1st. Cir. 1980) .......................................................... 11

*Vill. of Bondville v. Windstream Corp.*, 2015 U.S. Dist. LEXIS 194439 (C.D. Ill. Apr. 13, 2015) ................................................................................................................................... 8

**Statutes**

19 U.S.C. § 1304............................................................................................... 5, 9, 18, 19

19 U.S.C. § 1499 ..................................................................................................................... 2

19 U.S.C. § 1515 ..................................................................................................................... 6

19 U.S.C. § 1562 ................................................................................................... 10
19 U.S.C. § 1862 ................................................................................................... 11
28 U.S.C. § 2639 ............................................................................................... 6, 7
28 U.S.C. § 2640 ..................................................................................................... 7

**Regulations**
19 C.F.R. § 134.1 .................................................................................................. 12

**Other Authorities**
C.S.D. 85-25, 19 Cust. B. & Dec. 533 (1985) ......................................................... 18
*Webster's Third New International Dictionary* (1981 ed.) ....................................... 14

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. LEO M. GORDON, SENIOR JUDGE**
-------------------------------------------------------------------- X

CYBER POWER SYSTEMS (USA) INC.        :
                :

       **Plaintiff,**        :
                :

       *v.*            :        **No. 20-cv-00124**
                :

THE UNITED STATES,         :
                :

       **Defendant.**      :
-------------------------------------------------------------------- X

## PLAINTIFF'S PRETRIAL MEMORANDUM

Plaintiff submits this pretrial memorandum pursuant to this Court's Order Governing Trial Preparations (ECF 97), dated March 24, 2022. Trial in this case is scheduled to begin on August 8, 2022[1]. At issue is whether plaintiff's excluded merchandise, consisting of various models of uninterruptable power supplies ("UPS") and surge voltage protectors ("SVP"), was substantially transformed by manufacturing operations in the Philippines and properly marked "Made in the Philippines" pursuant to 19 U.S.C. 1304(a). For the reasons set forth herein, plaintiff submits that the goods are products of the Philippines, and that U.S. Customs and Border Protection ("CBP") improperly excluded them from entry and erred in demanding that they be marked "Made in China." The Court should enter judgment in plaintiff's favor and direct CBP to allow the merchandise at bar to be imported with their current "Made in Philippines" markings.

---

[1] At this time, it is anticipated that most of the direct testimony of plaintiff's witness Chi Ting (Tim) Huang will be taken by deposition on August 5, 2022, and that the transcript of his testimony will be entered in the record.

## **BACKGROUND**

Plaintiff imported the merchandise at bar under cover of Minneapolis Consumption Entry No. 791-2579496-2 (dated March 27, 2020). The merchandise consisted of 5 models of UPS's, Model Nos: CP600LCDa, CBN50U48A-1, CST135XLU, OR500LCDRM1U and SX650U. The merchandise also included a single type of SVP, Model No. HT1206UC2RC1. Customs detained the merchandise, demanding that plaintiff re-mark the goods and their packages as "Made in China." Plaintiff refused, and the goods were deemed excluded pursuant to 19 U.S.C. § 1499(c)(5)(A). Plaintiff thereupon filed Minneapolis Protest no. 3501-20-101425 to contest the exclusion of its merchandise. CBP denied that protest on June 20, 2020. Plaintiff then timely initiated this action on June 22, 2020 to challenge the denial of its protest concerning the exclusion from entry of its merchandise for improper marking.

This Court denied the parties' cross-motions for summary judgment because "the factual details as to the extent and nature of Cyber Power's operations regarding the subject merchandise in the Philippines also remain in dispute." *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1357 (Ct. Int'l Trade 2022). However, the Court enunciated the legal standard for determining country of origin which must be applied in this action, making clear that the origin of plaintiff's merchandise is to be determined by applying the "substantial transformation" test of a change in "name, character or use," as outlined by the Court of Appeals in *United States v. Gibson-Thomsen Inc.,* 27 C.C.P.A. 267 (1940). With respect to this test, this Court has noted:

> The fact-intensive nature of the substantial transformation analysis in this matter is clear from any attempt to evaluate whether Plaintiff's Philippine operations result in a change in the name, character, or use of the subject merchandise. *See Gibson-Thomsen Co., Inc.*, 27 C.C.P.A. 267. With respect to the name criterion, there does not appear to be any dispute that all of the subject merchandise at issue undergoes a change in "name" as none of the components share a name with the finished subject merchandise. See Pl.'s Reply at 11 (citing Def.'s XMSJ at 26). There is also no dispute that under the "name, character, and use" analysis, a change in name is

2

generally considered to be the least compelling factor in support of a finding of substantial transformation. *See* Def.'s XMSJ at 20 (citing *Sassy, Inc. v. United States*, 24 CIT 700, 704 (2000), and *Ferrostaal Metals Corp.*, 11 CIT at 478, 664 F. Supp. at 541 ("The name criterion is generally considered the least compelling of the factors which will support a finding of substantial transformation.")). While the satisfaction of the name criterion in this matter lends some support to Plaintiff's claim, this change in name alone does not appear sufficient to constitute a "substantial transformation" of the subject merchandise. The court must therefore consider whether changes in the "character" and/or "use" of the merchandise as part of Plaintiff's Philippine operations have effected a "substantial transformation" of the subject merchandise. *See Precision Specialty Metals, Inc. v. United States*, 24 CIT 1016, 1029–30, 116 F. Supp. 2d 1350, 1364 (2000) (noting that courts generally focus on character and use criteria in assessing whether substantial transformation has occurred).

*Cyber Power Systems (USA) Inc.,* 560 F. Supp. 3d at 1355-56.

## <u>STATEMENT OF MATERIAL FACTS TO BE ESTABLISHED AT TRIAL</u>

A statement of stipulated facts, upon which the parties agree there is no issue, has been submitted to the Court as Schedule C of the Pretrial Order. A full statement of the material facts plaintiff intends to prove at trial has been submitted to the Court as Schedule C-1 of the joint pretrial order. At trial plaintiff intends to establish the following.

Plaintiff CyberPower Systems (USA), Inc. ("Cyber Power USA" or "CPUSA") is the Shakopee, Minnesota-based subsidiary of CyberPower Systems, Inc., of Taipei, Taiwan ("Cyber Power Taiwan" or "CPSI"). CPSI manufactures electrical power solutions, including uninterruptible power supplies and surge voltage protectors.

Since October 2018, UPS and SVP devices have been manufactured at plant located in Manila, The Philippines (known as Cyber Power Systems Manufacturing, Inc. ("Cyber Power Philippines" or "CPSMI").

Uninterruptible Power Supplies ("UPS") are electrical devices that provide emergency power to a connected device when the input power source fails. A UPS differs from an auxiliary or emergency power system or standby generator in that it will provide near-instantaneous

protection from input power interruptions, by supplying energy stored in the UPS's internal batteries to connected devices, such as computers, home entertainment systems, telecommunications equipment, or medical devices. The battery run-time of most UPS devices is relatively short (only a few minutes) but sufficient to start a standby power source or properly shut down the protected equipment. UPS come in various sizes, ranging from small (200 volt-ampere) models designed to protect a single computer to large units designed to protect entire buildings or data centers.

Surge Voltage Protectors ("SVP") are electrical devices installed in power distribution systems for the purpose of protecting connected devices against electrical current surges and spikes, including those caused by lightning. Plaintiff's SVPs use voltage-dependent resistors (varistors) which display a variable impedance, depending on the current flowing through the device or the voltage across its terminals, and preventing current spikes from reaching and damaging connected devices.

Plaintiff CPSUSA imported the five (5) models of UPS, and one (1) model of SVP, devices from CPSMI's manufacturing facility in the Philippines. In the Philippines, the devices were manufactured by CPSMI through *inter alia* the assembly, connection, and testing of a large number of components. Step-by-step procedures for the manufacture of all the subject merchandise in this action are included in plaintiff's evidence.

In the case of four (4) of the UPS products, and the single SVP product at issue, the parts included printed circuit board assemblies ("PCBA") which were produced in China. After importation into the Philippines, they are programmed with firmware, which is developed in

Taiwan, using millions of lines of software code produced by Taiwanese software engineers.[2] In the case of one UPS unit—*i.e.*, UPS Model No. CP600LCDa—the printed circuit boards ("PCB") were populated with micro-components and manufactured in the Philippines to create PCBAs using Dual Inline Positioning ("DIP") and Surface Mount Technology (SMT) wave-soldering devices, at the plant of CPSMI's affiliate, Phisonic, Inc. ("Phisonic"), which is located immediately adjacent to the Cyber Power assembly plant.

The issue presented in this case is whether the manufacturing operations at CPSMI's Philippines facility resulted in the creation of new and different articles which are required to be marked "Made in Philippines" for purposes of the marking statute, 19 U.S.C. § 1304(a).

## DESCRIPTION OF THE EVIDENCE PLAINTIFF INTENDS TO INTRODUCE AT TRIAL SUPPORTING THE MATERIAL FACTS

At trial plaintiff intends to call three witnesses: (i) Brent Lovett, General Manager, Cyber Power Systems (USA) Inc.; (ii) Thomas Fuehrer, Electrical Project Manager, Cyber Power Systems (USA) Inc.; and (iii) Chi-Ting ("Tim") Huang, General Manager, CPSMI.

Mr. Lovett will testify concerning the nature of the products sold by plaintiff Cyber Power Systems (USA) Inc., their commercial identities and acceptance, and their names, characters and uses. He will discuss the functional and commercial features of these goods, their markets in the United States, and customer expectations regarding these goods.

Mr. Fuehrer will testify as to the functions performed by the merchandise at bar, the functions performed by individual components of the subject merchandise, and the methods by which these goods are manufactured, which includes the creation and downloading of firmware

---

[2] "Firmware" is generally distinguished from "software" in that firmware is computer programming code which is installed in a device or component which has no native intelligence whatsoever, while "software" is installed in a device with native intelligence (*e.g.,* a computer with an operating system software suite).

onto the devices. He will discuss the roles played by firmware in making the subject devices operational.

Mr. Huang will authenticate business records of Cyber Power Systems Manufacturing Inc., to the extent those records may need further authentication. He will also testify as to the nature and extent of manufacturing operations performed at the CPSMI factory in the Philippines with respect to the models of UPS and SVP at bar in this case

In connection with its offer of proof, plaintiff intends to introduce the bills of material ("BOM") for all of the subject merchandise which detail the specific components of the products at issue, and the BOM for the PCBA's of the products at issue. It will also introduce the CPSMI manufacturing standard operating procedures ("SOP") and manufacturing flow charts for all of the devices at issue, which provide visibility into the step-by-step manufacturing that occurred in the Philippines.

Plaintiff does not believe that defendant will be able to introduce any admissible fact evidence to counter its presentation. Defendant has proposed introducing testimony of two CBP officials: (i) National Import Specialist Karl Moosbrugger;[3] and (ii) Import Specialist Linda Horace. Plaintiff has moved the Court to bar the testimony of both witnesses because *inter alia* (1) they are not percipient witnesses with actual knowledge of CPSMI's manufacturing activities; and (2) they have not been qualified to provide expert testimony in accordance with the Rules of the U.S. Court of International Trade ("USCIT R.") or the Federal Rules of Evidence ("FRE").

Indeed, FRE 602 requires that fact witnesses testify only on the basis of personal knowledge. This is true, as well, of witnesses providing lay opinions. *Hi-Tech Rockfall Constr. v.*

---

[3] Ms. Horack is the "appropriate Customs officer" who signed the protest decision in this case pursuant to 19 U.S.C. § 1515(a). If testimony concerning the reasons for the protest denial were relevant—and it is not, given the statutory presumption of correctness in 28 U.S.C. § 2639(a)(1)—she could speak to that. Mr. Moosbrugger, however, could not.

*County of Maui,* 2009 U.S. Dist. LEXIS 146098 (D. Haw. Mar. 12, 2009); *Mahaska Bottling v. Pepsico Inc.* 2019 U.S. Dist. LEXIS 230681 (S.D. Iowa Apr. 9, 2019); *Corp. Fin Inc. v. Principal Life Ins. Co.*, 2006 U.S. Dist. LEXIS 84541 (S.D. Fla. Nov. 20, 2006).

However, defendant has indicated that it intends to offer its two witnesses to provide improper and inadmissible *expert* testimony. Specifically, the government has indicated that Ms. Horacek and Mr. Moosbrugger will testify as to their review of documents provided by Cyber Power in connection with CBP's administrative consideration of the protest, and provide opinions to the Court based on that review. According to the government, "[t]his testimony is relevant because it will tend to make it less probable that documents offered by plaintiff at trial are sufficient to establish its preferred country of origin."[4] The government made similar representations regarding the proposed testimony of Mr. Moosbrugger.[5]

---

[4] *See* ECF 125, at p. 6, where the government makes it clear that Ms. Horacek is being offered to provide opinions based on a review of documents:

> Ms. Horacek, as the import specialist who worked the entry, and who issued the protest decision as part of her job, will testify as to the types of documentation that Cyber Power needed to submit to CBP to establish country of origin. She will also provide testimony establishing why the documents submitted by Cyber Power were insufficient. This testimony is relevant because it will tend to make it less probable that documents offered by plaintiff at trial are sufficient to establish its preferred country of origin.

Not only is this impermissible expert testimony, but it seeks to usurp the fact-finding role of the Court in this action.

[5] *See* ECF 126, at p. 6, where the government states:

> While Mr. Moosbrugger is able to testify as to the types of documentation that an importer needs to submit to CBP to establish country of origin, he is also able to provide testimony, as a percipient witness, as to why CBP rejects the Philippines as the country of origin for the six models at issue. This testimony is relevant because it will tend to make it less probable that documents and testimony offered by plaintiff at trial are sufficient to establish its preferred country of origin.

It is undisputed that Mr. Moosbrugger has never observed operations at Cyber Power Philippines. As to what he is a "percipient" witness for, the defendant later states that "[t]he scope of facts to which Mr. Moosbrugger was percipient, specifically all the facts considered by CBP in coming to its country of origin decision, is both relevant and central to the trial of this case." ECF 126, at 8. On the contrary, such testimony is neither percipient, not is it relevant, in light of the statutory presumption of correctness, 28 U.S.C. § 2639(a)(1), and the requirement in 28 U.S.C. § 2640 that this case be tried *de novo* on the basis of the evidence *placed before the Court.*

It is apparent that what defendant seeks to do is have these witnesses present opinion testimony—in effect, to improperly comment on the evidence plaintiff will put forth at trial. This is the role of the expert witness. As noted in *Vill. of Bondville v. Windstream Corp.*, 2015 U.S. Dist. LEXIS 194439, at *11-12 (C.D. Ill. Apr. 13, 2015), "**Forming an opinion based on a review of documents and invoices after the fact is the province of a retained expert witness under Rule 26(a)(2)(B)**." (Emphasis added); *see also LeBlanc v. Mr. Bult's, Inc.*, 2019 U.S. Dist. LEXIS 134937, at *11 (N.D. Ill. Aug. 12, 2019).

As noted in *Chen-Oyster v. Goldman, Sachs & Co.*, 114 F.Supp. 3d 110, 124-25 (S.D.N.Y. 2015):

> A witness must either have first-hand knowledge of the matter about which he testifies, and so testify as a percipient witness, or he must utilize expertise in order to aid the finder of fact in understanding esoteric or complex evidence. *See United States v. Mejia,* 545 F.3d 179, 194-96 (2d Cir. 2008).

It is undisputed that the defendant did not identify Ms. Horacek or Mr. Moosbrugger to the plaintiff as expert witnesses. It did not provide expert reports, it did not make Mr. Moosbrugger available to plaintiff for deposition as an expert,[6] nor satisfy any of the expert witness disclosure requirements of USCIT R. 26(b).

Quite apart from the considerable prejudice to plaintiff, were this court to allow Ms. Horacek and Mr. Moosbrugger to provide opinion or commentary evidence in this trial, "after having not complied with the Federal Rules, it would lower the bar for other experts and "undermine the necessity of following the Federal Rules." *Hess v. White Castle Sys. Inc.*, 2020 U.S. Dist. LEXIS 55720 (S.D. Ill. March 31, 2020). The same is true of this Court's rules.

---

[6] Ms. Horacek testified at deposition that she returned to CBP in 2018 after a lengthy absence from the workforce, and received 7 weeks of import specialist training in South Carolina, of which 2 days were devoted to country of origin topics. It seems highly unlikely that, even if she had been offered as an expert witness, the Court would have found her qualified to offer expert opinion testimony in this action.

The appropriate action in this case is to bar Ms. Horacek and Mr. Moosbrugger from providing the proffered expert testimony. *Peters v. Butler,* 2021 U.S. Dist. LEXIS 48914, at *32-33 (S.D. Ill. Mar. 16, 2021).

## ARGUMENT

I.     **Requirements of the Country of Origin Marking Statute, 19 U.S.C. § 1304.**

Section 304(a) of the Tariff Act of 1930, 19 U.S.C. § 1304(a), requires that all goods of foreign origin imported into the United States, or their packages, be marked permanently, legibly, and in a conspicuous place, so as to indicate to the "ultimate purchaser" in the United States the English name of the country of origin. The statute provides in pertinent part:

Sec. 1304. Marking of imported articles and containers

a) Marking of articles

> Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

> 1. Determine the character of words and phrases or abbreviations thereof which shall be acceptable as indicating the country of origin and prescribe any reasonable method of marking, whether by printing, stenciling, stamping, branding, labeling, or by any other reasonable method, and a conspicuous place on the article (or container) where the marking shall appear;

> 2. Require the addition of any other words or symbols which may be appropriate to prevent deception or mistake as to the origin of the article or as to the origin of any other article with which such imported article is usually combined subsequent to importation but before delivery to an ultimate purchaser[.][7]

---

[7] 19 U.S.C. § 1304(a)(3) authorizes the Secretary of the Treasury to authorize numerous exceptions to country of origin marking requirements, which exceptions are not relevant to the instant case.

Historically, Courts have taken the position that a good originates, for marking purposes, in the last country where it underwent a "substantial transformation" prior to being imported into the United States. If an imported article undergoes a "substantial transformation" after importation into the United States, it is no longer considered a foreign product and need not be marked to show a foreign country of origin. *See Gibson-Thomsen Co.*, 27 C.C.P.A. at 270-71.

The *Gibson-Thomsen* court adopted the concept of "substantial transformation" from the U.S. Supreme Court's decision in *Anheuser-Busch Brewing Assn. v. United States*, 207 U.S. 556 (1908), which concerned the question of whether goods had been "manufactured" into new and different articles for purposes of the duty drawback statute. The *Anheuser-Busch* Court noted:

> Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft v. Wiegmann,* 121 U.S. 609. There must be transformation; a new and different article must emerge, "having a distinctive name, character or use."

207 U.S. at 562 (emphasis added).

The "substantial transformation" test of a change in "name, character or use" is well-known in customs law and has been used, with minor variations, to determine the country of origin of goods for marking purposes, *see Gibson-Thomsen Co., supra;* to define "manufacturing" for duty drawback purposes, *see Anheuser-Busch Brewing Assn. supra*; to administer preferential tariff programs, such as the Generalized System of Preferences ("GSP"), *see e.g., Torrington Co. v. United States*, 764 F.2d 1543 (Fed. Cir. 1985); to determine the origin of goods for purposes of voluntary restraint and quota programs, *see e.g., Ferrostaal Metals Corp. v. United States*, 664 F. Supp. 535 (Ct. Int'l Tr. 1987); *see also e.g., Superior Wire Inc. v. United States*, 11 C.I.T. 608 (1987); to determine the meaning of "manufacture" for purposes of the bonded warehouse statute, 19 U.S.C. § 1562, *see Tropicana Products Inc. v. United States*, 16 C.I.T. 155, 160 (1992); and to

10

determine whether goods are transformed in countries from which certain Federal government procurements are prohibited, 19 U.S.C. § 1862, *see Energizer Battery Inc. v. United States,* 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016).

Courts render "substantial transformation" determinations on a fact-specific, case-by-case basis. A change in name has generally been considered the least persuasive factor in determining whether a substantial transformation has taken place, *see National Juice Products Assn. v. United States*, 10 C.I.T. 48, 59-60 (1986); however, only a change in one of the three specified criteria— *i.e.*, name, character or use—is required to establish a "substantial transformation." *See Koru North America v. United States*, 12 C.I.T. 1120, 1126 (1988).

Some Courts have also established "cross-checks" on the *Anheuser-Busch* criteria of "name, character and use," for example by considering the cost or value added by specified processes, *see e.g*., *Ferrostaal Metals Corp., supra; Superior Wire Inc., supra; Uniroyal, Inc. v. United States*, 3 C.I.T. 220 (1982); *United States v. Murray*, 621 F.2d 1163 (1st. Cir. 1980), *cert. den*. 499 U.S. 837 (1980); or by considering whether there has been a transformation from a "producer's good" to a "consumer good." *See e.g.*, *Midwood Industries Inc. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970), *appeal dismissed*, 57 C.C.P.A. 141 (1970).

## II.   The Subject UPS and SVP Devices are Properly Marked as Products of The Philippines.

For decades it has been clear that where an article is produced in two or more foreign countries, the country of origin of the good, for purposes of the marking statute is the *last* country where it undergoes a "substantial transformation" prior to being imported into the United States. The Court of Appeals noted in *Friedlaender & Co*., *v. United States*, 27 C.C.P.A. 297, 303 (1940), that:

It is true that article 528 (c) of the Customs Regulations of 1937, as amended by T.D. 49658, states that "The country of origin means the country of manufacture or production." It also stated that "Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the country of origin' within the meaning of this article." When the entire paragraph is read it is clear that the statement contained in the first sentence was made in view of the decisions of this court and the Court of Customs and Patent Appeals relating to merchandise that had been manufactured in one country and transported to another country for further work or complete finishing, and that it had no reference to a change of jurisdiction of the place of manufacture, or production, or origin.

The rule remains true today, and is codified in 19 C.F.R. § 134.1(b) (emphasis added):

(b) Country of origin. "Country of origin" means the country of manufacture, production, or growth of any article of foreign origin entering the United States. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of this part; however, for a good of a NAFTA country, the NAFTA Marking Rules will determine the country of origin.

We now turn to consideration of whether the products at bar acquire a new "name, character or use" as a result of CPSMI's manufacture in the Philippines. Uncontradicted evidence will demonstrate that the articles acquire a new "name, character or use" by dint of the Philippine manufacturing.

A.     **The UPS and SVP Devices Acquire New Names as a Result of the Manufacturing Operations Performed by CPSMI in the Philippines.**

All of plaintiff's UPS and SVP devices acquire new names because of CPSMI's Philippine manufacturing operations. An examination of the bills of material for each of the five (5) UPS units reveal that no component used in the manufacture of any of them in the Philippines was denominated an "uninterruptible power supply." Likewise, none of the components in the bill of materials for the sole SVP at issue is denominated as a "surge voltage protector," or by any similar name. Moreover, trial testimony of Brent Lovett will establish that, both UPS and SVP units are

recognized as unique articles of commerce, having distinct names which describe their functions, and which are recognized by consumers in commerce.

While a change in name is typically viewed as the weakest indicator of a "substantial transformation," such a change does indicate that the imported articles are "different articles of commerce" in a commercial sense and in a tariff sense. *Midwood Industries Inc. v. United States*, 64 Cust. Ct. at 508-09; *see also United States v. International Paint Inc*., 35 C.C.P.A. 87, 94 (1948).

Even so, a change in name has evidentiary weight. In *Sassy, Inc. v. United States*, 24 C.I.T. 700, 704-05 (2000), the court indicated that the various components of a pacifier (*e.g*., plug, nipple shield) had different names from the finished article (*i.e*., the pacifier). Tariff Acts are presumed to be written in the language of commerce—*see Swan v. Arthur*, 103 U.S. 594, 598 (1881); *Hartmann Trunk Co. v. United States*, 27 C.C.P.A. 254, 257 (1940)—which is presumed to comport with the common meaning of terms.

The test's review of change in name also injects an element of common sense into origin determinations. A retail purchaser heading to, for instance, The Home Depot, anticipating the purchase of a UPS or SVP device would expect to find the finished, functional retail article which is obtained through the manufacturing operations CPSMI performs in the Philippines. Such customer would be rather surprised to instead encounter a retail box containing an unassembled collection of parts described in a bills of materials generated before the CPSMI assembly operations commence. As the Court has previously noted in this action "on a practical level a finished flashlight does have a different name, character, and use than a pile of 50 unassembled constituent components." *Cyber Power Sys. (USA) v. United States*, 471 F. Supp. 3d 1371, 1377 (Ct. Int'l Trade 2020). The same is true of UPS and SVP devices.

**B.      The Imported UPS and SVP Devices Have a Different Character Than Any of the Components Imported Into the Philippines.**

Next, trial evidence will demonstrate that the UPS and SVP devices CPSMI manufactures in the Philippines clearly have a "character" distinct from their various component materials and parts used to assemble them. "Character" has been defined as "one of the essentials of structure, form materials or function that usually make up and usually distinguish the individual." *Sassy, Inc.*, 24 C.I.T. at 704 (citing *Nat'l Hand Tool Corp. v. United States,* 16 C.I.T. 308, 311 (1992), aff'd, 989 F.2d 1201 (Fed. Cir. 1983)); *see also Webster's Third New International Dictionary,* "character" (1981 ed.)). Even where component parts are visually identifiable in the finished article, the finished article will likely have a character and function different from the individual component parts. *Sassy, Inc.*, 24 C.I.T. at 704-05.

In evaluating "character" in substantial transformation determinations, courts often distinguish between substantial transformations based on assembly of components and those involving treatment of a single material. *See Texas Instruments Co. v. United States*, 69 C.C.P.A. 151, PIN (1982); *see also Adolphe Schwob, Inc. v. United States*, 62 Treas. Dec. 248, T.D. 45908 (1933), aff'd, 21 C.C.P.A. 116 (1933). Changes in "character" are also denominated by changes in "use," and the two criteria are closely related. *See Ferrostaal Metals Corp.*, 11 C.I.T. at 476.

Changes in "character" can also be evaluated by examining whether something evolves from a simple undifferentiated material to something with a defined use or range of uses, *Torrington Co.*, 764 F.2d at 1563, and whether it has been transformed from a "producer's good" to a "consumer good." *See SDI Techs Inc. v. United States*, 977 F. Supp. 1235, 1240 (Ct. Int'l Tr. 1997); *see also Midwood Industries Inc.*, 64 Cust. Ct. at 507.

There is no doubt that, in the case of plaintiff's UPS and SVP devices, CPSMI's operations in the Philippines create new and different articles of commerce having a character distinct from

those of their components. Unlike the situation described in *Energizer Battery Inc. v. United States*, 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016), the various components assembled in the Philippines are not identifiable as intended for a particular finished article. Rather, they are general use electronic and electrical components—*e.g.,* relays, diodes, resistors, zeners, varistors, transformers, heat sinks, batteries and other components—which might be used to make a nearly-infinite range of goods.

Indeed, most of the components assembled by CPSMI in the Philippines to make the finished UPS and SVP devices are parts of general use which could be used to make a wide range of electronic and electrical articles. These include terminal anodes and cathodes, wiring, transformers, heat sinks, USB charger boards, electrical wires and plugs, light emitting diodes ("LED"), LAN and other electronic jacks, sockets, grounding terminals, and circuit breakers. In the case of UPS devices, sealed lead acid batteries are also installed in the products in the Philippines. UPS and SVP devices require all of these various components, but they must first be assembled and connected together in precise configurations with technical exactitude in order for the UPS and SVP devices to perform their intended functions.

While CBP has placed extreme emphasis on the origin of the PCBAs—which are (with respect to four of the five UPS devices) produced in China and shipped to the Philippines for assembly with other components to make UPS devices—the fact remains that these PCBAs themselves undergo a profound change in "character" after their importation into the Philippines, before imparting a character change to the UPS devices in which they are incorporated. As shipped from China to the Philippines, these PCBAs are lifeless and incapable of functioning. After importation into the Philippines, they are programmed with "firmware," which is developed in Taiwan, using millions of lines of software code produced by Taiwanese software engineers. This

firmware is what instructs the PCBAs to perform various functions relative to the other components of the UPS devices. *Id*. Thomas Fuehrer will develop this in testimony at trial.

Programming an electronic device with code has been recognized by this Court for decades as being a significant operation in a substantial transformation context. In *Data General Corp. v. United States*, 4 C.I.T. 182 (1982), the Court held that using firmware to program a PROM (Programmable Read-Only Memory) into a ROM (read only memory) significantly changed the character of the article:

> The Court is not convinced that programming a PROM is a mere modifying or finishing step. Defendant underestimates the time, expense and expertise required to program a PROM," including the development of patters and production of a master PROM, which required "much time and expertise."

*Id*. at 185. The court also noted that once a PROM had been converted to a ROM, the ROM was no longer programmable. *Id.*

Noting that "character" is "one of the essentials of structure, form, materials or function that usually make up and usually distinguish the individual," *Sassy, Inc*., 24 C.I.T. at 704, it is readily apparent that, by reason of the operations performed in the Philippines, the UPS and SVP devices at bar clearly have acquired a new structure and form. New materials have been added and the devices have acquired functions that clearly did not inhere in any of the constituent components.

**C.      The UPS and SVP Devices Acquire a New "Use" by Reason of the Operations Performed by CPSMI in the Philippines.**

UPS and SVP devices each have an important and unique purpose. A UPS must be able to detect failures in a main power source—whose current flows through the UPS—and then engage internal batteries to provide continuing power to connected, protected devices, until the connected devices can be powered down (*e.g.,* to protect against data loss), or connected to an auxiliary or

backup power source, such as a generator. SVPs must be able to detect potentially harmful spikes in electrical currents, including those resulting from phenomena such as lightning strikes, and cut off the flow of current to protected, connected devices.

None of the components imported into the Philippines and housed within the UPS and SVP devices at bar have the ability to independently perform any of these functions. Prior to CPSMI's assembly of the UPS and SVP devices in the Philippines, there was no device which could be connected to electrical current. There were no terminals into which a protected device could have been plugged. The PCBAs within the devices had no intelligence which could allow them to handle electrical current, measure it, or actuate a battery to provide reserve power. Indeed, there was no battery in any UPS device, until the batteries (some of them of Vietnamese origin) were added in the Philippines. The devices had no instructions for engaging the battery until programmed with firmware in the Philippines.

The SVP devices at issue had no way to connect to a power source, nor any terminal into which a protected device could be plugged until these features were added in the Philippines by assembly work performed there by CPSMI workers. They could not interrupt circuits to stop voltage spikes until the metal oxide varistors and related components were assembled to the rest of the device—this again occurring in the Philippines. It is beyond peradventure of doubt that the operations performed at CPSMI's Philippines plant in all cases resulted in the creation of new articles of commerce having a character and use distinct from any and all of their components. *See e.g.*, *Carlson Furniture Industries v. United States*, 65 Cust. Ct. 474 (1970) (chair parts imported into the United States where they were surface finished, assembled and fitted together, connected with steel pins at all the key joints, with legs cut to length, leveled and supplied with glides and

casters were new articles of commerce, with a distinct name, character and use). The UPS and SVP units produced in the Philippines are recognizable as new consumer articles of commerce.

This is not a close case. The operations performed by CPSMI in the Philippines to create the UPS and SVP devices at issue result in the creation of a new and different article of commerce having a name, character and use different than its components. The "name, character or use" test set out in *Gibson-Thomsen Co., supra, Anheuser-Busch Brewing Assn., supra*, and other cases defining "substantial transformation" have been amply met.

To the extent the Court may wish to perform the "cross-checks" sometimes used in evaluating changes in name, character and use, these are amply satisfied. There is transformation from "producer's goods" to "consumers' goods. *See SDI Techs Inc.*, 977 F. Supp. at 1240; *Midwood Industries Inc.*, 64 Cust. Ct. at 507. The assembly operations performed in the Philippines are "complex and meaningful." *See* C.S.D. 85-25, 19 Cust. B. & Dec. 533 (1985). The assembly operations involve hundreds of manufacturing workers, performing complex processes that need to be performed with skill and precision, and for which the workers receive extensive training. The operations performed in the Philippines impart significant added value to the product.

Returning to the consumer disclosure provisions of the marking statute, 19 U.S.C. § 1304(a), it is clear that the intent of the law is to advise a retail "ultimate purchaser" walking into The Home Depot or Best Buy to purchase a UPS or SVP device regarding the country of origin where that finished UPS or SVP was made. The consumer is interested in knowing the country where the workmanship was put into the product to create it, where the electrical testing and quality control processes were performed, where UL certification experts examined it and held it to be in compliance with its consumer safety standard. In all these respects, the UPS and SVP devices were made in the Philippines and should be marked as such under 19 U.S.C. § 1304(a).

**III.    The Disjunctive Test Articulated in *Energizer Battery* is Not Appropriate in This Case.**

As noted in this Court's prior opinion denying the parties cross motions for summary judgement, "to suggest that all parts (however many) assembled into a 'pre-determined' product may never result in a substantial transformation … is not, and cannot be, the law." *Cyber Power Systems (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1355 (Ct. Int'l Tr. 2022). As such, any argument that defendant makes concerning this test and the application of *Energizer Battery, Inc. v. United States*, 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016), should be disregarded.

## CONCLUSION

For the reasons set forth herein, plaintiff requests that this Court issue an order:

(i)    finding that the country of origin, for marking purposes, 19 U.S.C. § 1304(a), of the subject uninterruptible power supplies and surge voltage protectors produced by CPSMI and imported into the United States by plaintiff is the Philippines;

(ii)    determining that the subject merchandise was marked correctly as products of the Philippines at the time of entry; and

(iii)    determining that defendant erred in excluding the subject merchandise from entry, erred in demanding that the subject merchandise be marked "Made in China," and erred in denying Plaintiff's protest against the exclusion.

As detailed herein, the "substantial transformation" test for determining country of origin of merchandise is a commercially-based test which should be cognizable to businesspersons. It is not, and should not, be based, on quixotic notions of "essence" or vague qualitative concepts of "sufficient" processing, which are subjective and changeable at will. A product's country of origin is effectively its "passport" in international trade. The determination of origin dictates which countries a good may (or may not) be shipped to, the tariffs it will incur, and the restrictions which

might be imposed on it in particular destinations. For over a century, it has been construed and

applied as a commercially based test. This Court should apply these commercial concepts in the

instant case, and reaffirm the application of commercial common sense to an extremely important

area of customs law and jurisprudence.

 

Respectfully submitted,

/s/ John M. Peterson
John M. Peterson
Patrick B. Klein
NEVILLE PETERSON LLP
*Counsel for Plaintiff*
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

/s/ Richard F. O'Neill
Richard F. O'Neill
701 Fifth Ave
Suite 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

Dated:  August 1, 2022

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. LEO M. GORDON, SENIOR JUDGE**
-------------------------------------------------------------------- X
**CYBER POWER SYSTEMS (USA) INC.**                   :
                                                     :
         **Plaintiff,**                              :
                                                     :
         *v.*                                        :         **No. 20-cv-00124**
                                                     :
**THE UNITED STATES,**                               :
                                                     :
         **Defendant.**                              :
-------------------------------------------------------------------- X

## CERTIFICATE OF COMPLIANCE

     Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Richard F. O'Neill, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 6,416 words.

                                Respectfully submitted,

                                /s/ Richard F. O'Neill
                                  Richard F. O'Neill