**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. LEO M. GORDON, SENIOR JUDGE**
-------------------------------------------------------------------- X

| | | |
|---|---|---|
| CYBER POWER SYSTEMS (USA) INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| *v.* | : | No. 20-cv-00124 |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------------- X

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PLAINTIFF,
CYBER POWER SYSTEMS (USA) INC.**

NEVILLE PETERSON LLP
*Counsel to Plaintiff Cyber Power Systems (USA) Inc.*

John M. Peterson
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
701 Fifth Ave
Suite 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

Dated:  September 29, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PLAINTIFF, CYBER POWER SYSTEMS (USA) INC...................................................................1

PROPOSED FINDINGS OF FACT ...........................................................................1

I.   CUSTOMS ENTRY AND MERCHANDISE AT ISSUE. ...................................1

     A.   CUSTOMS ENTRY. .................................................................................1

     B.   MERCHANDISE AT ISSUE. .....................................................................4

          1.   UPS Model No. OR500LCDRM1U. ...............................................4

          2.   UPS Model No. SX650U. .................................................................4

          3.   UPS Model No. CBN50U48A-1 .......................................................5

          4.   UPS Model No. CP600LCDa. ..........................................................5

          5.   UPS Model No. CST135XLU. ..........................................................6

          6.   SVP Model No. HT1206UC2RC1 ....................................................6

II.  ESTABLISHMENT OF CYBER POWER PHILIPPINES PLANT....................6

     A.   UPS MANUFACTURING OPERATIONS. .................................................7

          1.   UPS Model No. CP600LCDa..........................................................7

          2.   UPS Model CBN50U48A-1. ............................................................9

          3.   UPS Model No. CST135XLU. ........................................................11

          4.   UPS Model No. OR500LCDRM1U. ...............................................12

          5.   UPS Model No. SX650U. ...............................................................14

     B.   DESIGN AND INSTALLATION OF FIRMWARE ON ALL SUBJECT UPS MODELS. ...............................................................................................16

     C.   SVP DEVICE AT ISSUE.........................................................................17

          1.   SVP Model No. HT1206UC2RC1....................................................17

     D.   ADDITIONAL CPSMI OPERATIONS PERFORMED IN THE PHILIPPINES. ...................................................................................................19

     E.   U.S. DEPARTMENT OF HOMELAND SECURITY VISIT TO PHILIPPINES FACILITIES OF CPSMI AND PHISONIC. .......................................................20

PROPOSED CONCLUSIONS OF LAW ....................................................................22

## TABLE OF AUTHORITIES

**Cases**

*A.N. Deringer Inc. v. United States*, 51 Cust. Ct. 21 (1963) .......................................................... 27

*Acetris Health LLC v. United States*, 949 F.3d 719 (Fed. Cir. 2020). ............................. 24, 36, 37

*Adolphe Schwob, Inc. v. United States*, 21 C.C.P.A. 116 (1933). ................................... 29, 39

*Anheuser-Busch Brewing Assn. v. United States*, 207 U.S. 556 (1908) ........................ 23, 24, 37

*Azteca Milling Inc. v. United States*, 12 C.I.T. 1153 (1988) ........................................................ 38

*Carlson Furniture Industries v. United States*, 65 Cust. Ct. 474 (1970) ............................... 33, 39

*Contessa Food Prods. v. Lockspur Fish Processing Inc.*, 2001 U.S. Dist. LEXIS 25999
(C.D. Cal. 2001) ....................................................................................................................... 27

*Cyber Power Systems (USA) Inc. v. United States*, 471 F. Supp. 3d 1371 (2020) ..................... 35

*Cyber Power Systems (USA) Inc. v. United States*, 560 F. Supp 3d. 1347 (Ct. Int'l Tr.
2022) ............................................................................................................ 24, 26, 27, 34

*Data General Corp v. United States*, 4 C.I.T. 182 (1982) ......................................................... 31

*Energizer Battery Inc. v. United States*, 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016) ... 24, 29, 35, 36

*Ferrostaal Metals Corp. v. United States*, 664 F. Supp 535 (Ct. Int'l Tr. 1987) ........ 23, 24, 29, 34

*Hartmann Trunk Co. v. United States*, 27 C.C.P.A. 254 (1940) ................................................ 28

*Koru North America v. United States*, 12 C.I.T. 1120 (1988) .................................................... 24

*M.B.I. Indus. v. United States*, 16 C.I.T. 45 (1992). ................................................................. 27

*Midwood Indus. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970) .................................. passim

*Nat'l Hand Tool Corp. v. United States*, 16 C.I.T. 308 (1992) .................................................. 28

*National Juice Products Assn. v. United States*, 10 C.I.T. 48 (1986) .................................... 24, 27

*Sassy, Inc. v. United States*, 24 C.I.T. 700 (2000) ......................................................... 28, 31, 39

*SDI Techs Inc. v. United States*, 977 F. Supp. 1235 (Ct. Int'l Tr. 1997) ............................... 29, 33

*Superior Wire Inc. v. United States*, 11 C.I.T. 608 (1987) .................................................. 23, 24

*Swan v. Arthur*, 103 U.S. 594 (1881) ....................................................................................... 28

*Texas Instruments Co. v. United States*, 69 C.C.P.A. 151 (1982) .............................................. 29

*Torrington Co. v. United States*, 764 F.2d 1543 (Fed. Cir. 1985) .................................... 23, 29, 38

*Tropicana Products Inc. v. United States*, 16 C.I.T. 155 (1992) ................................................ 24

*Uniroyal, Inc. v. United States*, 3 C.I.T. 220 (1982) ................................................................ 24

*United States v. Friedlaender & Co.*, 27 C.C.P.A. 297 (1940): .................................................. 25

*United States v. Gibson-Thomsen Co.*, 27 C.C.P.A. 267 (1940) .......................................... passim

*United States v. International Paint Inc.*, 35 C.C.P.A. 87 (1948). .............................................. 27

*United States v. Mersky,* 361 U.S. 431 (1960) .......................................................................... 25

*United States v. Murray*, 621 F.2d 1163 (1st. Cir. 1980) .......................................................... 25

*Xerox Corporation v. United States*, 25 C.I.T. 85 (2011) .......................................................... 37

**Statutes**

15 U.S.C. 78a ........................................................................................................................... 27

19 U.S.C. § 1304 .................................................................................................................. passim

19 U.S.C. § 1562 ...................................................................................................................... 24

19 U.S.C. § 1862 ................................................................................................................... 24, 35

49 U.S.C. § 32304 .................................................................................................................... 27

**Other Authorities**

*Customs Service Decision* 85-25, 19 Cust. B. & Dec. 533 (1985). ............................................ 33

Webster's Third New International Dictionary (1981 ed.) ........................................................... 28

**Regulations**

19 C.F.R. § 134.1 ..................................................................................................... 23, 25, 27, 30

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. LEO M. GORDON, SENIOR JUDGE**

-------------------------------------------------------------------- X

CYBER POWER SYSTEMS (USA) INC.                :
                                                                           :
       **Plaintiff,**                    :
                                                                           :
      *v.*                                      :          **No. 20-cv-00124**
                                                                           :
THE UNITED STATES,                                 :
                                                                           :
      **Defendant.**                   :

-------------------------------------------------------------------- X

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PLAINTIFF, CYBER POWER SYSTEMS (USA) INC

Pursuant to this Court's order of August 11, 2022, plaintiff, Cyber Power Systems (USA) Inc., respectfully submits its proposed findings of fact and conclusions of law. As discussed herein, plaintiff submits that, at the trial of this action, held from August 5 – 11, 2022, plaintiff demonstrated by a preponderance of the evidence that the various models of uninterruptible power supplies ("UPS") and surge voltage protectors ("SVP") at bar were substantially transformed by manufacturing operations in the Philippines and properly marked "Made in the Philippines" pursuant to 19 U.S.C. § 1304(a).

## PROPOSED FINDINGS OF FACT

### I.    CUSTOMS ENTRY AND MERCHANDISE AT ISSUE.

###     A.    CUSTOMS ENTRY.

1.    Plaintiff, Cyber Power Systems (USA) Inc.'s ("Cyber Power"), Entry No. 791-2578496-2, made at the Port of Minneapolis, Minnesota, covers the articles at issue in this action. Pretrial Order ("PTO") Schedule C at ¶ 1 (ECF 142).

2.      The articles at issue in this action are model numbers CBN50U48A-1, CST135XLU, OR500LCDRM1U, SX650U, CP600LCDa, and HT1206UC2RC1. PTO Schedule C at ¶ 2 (ECF 142).

3.      Model numbers CBN50U48A-1, CST135XLU, OR500LCDRM1U, SX650U, and CP600LCDa are uninterruptible power supplies ("UPS"). PTO Schedule C at ¶ 3 (ECF 142).

4.      Model No. HT1206UC2RC1 is a surge voltage protector ("SVP").  PTO Schedule C at ¶ 4 (ECF 142).

5.      The subject merchandise was packaged into retail boxes marked "Made in Philippines." PTO Schedule C at ¶ 5 (ECF 142).

6.      U.S. Customs and Border Protection ("CBP") at the Port of Minneapolis, Minnesota, detained the merchandise for inspection pursuant to 19 U.S.C. § 1499(c)(2). PTO Schedule C at ¶ 6 (ECF 142).

7.      CBP issued to Cyber Power a CBP Form ("CF") 4647, Notice to Mark and/or Redeliver. PTO Schedule C at ¶ 7 (ECF 142).

8.      The Notice to Mark and/or Redeliver states in pertinent part:

Cyber Power is required to claim country of origin China on all Uninterruptible power supplies (UPS) and surge protectors and no exemption was given for marking purposes. All UPS and surge protectors must be entered as Chinese goods and marked made in China.

PTO Schedule C at ¶ 8 (ECF 142).

9.      Cyber Power declined to change the "Made in Philippines" marking on the goods and their packages. PTO Schedule C at ¶ 9 (ECF 142).

10.     The deemed exclusion of merchandise covered by Entry No. 791-2578496-2 occurred on April 3, 2020. PTO Schedule C at ¶ 10 (ECF 142).

11.     Cyber Power protested the exclusion of the subject merchandise on May 21, 2020, by filing Minneapolis Port Protest No. 3501-20-101425. PTO Schedule C at ¶ 11 (ECF 142).

12.     In connection with Protest No. 3501-20-101425, CBP Import specialist Horacek asked Cyber Power to: (1) provide technical specifications for UPS; (2) provide a labeled exploded view diagram of the unassembled UPS; (3) a bill of material for the UPS as it is assembled in the Philippines; 4) provide a step-by-step assembly procedure for the UPS; (5) provide a step-by-step testing procedure performed on the UPS; and (6) identify the location where the assembly of the UPS devices takes place. Cyber Power provided all the requested documents. Horacek Cross Examination 734:4-736:14.

13.     CBP denied Plaintiff's protest in full on June 19, 2020. PTO Schedule C at ¶ 12 (ECF 142).

14.     CBP Import Specialist Linda Horacek based the Denial of Cyber Power's exclusion protest on QUICS Message 45337 from Import Specialist Karl Moosbrugger drafted in January 2020 which did not deal with the merchandise at issue. PTX 69; Horacek Cross Examination 711:9-13, 717:15-718:12, 729:16-731:7.

15.     Cyber Power commenced this action on June 22, 2020, contending that all imported goods are products of the Philippines and should be marked as such. PTO Schedule C at ¶ 13 (ECF 142).

16.     Cyber Power Systems, Inc. ("CPSI"), a Taiwanese entity and parent of plaintiff, has an enterprise resource planning ("ERP") system from which it generated the information in the bill of materials. PTO Schedule C at ¶ 64 (ECF 142).

17.     Cyber Power Systems, Inc. purchases the components that comprise the subject merchandise. PTO Schedule C at ¶ 65 (ECF 142).

### B.    MERCHANDISE AT ISSUE.

#### 1.    UPS Model No. OR500LCDRM1U.

18.    UPS Model No. OR500LCDRM1U is a 500VA/300W UPS which is used as a backup battery source for various electrical appliances. PTO Schedule C at ¶ 14 (ECF 142).

19.    UPS Model No. OR500LCDRM1U provides battery backup (using simulated sine wave output) and surge protection for department servers, workgroup servers, workstations, network devices, and telecom installations without active PFC power supplies. PTO Schedule C at ¶ 15 (ECF 142).

20.    UPS Model No. OR500LCDRM1U uses Automatic Voltage Regulation to correct minor power fluctuations without switching to battery power, which extends battery life. PTO Schedule C at ¶ 16 (ECF 142).

21.    If power to a connected device is lost, UPS Model No. OR500LCDRM1U activates a lead acid battery, which provides emergency power to the connected device until power is restored, or another source of power (*e.g.*, emergency generator) can be collected. PTO Schedule C at ¶ 17 (ECF 142).

22.    The board printed circuit board assemblies ("PCBAs") incorporated into UPS Model No. OR500LCDRM1U is manufactured in China. PTO Schedule C at ¶ 18 (ECF 142).

#### 2.    UPS Model No. SX650U.

23.    UPS Model No. SX650U is a 650V/360W battery backup power supply which provides surge protection for lightning-induced surges and other power events that can damage electronic equipment. PTO Schedule C at ¶ 24 (ECF 142).

24.    UPS Model No. SX650U delivers enough battery backup to connected electronics during a utility power failure, so that the user can perform a graceful shutdown to protect against the loss

4

of data and damage to valuable electronics including computers, gaming consoles, and broadband routers. PTO Schedule C at ¶ 25 (ECF 142).

25.     The PCBAs incorporated into this device is manufactured in China. PTO Schedule C at ¶ 26 (ECF 142).

### 3.     UPS Model No. CBN50U48A-1.

26.     UPS Model No. CBN50U48A-1 is an uninterruptible power supply which provides cable telephony, wireless local loop and fiber to the premise suppliers with a local battery backup and power supply for home and office networking equipment. PTO Schedule C at ¶ 32 (ECF 142).

27.     UPS Model No. CBN50U48A-1 supplies surge protection and continuous 48Vdc during power surges and outages, keeping local power network interface units up and running.   PTO Schedule C at ¶ 33 (ECF 142).

28.     The PCBA incorporated in UPS Model No. CBN50U48A-1 is manufactured in China. PTO Schedule C at ¶ 34 (ECF 142).

### 4.     UPS Model No. CP600LCDa.

29.     UPS Model No. CP600LCDa is a 600VA/340W power supply which provides battery backup (using simulated sine wave output) and surge protection for desktop computers, workstations, networking devices, and home entertainment systems. PTO Schedule C at ¶ 40 (ECF 142).

30.     UPS Model No. CP600LCDa delivers enough battery backup power to perform a graceful shutdown to protect against the loss of data and damage to valuable electronics during longer power outages. PTO Schedule C at ¶ 41 (ECF 142).

31.     UPS Model No. CP600LCDa provides real time status and alerts of potential problems. PTO Schedule C at ¶ 42 (ECF 142).

32.     The PCBA for the UPS Model No. CP600LCDa were manufactured by Phisonic in the Philippines. Huang Deposition at 34:21-35:8.

### 5.     UPS Model No. CST135XLU.

33.     UPS Model No. CST135XLU is a 1350VA/810W battery backup designed to be used with automatic data processing equipment and other devices. PTO Schedule C at ¶ 48 (ECF 142).

34.     UPS Model No. CST135XLU is a line interactive power supply using a simulated sine wave for control of battery functions. PTO Schedule C at ¶ 49 (ECF 142).

35.     The PCBAs incorporated into this device are manufactured in China. PTO Schedule Cat ¶ 50 (ECF 142).

### 6.     SVP Model No. HT1206UC2RC1.

36.     SVP Model No. HT1206UC2RC1 is a surge protector which uses metal oxide varistor technology to provide surge protection of up to 2880 joules to connected devices. PTO Schedule C at ¶ 56 (ECF 142).

37.     SVP Model No. HT1206UC2RC1 has 12 outlets, 6 of which are standard and 6 of which are transformer spaced. PTO Schedule C at ¶ 57 (ECF 142).

38.     The PCBAs incorporated into this device are manufactured in China. PTO Schedule C at ¶ 58 (ECF 142).

## II.    ESTABLISHMENT OF CYBER POWER PHILIPPINES PLANT.

39.     CPSI created CPSMI to manufacture goods in the Philippines due to the escalating trade war between the U.S. and China, and the resulting additional Section 301 duties. Huang Cross Examination at 264:5-264:16.

40.     By October 2018, CPSMI had obtained all governmentally mandated certificates and registrations necessary to operate a production facility in the Philippines. *See* PTX 6. Huang

Deposition at 22:20-24:13. CPSMI's began producing finished products in October of 2018. Huang Direct at 26:10-26:19.

41.     On March 6, 2019, a new subsidiary, Phisonic, Inc. ("Phisonic"), was incorporated in the Philippines. Phisonic was charged with manufacturing PCBAs in the factory space immediately adjacent to CPSMI, at Unit A1, Block 1, Lot 6, Phase 2 Golden Gate Business Park, Buenavista, General Trias City, Cavite, Philippines. Phisonic thereafter obtained all required certifications and registrations necessary to commence production in the Philippines. *See* PTX 7; PTX 8; Huang Deposition at 28:6-29:4.

42.     Phisonic and CPSMI operate in the same building. While they have separate exterior entrances, workers can walk before the two companies, and materials can be shipped from Phisonic to CPSMI, without leaving the building. PTX 7, Huang Deposition at 29:10-33:15.

43.      Beginning in September 2019, Phisonic began to manufacture PCBAs in the Philippines for use in CPSMI's UPS and SVP manufacturing operations. These operations included populating printed circuit boards with microcomponents, and soldering the microcomponents in place using specialized surface mount technology ("SMT") equipment. Huang Deposition at 28:18-29:9.

44.     All of the subject merchandise in this action was produced in CPSMI's Philippines facility through processes of manufacture. Huang Deposition at 35:14-35:16, 36:17-36; 65:19-66:2.

## A.        UPS MANUFACTURING OPERATIONS.

### 1.      UPS Model No. CP600LCDa.

45.     The UPS Model No. CP600LCDa (a/k/a CP600LCD) is a 600VA/340W uninterruptible power supply which provides battery backup and whose specifications are found at PTX 9 (Product

Spec Sheet). A sample of this product has been submitted to the Court. *See* PTX 91. Huang Deposition at 34:21-35:8.

46.      The PCBA or the UPS Model No. CP600LCDa were manufactured by Phisonic in the Philippines. A sample of this product's PCBA assembly has been submitted to the Court. *See* PTX 92. Huang Deposition at 40:2-41:15.

47.      A timeline of the work performed on UPS Model no. CP600LCDa is provided at PTX 13 (Production Timeline, UPS Model No. CP600LCDa). This Production timeline shows that SMT and DIP assembly operations are performed on printed circuit boards ("PCB") in the Philippines to produce PCBAs that are then assembled at CPSMI's Philippines facility with other components to create finished UPS devices. *Id.*; Huang Deposition at 40:16-46:14.

48.      The bill of materials for UPS Model No. CP600LCDa shows that discrete components are assembled together in the Philippines to create a new and different article of commerce, *viz.* an uninterruptible power supply. *See* PTX 11 (Bill of Materials for All Components in UPS Model No. CP600LCDa); Huang Deposition at 37:2-39:12; *see* PTX 12 (Bill of Materials for PCBA components in UPS Model No. CP600LCDa); Huang Deposition at 39:13-14:15. The internal components of UPS Model No. CP600LCDa, including those comprising the PCBAs, are products of *inter alia* China, Taiwan, Malaysia, Morocco, and Mexico. *Id.* As stated, all of the DIP and SMT processes to manufacture the PCBAs in UPS Model No. CP600LCDa occur in the Philippines and are performed by Phisonic. *Id.*

49.      The assembly operations for UPS Model No. CP600LCDa that are performed by CPSMI in the Philippines are detailed at PTX 14 (Assembly Operations Flowchart, UPS Model No. CP600LCDa); Huang Deposition at 46:15-48:23; PTX 15 Huang Deposition at 50:4-53:19, and PTX 16 (Standard Operating Procedure, UPS Model No. CP600LCDa); Huang Deposition

at 53:20-55:5.

50.      The assembled UPS Model No. CP600LCDa is then programmed in the Philippines with firmware which is produced in Taiwan and which enables the electronic components of the UPS to function. Huang Deposition at 80:5-81:25, Fuerher Direct 380:10-15.

51.      None of the components which are assembled in the Philippines, taken individually, can detect power outages or serve as a backup power supply system using battery power. Huang Deposition at 61:5-61:13.

### 2.      UPS Model CBN50U48A-1.

52.      UPS Model no. CBN50U48A-1 is an uninterruptible power supply which provides cable telephony, wireless local loop ("WLL") and fiber to the premise ("FTTx") suppliers with a local battery backup and power supply for home and office networking equipment. It supplies surge protection and continuous 48Vdc during power surges and outages, keeping local power network interface units up and running. PTX 18 (Spec Sheet, UPS Model No. CBN50U48A-1), Huang Deposition at 61:22-63:16. A sample of this product has been submitted to the Court. *See* PTX 91.

53.      A user manual for UPS Model No. CBN50U48A-1 depicts its operation. *See* PTX 19 (User Manual, UPS Model No. CBN50U48A-1); Huang Deposition at 64:7-64:15. Technical specifications for UPS Model No. CBN50U48A-1 are appended as PTX 20 (Technical Specs, UPS Model No. CBN50U48A-1); Huang Deposition at 64:16-65:18.

54.      A timeline of the work performed in the Philippines to create UPS Model No. CBN50U48A-1 is provided at PTX 23 (Philippines Production Timeline, UPS Model No. CBN50U48A-1); Huang Deposition at 68:21-71:6. This timeline shows that SMT and DIP assembly operations are performed on PCBA in China to produce a PCBA, and that the PCBA is then imported into the Philippines for final UPS assembly operations by CPSMI into the UPS

Model No. CBN50U48A-1. *Id.* A sample of this product's PCBA has been submitted to the Court. *See* PTX 92.

55.     A step-by-step procedure of the SMT and DIP processes taking place in China according to Cyber Power's production standard operating procedures is depicted at PTX 24 (Standard Operating Procedures for Chinese Manufacture of PCBA, UPS Model No. CBN50U48A-1); Huang Deposition at 71:11-74:9.

56.     A step-by-step procedure of the Philippines-manufacture of UPS Model No. CBN50U48A-1 is provided at PTX 25 (Standard Operating Procedure for Philippines Manufacture of UPS Model No. CBN50U48A-1). Huang Deposition at 74:10-75:13.

57.     The assembly operations for UPS Model No. CBN50U48A-1 that are performed by CPSMI in the Philippines are also detailed in a flowchart at PTX 26 (Assembly Operations Flowchart, UPS Model no. CBN50U48A-1). Huang Deposition at 74:14-76:6.

58.     Depictions of the UPS Model No. CBN50U48A-1's Schematic of PCBA, Dimension Drawing, and Exploded View Diagram are appended as PTX 27 (Schematic of PCBA, Dimension Drawing, and Exploded View Diagram, UPS Model No. CBN50U48A-1); Huang Deposition at 76:6-78:5.

59.     The assembled UPS Model No. CBN50U48A-1 is then programmed in the Philippines with firmware which is produced in Taiwan and which enables the electronic components of the UPS to function. Huang Deposition at 78:6-80:4.

60.      None of the components which are assembled in the Philippines, taken individually, can detect power outages or serve as a backup power supply system using battery power. Huang Deposition at 82:2-82:13.

### 3.    UPS Model No. CST135XLU.

61.    UPS Model No. CST135XLU is a 1350VA/810W battery backup whose specifications are found at *See* PTX 28 (Spec Sheet, UPS Model No. CST135XLU); Huang Deposition at 82:14-84:19. A sample of this product has been submitted to the Court. *See* PTX 91. A user manual for UPS Model No. CST135XLU is appended as PTX 29 (User Manual, UPS Model No. CST135XLU); Huang Deposition at 84:20-85:12.

62.    The bill of materials for UPS Model No. CST135XLU shows that discrete components are assembled together to create a new and different article of commerce, *viz.* an uninterruptible power supply. *See* PTX 30 (Bill of Materials for All Components in UPS Model No. CST135XLU); Huang Deposition at 85:12-86:25; PTX 31 (Bill of Materials for Components of PCBAs in UPS Model No. CST135XLU); Huang Direct at 87:2-95:8. The internal components of UPS Model No. CST135XLU, including those comprising the main board and control board PCBAs, are products of *inter alia* China, Taiwan, Malaysia, Morocco, Mexico, the Philippines, and Vietnam. *Id.* The DIP and SMT processes used to manufacture the main board and control board PCBAs for UPS Model No. CST135XLU occur in China and are performed by Cyber Power China. Huang Deposition at 86:9-86:25; 87:5-91:6, 92:10-94:11.

63.    A timeline of the work performed in the Philippines on UPS Model No. CST135XLU is provided at PTX 32 (Philippines Production Timeline, UPS Model No. CST135XLU); Huang Deposition at 95:9. This  timeline shows that SMT and DIP assembly operations are performed on PCBs in China to produce PCBAs, and that the PCBAs are then imported into the Philippines for final UPS assembly operations by CPSMI into the UPS Model No. CST135XLU. *Id.* A step-by-step procedure of the SMT and DIP processes taking place in China according to Cyber Power's production standard operating procedures is depicted at PTX 33

(Standard Operating Procedures for Chinese Manufacture of PCBA, UPS Model No. CST135XLU). A step-by-step procedure of the Philippines-manufacture of UPS Model No. CST135XLU is provided at PTX 34 (Standard Operating Procedure for Philippines Manufacture of UPS Model No. CST135XLU). A sample of this products PCBA assembly has been submitted to the Court. Huang Deposition at 95:9-97:20, 97:21-101:19, 101:22-104:5.

64.     The assembly operations for UPS Model No. CST135XLU that are performed by CPSMI in the Philippines are also detailed in a flowchart at PTX 35 (Assembly Operations Flowchart, UPS Model No. CST135XLU). Depictions of the UPS Model No. CST135XLU's Schematic of PCBA, Dimension Drawing, and Exploded View Diagram are appended as PTX 36 (Schematic of PCBA, Dimension Drawing, and Exploded View Diagram, UPS Model No. CST135XLU). Huang Deposition ay 104:6-105:3, 105:4-107:4.

65.     The assembled UPS Model No. CST135XLU is then programmed in the Philippines with firmware which is produced in Taiwan and which enables the electronic components of the UPS to function. Huang Deposition at 107:7-13, 107:25-108:14.

66.     None of the components which are assembled in the Philippines, taken individually, can detect power outages or serve as a backup power supply system using battery power. Lovett Direct at 510:6-510:10.

### 4.     UPS Model No. OR500LCDRM1U.

67.     UPS Model No. OR500LCDRM1U is a 500VA/300W UPS which is used as a backup battery source for various electrical appliances. The product provides battery backup (using simulated sine wave output) and surge protection for department servers, workgroup servers, workstations, network devices, and telecom installations without active PFC power supplies. *See* PTX 37 (Spec Sheet, UPS Model No. OR500LCDRM1U); Huang Deposition at 108:25-110:17.

This product uses Automatic Voltage Regulation ("AVR") to correct minor power fluctuations without switching to battery power, which extends battery life. AVR is essential in areas where power fluctuations occur frequently. In the event power to a connected device is lost, the UPS activates a lead acid battery, which provides emergency power to the connected device until power is restored, or another source of power (*e.g.*, emergency generator) can be collected. A sample of this product has been submitted to the Court. *See* PTX91.

68.    The bill of materials for UPS Model No. OR500LCDRM1U shows that discrete components are assembled together to create a new and different article of commerce, *viz.* an uninterruptible power supply. *See* PTX39 (Bill of Materials for All Components in UPS Model No. OR500LCDRM1U); Huang Deposition at 111:15-113:2; PTX40 (Bill of Materials for Components of PCBAs in UPS Model No. OR500LCDRM1U); Huang Deposition at 113:4-113:22.

69.    The DIP and SMT processes used to manufacture the main board and switch board PCBAs for UPS Model No. OR500LCDRM1U occur in China and are performed by Cyber Power China; Huang Deposition at 116:13-25. A sample of this products PCBA assembly has been submitted to the Court. PTX92.

70.    A timeline of the work performed in the Philippines on UPS Model No. OR500LCDRM1U is provided at PTX41 (Philippines Production Timeline, UPS Model No. OR500LCDRM1U). This timeline shows that SMT and DIP assembly operations are performed on PCBs in China to produce PCBAs, and that the PCBAs are then imported into the Philippines for final UPS assembly operations by CPSMI into the UPS Model No. OR500LCDRM1U. Huang Depositions at 114:23-116:4.

71.    A step-by-step procedure of the SMT and DIP processes taking place in China

according to Cyber Power's production standard operating procedures is depicted at PTX 42 (Standard Operating Procedures for Chinese Manufacture of PCBA, UPS Model No. OR500LCDRM1U); Huang Deposition at 116:5-116:25.

72.     A step-by-step procedure of the Philippines-manufacture of UPS Model No. OR500LCDRM1U is provided at PTX43 (Standard Operating Procedure for Philippines Manufacture of UPS Model No. OR500LCDRM1U); Huang Deposition 117:2-123:2.

73.     The assembly operations for UPS Model No. OR500LCDRM1U that are performed by CPSMI in the Philippines are also detailed in a flowchart at PTX 44 (Assembly Operations Flowchart, UPS Model No. OR500LCDRM1U); Huang Deposition at 123:3-125:7.

74.     Depictions of the UPS Model No. OR500LCDRM1U's Schematic of PCBA, Dimension Drawing, and Exploded View Diagram are appended as PTX45 (Schematic of PCBA, Dimension Drawing, and Exploded View Diagram, UPS Model No. OR500LCDRM1U); Huang Deposition at 125:8-128:7.

75.     The assembled UPS Model No. OR500LCDRM1U is then programmed in the Philippines with firmware which is produced in Taiwan and which enables the electronic components of the UPS to function; Huang Deposition at 121:2-121:10.

76.     None of the components which are assembled in the Philippines, taken individually, can detect power outages or serve as a backup power supply system using battery power. Lovett Direct at 510:6-510:10.

### 5.     UPS Model No. SX650U.

77.     UPS Model No. SX650U is a 650V/360W battery backup power supply which provides surge protection for lightning-induced surges and other power events that can damage electronic equipment. This unit delivers enough battery backup to connected electronics during a utility

power failure, so that the user can perform a graceful shutdown to protect against the loss of data and damage to valuable electronics including computers, gaming consoles, and broadband routers. *See* PTX46 (Spec Sheet, UPS Model No. SX650U). A sample of this product has been submitted to the Court. *See* PTX91; Huang Deposition at 128:8-139:14.

78.     The bill of materials for UPS Model No. SX650U shows that discrete components are assembled together to create a new and different article of commerce, *viz*. an uninterruptible power supply. *See* PTX48 (Bill of Materials for All Components in UPS Model No. SX650U); *see* PTX49 (Bill of Materials for Components of PCBAs in UPS Model No. SX650U). The internal components of UPS Model No. SX650U, including those comprising the main board, USB board, and USB charger board PCBAs, are products of *inter alia* China, Taiwan, Mexico, Malaysia, Morocco, Thailand, the Philippines, and Vietnam. *Id.* The DIP and SMT processes used to manufacture the main board, USB board, and USB charger board PCBAs for UPS Model No. SX650U occur in China and are performed by Cyber Power China. *Id.* Huang Deposition at 131:9-132:22, 132:23-136:24.

79.     A timeline of the work performed in the Philippines on UPS Model No. SX650U is provided at PTX50 (Philippines Production Timeline, UPS Model No. SX650U). This timeline shows that SMT and DIP assembly operations are performed on PCBs in China to produce PCBAs, and that the PCBAs are then imported into the Philippines for final UPS assembly operations by CPSMI into the UPS Model No. SX650U. *Id.* Huang Deposition at 136:25-138:19.

80.     A step-by-step procedure of the SMT and DIP processes taking place in China according to Cyber Power's production standard operating procedures is depicted at PTX51 (Standard Operating Procedures for Chinese Manufacture of PCBA, UPS Model No. SX650U). A step-by-step procedure of the Philippines-manufacture of  UPS Model No. SX650U is provided at

PTX52 (Standard Operating Procedure for Philippines Manufacture of UPS Model No. SX650U). Samples of this model's PCBA have been submitted to the Court. *See* PTX92. Huang Deposition at p. 138:20-140:21, 140:24-141:24.

81.     The assembly operations for UPS Model No. SX650U that are performed by CPSMI in the Philippines are also detailed in a flowchart at PTX53 (Assembly Operations Flowchart, UPS Model No. SX650U); PTX 53; Huang Direct 142:2-143:4; Depictions of the UPS Model No. SX650U Schematic of PCBA, Dimension Drawing, and Exploded View Diagram are appended as PTX54 (Schematic of PCBA, Dimension Drawing, and Exploded View Diagram, UPS Model No. SX650U); Huang Deposition at 143:5.

82.     The assembled UPS Model No. SX650U is then programmed in the Philippines with firmware which is produced in Taiwan and which enables the electronic components of the UPS to function. Huang Deposition at 145:25-146:13.

83.     None of the components which are assembled in the Philippines, taken individually, can detect power outages or serve as a backup power supply system using battery power. Huang Deposition at 146:23-147:19.

84.     The assembly operations for UPS Model No. SX650U that are performed by CPSMI in the Philippines result in the creation of a new and different article of commerce with a new name, character, and use as compared to its Philippines-assembled components. Huang Deposition at 146:23-147:19.

##### B.     DESIGN AND INSTALLATION OF FIRMWARE ON ALL SUBJECT UPS MODELS.

85.      Firmware is applied to the PCBAs in all the subject UPS models. This programming occurs at CPSMI's plant in the Philippines, using firmware code which was created by CPSI in Taiwan by Taiwanese firmware engineers. The UPS units which are the subject of this case each

16

feature one or more PCBA. PCBAs consist of a number of micro-components (*e.g.,* diodes, rectifiers, capacitors, etc.) which are mounted on a PCB and electrically connected. Huang Direct at 61:5-61:15, 78:6-80:4, 107:7-107:13, 107:25-108:14, 121:2-121:10, 145:25-146:13.

86.     All of the firmware used in the subject UPS devices which are the subject of this case was created in Taiwan by Taiwanese firmware engineers. The firmware is downloaded and programed into the subject UPS units in the Philippines. This programing occurs after the PCBAs have been assembled with other components to make the subject UPS devices. *Id.*

87.     Firmware code is used to instruct the UPS devices' performance of various functions. Fuehrer Direct at 385:17-387:9.

88.     Until the PCBAs within the subject UPS devices are programmed with this firmware code and successfully tested, they have no functionality whatsoever. It is the programming of the PCBAs with the Taiwanese origin firmware code, which programming occurs in the Philippines, which enables the PCBAs in a UPS unit to function at all. Without the firmware, neither the PCBAs nor the UPS units have any functionality whatsoever. Fuehrer Direct at 376:7-376:15.

89.     The 5 models of UPS articles at issue in this action possess firmware. All of the UPS units involved in this case require programing with firmware of like complexity in order to enable them to perform their functions. *Id.*

### C.     SVP DEVICE AT ISSUE.

#### 1.     SVP Model No. HT1206UC2RC1.

90.     SVP Model No. HT1206UC2RC1 is a surge voltage protector which uses metal oxide varistor ("MOV") technology to provide surge protection of up to 2880 joules to connected devices. The product features 12 outlets: 6 standard and 6 transformer spaced. PTX55 (Spec. Sheet, SVP Model No. HT1206UC2RC1); Huang Deposition at 148:7-149:24. A sample of this product

has been submitted to the Court. *See* PTX91.

91.     The bill of materials for SVP Model No. HT1206UC2RC1 shows that discrete components are assembled together to create a new and different article of commerce, *viz.* a surge voltage protector. *See* PTX57 (Bill of Materials for All Components in SVP Model No. HT1206UC2RC1); Huang Deposition at 150:8-153:2; *see* PTX58 (Bill of Materials for Components of PCBAs in SVP Model No. HT1206UC2RC1), Huang Deposition at 153:2-157:5.

92.     The internal components of SVP Model No. HT1206UC2RC1, including those comprising the surge board, charger board, USB connector board, coax board, and RJ45 board PCBAs, are products of *inter alia* China, Taiwan, United States, Malaysia, and Thailand. *Id.* The DIP and SMT processes used to manufacture the surge board, charger board, USB connector board, coax board, and RJ45 board PCBAs for SVP Model No. HT1206UC2RC1 occur in China and are performed by Cyber Power China. *Id.* Sample of this products PCBA assembly has been submitted to the Court. *See* PTX92.

93.     A timeline of the work performed in the Philippines on SVP Model No. HT1206UC2RC1is provided at PTX59 (Philippines Production Timeline, SVP Model No. HT1206UC2RC1). This timeline shows that SMT and DIP assembly operations are performed on PCBs in China to produce PCBAs, and that the PCBAs are then imported into the Philippines for final SVP assembly operations by CPSMI into the SVP Model No. HT1206UC2RC1. *Id.* A step-by-step procedure of the SMT and DIP processes taking place in China according to Cyber Power's production standard operating procedures is depicted at PTX60 (Standard Operating Procedures for Chinese Manufacture of PCBA, SVP Model No. HT1206UC2RC1). A step-by-step procedure of the Philippines-manufacture of SVP Model No. HT1206UC2RC1is provided at PTX61 (Standard Operating Procedure for Philippines Manufacture of SVP Model No.

HT1206UC2RC1). The assembly operations for SVP Model No. HT1206UC2RC1that are performed by CPSMI in the Philippines are also detailed in a flowchart at PTX62 (Assembly Operations Flowchart, SVP Model No. HT1206UC2RC1). Huang Direct 157:7-159:7, Huang Deposition at 159:8-160:4, 160:5-166:17, 166:22-167:12.

94.     Depictions of the SVP Model No. HT1206UC2RC1's Schematic of PCBA, Dimension Drawing, and Exploded View Diagram are appended as PTX63 (Schematic of PCBA, Dimension Drawing, and Exploded View Diagram, SVP Model No. HT1206UC2RC1). Huang Deposition at 167:13-168:15.

95.     None of the components which are assembled in the Philippines, taken individually, can detect potentially harmful spikes in electrical current or cut the flow of current to connected devices. Huang Deposition at 168:12-168:21.

96.     The assembly operations for UPS Model No. SX650U that are performed by CPSMI in the Philippines result in the creation of a new and different article of commerce with a new name, character, and use as compared to its Philippines-assembled components. *Id.;* Lovett 510:6-510:10.

**D.     ADDITIONAL   CPSMI   OPERATIONS   PERFORMED   IN   THE PHILIPPINES.**

97.     In addition to the foregoing assembly operations, and UPS firmware design and installation, which created the individual models of subject merchandise described above, CPSMI performed the following quality control and product testing operations in the Philippines on all subject UPS and SVP devices:

     a.   UPS parameter calibration, using auto test equipment to check input and output voltage, output voltage and frequency;

     b.   Hi-Pot electrical testing and full function testing, such as input tests, output tests, backup tests, software communication tests, overload tests; Huang Dep. 77:13-

77-:20.

     c.   USB communications tests, for devices featuring USB ports.

*See e.g.,* PTX14, PTX26, PTX35, PTX44, PTX53, PTX62.

98.     For UPS units, CPSMI also performs a cold start test to ensure that the device cannot be turned on while in battery mode, and a waveform test to ensure the electrical circuit can carry the specified current. *Id.*

99.     CPSMI performs the following labeling and packaging operations in the Philippines on all subject UPS and SVP devices: product labeling; product packaging; insertion of user manuals within the product packaging; preparation for shipment; palletizing. Huang Direct at 16; 176:9-13; 211:7-212:19.

### E.    U.S. DEPARTMENT OF HOMELAND SECURITY VISIT TO PHILIPPINES FACILITIES OF CPSMI AND PHISONIC.

100.    On July 23, 2020, U.S. Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI") Investigator, Denver B. Langaman, and Assistant Attache Jim Anglemeyer (the "HSI Agents"), with office addresses at the U.S. Embassy in Manila Philippines, arrived for an unannounced visit to the Philippines facilities of CPSMI and Phisonic, at Units A & B Lot 6, Block 1, Phase 2 Buenavista I General Trias Cavite, Philippines. Anglemeyer Deposition at 19:7-19:13.

101.    During their visit on July 23, 2020, the HSI Agents toured the Cyber Power facilities, observing the assembly and other activities in the CPSMI area of the facility. *Id.*

102.    The HSI Agents' visit was documented by video. Anglemeyer Deposition at 24:4-24:13

103.    In addition, HSI Agent Langaman took photographs during the July 2020 site visit. Langaman Deposition at 38:8-42:16.

104.    HSI Agent Langaman also photographed a worker placing PCBAs in a Jutze Automated

Optical Inspection Machine, which inspects PCBAs for manufacturing defects, and a photograph of a JT Co. LLC-produced reflow soldering machine, *id.*, which is used to solder microcomponents onto PCBAs. *Id.*

105.     On or about July 26, 2020, HSI Agent Denver Langaman, one of the HSI Agents who visited the plant on July 23, 2020, prepared a report about the visit. Langaman Deposition at 45:12-46:2.

## PROPOSED CONCLUSIONS OF LAW

1.      Section 304(a) of the Tariff Act of 1930, 19 U.S.C. § 1304(a), requires that all goods of

foreign origin imported into the United States, or their packages, be marked permanently, legibly,

and in a conspicuous place, so as to indicate to the "ultimate purchaser" in the United States the

English name of the country of origin. The statute provides in pertinent part:

> **Sec. 1304. Marking of imported articles and containers**
>
> **a) Marking of articles**
>
> Except as hereinafter provided, every article of foreign origin (or its container, as
> provided in subsection (b) hereof) imported into the United States shall be marked
> in a conspicuous place as legibly, indelibly, and permanently as the nature of the
> article (or container) will permit in such manner as to indicate to an ultimate
> purchaser in the United States the English name of the country of origin of the
> article. The Secretary of the Treasury may by regulations—
>
> > (1) Determine the character of words and phrases or abbreviations thereof
> > which shall be acceptable as indicating the country of origin and
> > prescribe any reasonable method of marking, whether by printing,
> > stenciling, stamping, branding, labeling, or by any other reasonable
> > method, and a conspicuous place on the article (or container) where the
> > marking shall appear;
> > (2) Require the addition of any other words or symbols which may be
> > appropriate to prevent deception or mistake as to the origin of the article
> > or as to the origin of any other article with which such imported article
> > is usually combined subsequent to importation but before delivery to an
> > ultimate purchaser … [1]

2.      Where a good is produced in two or more countries, the courts have ruled that the country

of origin of that good, for marking purposes, is the last country where it underwent a "substantial

transformation" prior to being imported into the United States. *See United States v. Gibson-*

---

[1] 19 U.S.C. § 1304(a)(3) authorizes the Secretary of the Treasury to authorize numerous exceptions to country of origin marking requirements, which exceptions are not relevant to the instant case.

*Thomsen Co.*, 27 C.C.P.A. 267 (1940).[2] CBP has incorporated this rule into its regulations. *See* 19 C.F.R. § 134.1(b).[3]

3.    The concept of "substantial transformation" is taken from the United States Supreme Court's decision in *Anheuser-Busch Brewing Assn. v. United States*, 207 U.S. 556 (1908), which concerned the question of whether goods had been "manufactured" into new and different articles for purposes of the duty drawback statute. The Court noted:

> Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft v. Wiegmann,* 121 U.S. 609. There must be transformation; a new and different article must emerge, "having a distinctive name, character or use."

207 U.S. at 562 (emphasis added).

4.    The "substantial transformation" test of a change in "name, character or use" is well-known in customs law and has been used, with minor variations, to determine the country of origin of goods for marking purposes, *see Gibson-Thomsen Co., Inc.*, *supra*; to define "manufacturing" for duty drawback purposes, *see Anheuser-Busch Brewing Assn. supra;* to administer preferential tariff programs, such as the Generalized System of Preferences, *see Torrington Co. v. United States*, 764 F.2d 1543 (Fed. Cir. 1985); to determine the origin of goods for purposes of voluntary restraint and quota programs, *see Ferrostaal Metals Corp. v. United States*, 664 F. Supp 535 (Ct. Int'l Tr. 1987); *see also Superior Wire Inc. v. United States*, 11 C.I.T. 608 (1987); to determine

---

[2] If an imported article undergoes a "substantial transformation" after importation into the United States, it is no longer considered a foreign product and need not be marked to show a foreign country of origin. *See United States v. Gibson-Thomsen Co.*, 27 C.C.P.A. 267 (1940).

[3] 19 C.F.R. § 134.1 (b) provides:

> (b) Country of origin. "Country of origin" means the country of manufacture, production, or growth of any article of foreign origin entering the United States. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of this part; however, for a good of a NAFTA country, the NAFTA Marking Rules will determine the country of origin.

the meaning of "manufacture" for purposes of the bonded warehouse statute, 19 U.S.C. § 1562, *see Tropicana Products Inc. v. United States*, 16 C.I.T. 155 (1992); and to determine whether goods are transformed in countries from which certain Federal government procurements are prohibited, 19 U.S.C. § 1862, *see Energizer Battery Inc. v. United States*, 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016); *Acetris Health LLC v. United States*, 949 F.3d 719 (Fed. Cir. 2020).

5.      Courts render "substantial transformation" determinations on a fact-specific, case-by-case basis. A change in name has generally been considered the least persuasive factor in determining whether a substantial transformation has taken place, *see National Juice Products Assn. v. United States*, 10 C.I.T. 48 (1986) *Cyber Power Systems (USA) Inc. v. United States*, 560 F. Supp 3d. 1347, 1355-56 (Ct. Int'l Tr. 2022).[4]

6.      However, only a change in one of the three specified criteria—*i.e.,* name, character or use—is required to establish a "substantial transformation." *See Koru North America v. United States*, 12 C.I.T. 1120 (1988)[5].

---

[4] In its most recent decision in this action, the Court held:

> With respect to the "name" criterion, there does not appear to be any dispute that all of the subject merchandise at issue undergoes a change in "name" as none of the components share a name with the finished subject merchandise. See Pl.'s Reply at 11 (citing Def.'s XMSJ at 26). There is also no dispute that under the "name, character, and use" analysis, a change in name is generally considered to be the least compelling factor in support of a finding of substantial transformation. See Def.'s XMSJ at 20 (citing *Sassy, Inc. v. United States*, 24 CIT 700, 704, SLIP OP. 2000-93 (2000), and *Ferrostaal Metals Corp. [v. United States]*, 11 CIT at 478, 664 F. Supp. at 541 ("The name criterion is generally considered the least compelling of the factors which will support a finding of substantial transformation.")). While the satisfaction of the name criterion in this matter lends some support to Plaintiff's claim, this change in name alone does not appear sufficient to constitute a "substantial transformation" of the subject merchandise. The court must therefore consider whether changes in the "character" and/or "use" of the merchandise as part of Plaintiff's Philippine operations have effected a "substantial transformation" of the subject merchandise. See *Precision Specialty Metals, Inc. v. United States*, 24 CIT 1016, 1029-30, 116 F. Supp. 2d 1350, 1364, SLIP OP. 2000-121 (2000). (noting that courts generally focus on character and use criteria in assessing whether substantial transformation has occurred).

*Cyber Power Systems (USA) Inc.,* 560 F. Supp. 3d at 1355-1356.

[5] Some Courts have also established "cross-checks" on the *Anheuser-Busch/Gibson-Thomsen* criteria of "name, character and use," for example by considering the cost or value added by specified processes, *see e.g.*, *Ferrostaal, supra; Superior Wire, supra; Uniroyal, Inc. v. United States,* 3 C.I.T. 220 (1982); *United States v. Murray,*

7.      Section 304(a) is a consumer "right to know" statute designed to prevent deception and

confusion in the trade and commerce of the United States. Its purpose was articulated by the Court

of Appeals in *United States v. Friedlaender & Co.*, 27 C.C.P.A. 297, 302 (1940):

> As we see it, Congress intended that the ultimate purchaser should be able to know
> by an inspection of the marking on imported goods the country of which the goods
> is the product. The evident purpose is to mark the goods so that at the time of
> purchase the ultimate purchaser may, by knowing where the goods were produced,
> be able to buy or refuse to buy them, if such marking should influence his will.

8.      In *Gibson-Thomsen, supra*, the Court noted the purpose of the marking law to be the

prevention of confusion and deception in the "trade and commerce of the United States[,]" and

noted that the purpose of the law was to communicate to the ultimate purchaser in the United States

the origin of the article he or she was purchasing—not the origin of the parts or materials from

which that article was made. 27 C.C.P.A. at 272.

9.      The marking statute's disclosure requirement is directed at, and anchored to, the "ultimate

purchaser" in the United States. The marking statute is implemented through regulations, *see*

*United States v. Mersky,* 361 U.S. 431 (1960), and in this regard, CBP has promulgated a

regulation, 19 C.F.R. § 134.1(d), which provides (emphasis added):

> (d) Ultimate purchaser. The "ultimate purchaser" is generally the last person in the
> United States who will receive the article in the form in which it was imported;
> however, for a good of a NAFTA country, the "ultimate purchaser" is the last
> person in the United States who purchases the good in the form in which it was
> imported. It is not feasible to state who will be the "ultimate purchaser" in every
> circumstance. The following examples may be helpful:
>
>     *            *            *
>
> **(3) If an article is to be sold at retail in its imported form, the purchaser at
> retail is the "ultimate purchaser."**

---

621 F.2d 1163 (1st. Cir. 1980), cert. den. 499 U.S. 837 (1980); or whether there has been a transformation from a
"producer's good" to a "consumer good." *See Midwood Indus. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970),
appeal dismissed, 57 C.C.P.A. 141 (1970).

**[Emphasis added].**

10.    In this case, plaintiff's imported UPSs and SVP devices are sold in their imported forms, through retailers such as The Home Depot, Best Buy, and Micro Center. The "ultimate purchaser" in this case, is the retail shopper who purchases these goods in their condition as imported, and the person to whom the required country of origin must be communicated.

11.    The information to be communicated to the ultimate purchasers is the country of origin of the imported UPS and SVP devices, not the origin of their components. See *Cyber Power Systems (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1352 (Ct. Int'l Tr. 2022);[6] see also *United States v. Gibson-Thomsen Co. Inc.,* 27 C.C.P.A. 267, 273, where the Court of Appeals held (emphasis added):

> We find nothing in the statute nor in its legislative history to warrant a holding that the Congress intended to require that an imported article, which is to be used in the United States as material in the manufacture of a new article having a new name, character, and use, and which, when so used, becomes an integral part of the new article, be so marked as to indicate to the retail purchaser of the new article that such imported article or material was produced in a foreign country.

Thus, disclosure of the origin of materials used to produce an imported article is not required by 19 U.S.C. § 1304(a).

12.    Where Congress wishes to direct a merchant to identify the country of origin of components or materials used in production of an article, it knows how to craft legislation for that

---

[6] This Court made the following "law of the case determination" in that Opinion:

… the court does not agree with Defendant that the purpose of the marking statute is to inform the consumer about the country-of-origin as to the component parts of the merchandise. See U.S. Customs & Border Protection, Marking of Country of Origin on U.S. Imports, Informed Compliance Publication, Pub. No. 1150-0620 (non-binding guidance stating, **"What is the purpose of marking?** To inform the ultimate purchaser in the United States of the country in which the imported article was made.")

560 F. Supp. 3d at 1347, 1352-1353 (Ct. Int'l Tr. 2022) (emphasis in original).

purpose.[7] No such requirement exists in 19 U.S.C. § 1304(a). Rather, under Section 304(a), it is necessary that the marking disclose the country of origin of the merchandise "which enters the commerce of the United States," *see A.N. Deringer Inc. v. United States*, 51 Cust. Ct. 21, 26 (1963),[8] and make that disclosure to the "ultimate purchaser," who in this case is defined by 19 C.F.R. § 134.1(d)(3) as the "purchaser at retail."[9] The focus is on the article being sold to a consumer or purchaser in the United States.[10]

13.     It is undisputed that all of the imported articles which are the subject of this case – five (5) models of uninterruptible power supplies (UPS) and one (1) model of Surge Voltage Protector – acquire new "names" by virtue of the operations performed by CPSMI in the Philippines. The Court has so found. *Cyber Power Systems (USA) Inc. v. United States,* 560 F. Supp. 3d 1347, 1355-56 (Ct. Int'l Tr. 2022).

14.     While a change in name is typically viewed as the weakest indicator of a "substantial transformation," such a change does indicate that the imported articles are "different articles of commerce" in a commercial sense and in a tariff sense. *Midwood Industries Inc.*, 64 Cust. Ct. at 508-09; *see also United States v. International Paint Inc*., 35 C.C.P.A. 87, 94 (1948).

---

[7] *See e.g.,* The American Automotive Labeling Act (AALA), 49 U.S.C. § 32304; *see also,* 49 C.F.R. Part 583; Section 13(p) of the Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.,* as amended by Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (requiring publicly traded companies to report through the SEC certain "conflict minerals" used or included in imported goods).

[8] In *A.N. Deringer*, the Court, speaking of the responsibilities imposed on importers of merchandise, indicated that "[o]ne such responsibility, and an important one, is to see that imported merchandise is properly marked before it enters the commerce of the United States." 51 Cust. Ct. 21, 26 (1963).

[9] Thus, in *Contessa Food Prods. v. Lockspur Fish Processing Inc*., 2001 U.S. Dist. LEXIS 25999 (C.D. Cal. 2001), the court noted that "[t]he marking statute was intended in part 'to facilitate consumer purchasing decisions' by marking goods so that informed and discriminating buyers could decide either "to buy or refuse to buy a [product] if such marking should influence their will" (citing *Nat'l Juice Prods Assn. v. United States*, 10 C.I.T. 48 (1986)).

[10] *See M.B.I. Indus. v. United States*, 16 C.I.T. 45 (1992).

15.     A change in name also has evidentiary weight. *Sassy, Inc. v. United States*, 24 C.I.T. 700, 704-05 (2000). In this regard, no component on the Bills of Material for any of the products at bar is described as "uninterruptible power supplies" or "surge voltage protectors".

16.     Tariff Acts are presumed to be written in the language of commerce—*see Swan v. Arthur*, 103 U.S. 594, 598 (1881); *Hartmann Trunk Co. v. United States*, 27 C.C.P.A. 254, 257 (1940)— which is presumed to comport with the common meaning of terms.

17.     That the uninterruptible power supplies and surge voltage protectors at bar all acquire, by virtue of the operations performed at CPSMI's Philippine factory, new names which are distinct from the names given to any of their component parts or materials, indicates that the products are new and different articles of the Philippines, and are properly so marked pursuant to 19 U.S.C. § 1304(a).

18.     Next, the UPS and SVP devices produced by CPSMI in the Philippines each clearly have a "character" distinct from their various component materials and parts used to assemble them. "Character" has been defined as "one of the essentials of structure, form materials or function that usually make up and usually distinguish the individual." *Sassy, Inc. v. United States*, 24 C.I.T. 700, 704 (2000) (citing *Nat'l Hand Tool Corp. v. United States*, 16 C.I.T. 308, 311 (1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993), and *see also* Webster's Third New International Dictionary (1981 ed.)). Even where component parts are visually identifiable in the finished article, the finished article has a character and function different from its parts. *Sassy, Inc.,* 24 C.I.T. at 704-05.

19.     In evaluating "character" in substantial transformation determinations, courts often distinguish between substantial transformations based on assembly of components and those involving treatment of a single material. *See Texas Instruments Co. v. United States*, 69 C.C.P.A.

151 (1982); *see also Adolphe Schwob, Inc. v. United States*, 62 Treas. Dec. 248, T.D. 45908 (1933), *aff'd*, 21 C.C.P.A. 116 (1933).

20.      Changes in "character" are also denominated by changes in "use," and the two criteria are closely related. *See Ferrostaal Metals Corp.*, 11 C.I.T. at 476.

21.      Changes in "character" can also be evaluated by examining whether something evolves from a simple undifferentiated material to something with a defined use or range of uses, *Torrington Co. v. United States*, 764 F.2d at 1563, and whether it has been transformed from a "producer's good" to a "consumer good." *See SDI Techs Inc. v. United States*, 977 F. Supp. 1235, 1240 (Ct. Int'l Tr. 1997); *see also Midwood Indus. Inc.*, 64 Cust. Ct. at 507.

22.      In the case of plaintiff's UPS and SVP devices, the operations performed by CPSMI in the Philippines create new and different articles of commerce having a character distinct from the character of their components. In contrast to the situation described in *Energizer Battery Inc. v. United States*, 190 F. Supp. 3d 1308 (Ct. Int'l Tr. 2016), the various components assembled in the Philippines are not identifiable as intended for a particular finished article. Rather, they are general use electronic and electrical components—*e.g.,* relays, diodes, resistors, zeners, varistors, transformers, heat sinks, batteries and other components—which might be used to make a wide range of goods.

23.      While defendant has placed heavy emphasis on the role of the PCBAs, which are components of the uninterruptible power supplies, the manufacturing operations performed in the Philippines result in the creation of new and different articles of commerce which have a character different from those of the PCBAs. By themselves, PCBAs are lifeless and incapable of functioning. They are "producer's goods", of no use to a consumer (who, in this case is the "ultimate purchaser" to whom country of origin information must be communicated). *See* 19

29

C.F.R. § 134.1(d); *see also Midwood Indus. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970), appeal dismissed, 57 C.C.P.A. 141 (1970)). A PCBA cannot connect to an electrical circuit; it cannot connect to a protected electrical device, such as a computer or home video system. Even if a PCBA could be connected to an electrical circuit and a protected device, it could not provide emergency power in the event of a loss or surge in electrical power, since it does not contain, and is not connected to, a battery. Providing emergency power in the event of a power failure or power surge is the principal use of an uninterruptible power supply.

24.     In addition, as imported into, or manufactured in, the Philippines, the PCBA is incapable of functioning at all, since it lacks firmware. Trial testimony established that, after importation into the Philippines, each PCBA must be programmed with "firmware,"[11] which is developed in Taiwan, using millions of lines of software code produced by software engineers working in Taiwan. "Firmware" is computer programming code that instructs the PCBAs to analyze incoming current values and signals, and to perform various functions relative to the other components of the UPS devices.[12] By itself, a PCBA could not initiate device function, perform safety checks, transfer current to or from a battery, execute instructions to activate or terminate battery power, or provide operating status information. Fuehrer Direct at 385:17-387:9.

25.     "Firmware" is installed onto a memory chip which is mounted on the PCBA. The memory chip provides the "brains" of the device, and, when programmed with firmware, acts as the operating system for the uninterruptible power supplies at bar. The memory chips in all of the uninterruptible power supplies and PCBAs at bar were made in Taiwan.

---

[11] "Firmware" is generally distinguished from "software" in that firmware is computer programming code which is installed in a device or component which has no native intelligence whatsoever, while "software" is installed in a device with native intelligence (*e.g*., a computer with an operating system software suite).

[12] "Firmware is defined in the Merriam-Webster Dictionary as "computer programs contained permanently in a hardware device (such as a read-only memory)".

26.     Programming an electronic device with firmware code has been recognized by this Court for four decades as being a significant operation in a substantial transformation context. In *Data General Corp v. United States*, 4 C.I.T. 182, 185 (1982), the Court held that using firmware to program a PROM (Programmable Read-Only Memory) into a ROM (read only memory) significantly changed the character of the article:

> The Court is not convinced that programming a PROM is a mere modifying or finishing step. Defendant underestimates the time, expense and expertise required to program a PROM", including the development of patterns and production of a master PROM, which required "much time and expertise."

*Id*. The court also noted that once a PROM had been converted to a ROM, the ROM was no longer programmable.

27.     The surge voltage protectors also acquire a new and distinct character by reason of the manufacturing operations performed at CPSMI's factory in the Philippines. The materials used to make the SVPs are generalized electrical components, such as diodes, varistors, lamps, mosfets, electrical caps, transformers and wire, which are "producer goods", fit only for use in manufacturing. The finished SVPs, by contrast, are ready-to-use ("plug and play") consumer articles which are capable of being connected to protected devices and shutting down the flow of electricity in the event of a voltage surge.

28.     Noting that "character" is "one of the essentials of structure, form, materials or function that usually make up and usually distinguish the individual," *Sassy, Inc.,* 24 C.I.T. at 704, it is readily apparent that, by reason of the operations performed in the Philippines, each of the UPS and SVP devices at bar clearly has acquired a new structure, form and character. New materials have been added and the devices have acquired characteristics and functions that clearly did not inhere in any of the constituent components assembled at the CPSMI plant in the Philippines.

29.     UPS and SVP devices each have an important and unique purpose. A UPS must be able to detect failures in a main power source—whose current flows through the UPS—and then engage internal batteries to provide continuing power to connected, protected devices, until the connected devices can be powered down (*e.g.,* to protect against data loss), or connected to an auxiliary or backup power source, such as a generator. SVPs must be able to detect potentially harmful spikes in electrical currents, including those resulting from phenomena such as lightning strikes, and cut off the flow of current to protected, connected devices. None of the components imported into the Philippines and housed within the UPS and SVP products at bar have the ability to perform any of these functions.

30.     Prior to CPSMI's assembly of the UPS and SVP devices in the Philippines, there were no devices which would be connected to electrical current. There were no terminals into which a protected device could have been plugged. The PCBAs within the UPS devices had no intelligence which would allow them to handle electrical current, measure it, or actuate a battery to provide reserve power in a UPS battery. Indeed, there was no battery in any UPS device, until the batteries were added in the Philippines. The devices had no instructions for engaging the battery until programmed with firmware in the Philippines. Thus, as a result of the operations performed in the Philippines, new articles of commerce were created, each having a "use" distinct from those of their components. Post-manufacturing testing is performed in the Philippines to confirm that the devices have acquired the ability to discharge their intended uses properly.

31.     The SVPs produced in the Philippines also had a new "use" distinct from those of their constituent components. The SVP devices at issue had no way to connect to a power source, nor any terminal into which a protected device could be plugged until these features were added in the Philippines by assembly work performed there. They could not interrupt circuits to stop voltage

spikes until the metal oxide varistors and related components were assembled to the rest of the device—again in the Philippines. It is beyond peradventure of doubt that the operations performed at CPSMI's Philippines plant in all cases resulted in the creation of new articles of commerce having a character and use distinct from any and all of their components. *See e.g., Carlson Furniture Industries v. United States*, 65 Cust. Ct. 474 (1970) (chair parts imported into the United States where they were surface finished, assembled and fitted together, connected with steel pins at all the key joints, with legs cut to length, leveled and supplied with glides and casters were new articles of commerce, with a distinct name, character and use).

32.     All of the merchandise at bar is the result of a "substantial transformation" which occurs in the Philippines, where the manufacturing operations performed at the CPSMI plant result in the creation of new and different articles of commerce, having names, characters and uses distinct from those of their constituent parts and materials.

33.     "Cross-checks" sometimes used by courts in evaluating changes in name, character and use, confirm these conclusions. There is transformation from "producer's goods" to "consumers' goods. *See SDI Techs,* 977 F. Supp. at 1240; *Midwood,* 64 Cust. Ct. at 507. The assembly operations performed in the Philippines are "complex and meaningful," *see Customs Service Decision* 85-25, 19 Cust. B. & Dec. 533 (1985). The assembly operations involve many manufacturing workers, performing complex processes that need to be performed with skill and precision, and for which the workers receive extensive training. The operations performed in the Philippines impart significant added value to the product.

34.     As noted in this Court's previous decision in this case, there is no basis for defendant's argument that the origin of plaintiff's goods should be based upon the origin of the greatest number of components in the imported merchandise, or according to the origin of that single component

which imparts the "essential character" to the imported articles. As this Court previously found, the purpose of the marking statute is to inform the consumer about the country-of-origin as to the component parts of the merchandise. *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1352-1353 (Ct. Int'l Tr. 2022) (citing U.S. Customs & Border Protection, Marking of Country of Origin on U.S. Imports, Informed Compliance Publication, Pub. No. 1150-0620, "What is the purpose of marking? To inform the ultimate purchaser in the United States of the country in which **the imported article** was made." (Emphasis added)).

35.     Nor is there any basis for the defendant's argument that the country of origin of the subject uninterruptible power supplies should be determined by the country of origin of the printed circuit board assemblies they contain which, defendant contends, impart their "essential character". There is no legal basis for Defendant's suggested "essence" test, and such a test was rejected by this court in *Ferrostaal Metals Corp*. v. United States, 11 CIT 470, 474 ("The Court finds that there is no basis in case law for the essence test as offered by defendant. Defendant cites no case where the name, character and use criteria were satisfied, yet no substantial transformation was found to have occurred.")

36.     This Court has already rejected Defendant's proposed focus on the PCBA and the application of an "essence" or "critical component" test. "The Government's suggestion to focus solely on the PCBA components of the subject merchandise may well undermine the objective of the "substantial transformation" test, namely to focus on a change in name, character, or use. *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1354 (Ct. Int'l Tr. 2022).

37.     The Court should also reject the Government's suggestion that it employ a "disjunctive" approach to the "substantial transformation" test, finding a "substantial transformation" only if the *individual components themselves* undergo a change in "name, character or use." This test was

34

applied in the case of *Energizer Battery Inc. v. United States*, 190 F.3d 1308 (Ct. Int'l Tr. 2016), in the context of determining a product's country of origin for purposes of government procurement. *Energizer Battery* did not involve imported goods, nor the country of origin marking statute. Rather, it concerned whether certain flashlights, assembled at a plant in Vermont from about 50 mainly Chinese components (including fasteners), effected a substantial transformation sufficient to cause the flashlights to be considered "domestic end products," eligible for offer to the Federal government in procurements governed by the Trade Agreements Act (TAA) government procurement code, *see* 19 U.S.C. § 1862. The *Energizer* Court found the assembly operations performed in the United States to be simple hand assembly, accomplished in no more than 7 minutes. Save for the fasteners, virtually all of the components were recognizable as parts of flashlights. While holding that assembly did not result in "substantial transformation" because many of the parts had a predetermined use, the *Energizer* court did hold that an assembly operation which was "sufficiently complex" could effect a change in origin, but offered no guidance on what "sufficiently complex" might mean.

38.     This Court has previously noted that this "disjunctive," component-specific view of substantial transformation has been rejected in earlier decisions. *See Cyber Power Systems (USA) Inc. v. United States*, 471 F. Supp. 3d 1371, 1378 (2020):

> This Court would add that the Court of International Trade in *Uniden America Corp. v. United States*, 24 CIT 1191, 1195–98, 120 F. Supp.2d 1091, 1095–1099 (2000) expressly rejected a component-by-component analysis in reviewing whether articles were substantially transformed.

This Court also noted that the *Energizer* formulation was "somewhat counterintuitive, because on a practical level a finished flashlight does have a different name, character and use than a pile of 50 unassembled constituent components." *Id.* In addition, this Court noted that the *Energizer* court's "component-by-component approach to the substantial transformation test would seem to

make it practically insurmountable for subsequent-country, pre-determined assembly to ever constitute further work/substantial transformation of an article." *Id*.  While acknowledging that the *Energizer* court in dicta held that "sufficiently complex" assembly could effect a desired change of origin, this Court noted that "Exactly what constitutes "sufficiently complex" is a bit of a mystery though." *Id*.

39.    This Court also forcefully rejected the disjunctive view of "substantial transformation in disposing of the cross-motions for summary judgment in this action, noting:

> the court does not agree that a component-by-component analysis assists in the determination of whether the subject merchandise at issue here underwent a substantial transformation in the Philippines for purposes of determining the country of origin under 19 U.S.C. § 1304(a). If, as Defendant argues, components assembled for a pre-determined use may never constitute substantial transformation, then, for all practical purposes, there can never be a substantial transformation because there will always be a pre-determined use. There would be no *Belcrest Linens v. United States*, 741 F.2d 1368, 1372 (Fed. Cir. 1984) (substantial transformation resulted from cutting bolt of cloth, scalloping, and sewing into pre-determined use of pillowcases); or *Ferrostaal Metals Corp*., 11 CIT at 471, 664 F. Supp. at 536 (substantial transformation as result of continuous hot-dip galvanizing process into pre-determined use for resulting product). It is one thing to say that the attachment of a handle to a pan, or a sole to a shoe, is too mundane for a substantial transformation; it is another to suggest that all parts (however many) assembled into a "pre-determined" product may never result in a substantial transformation. **That is not, and cannot be, the law.**

*Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1355 (Ct. Intl. Tr. 2022) (emphasis added).

40.    That the *Energizer Battery* case, which formed the basis for defendant's denial of Cyber Power's protest, and much of its argument before this Court, may have been incorrectly decided was underscored by the Federal Circuit's decision in *Acetris Health LLC v. United States*, 949 F.3d 719 (Fed. Cir. 2020), which noted that the Trade Agreements Act (TAA) set out two tests for origin in the government procurement area: (1) whether a good is "manufactured in" a country from

which TAA procurement is allowed; and (2) whether it is "substantially transformed" in a prohibited country. This analysis seems more consistent with the cadence of the TAA, as discussed by this Court in *Xerox Corporation v. United States*, 25 C.I.T. 85, (2011) which notes that the TAA effectively contains a prohibition on the procurement of goods substantially transformed in a non-TAA country, but does not, under any circumstances, bar purchases of goods "manufactured in" the United States.

41.     In *Acetris*, the Federal Circuit also discussed the regulatory history of the term "U.S.-made end product" and clarified "that the source of the components … is irrelevant in determining where a product is manufactured," explaining:

> When the term [manufacture] was introduced to the FAR, the government explained it as follows: '[t]he proposed rule defines U.S. made end products as products that are manufactured or substantially transformed in the United States, regardless of the source of the components." Federal Acquisition Regulation; Foreign Acquisition (Part 25 Rewrite), 63 Fed. Reg. 51642 (Sept. 28, 1998) (emphasis added). A product need not be wholly manufactured or substantially transformed in the United States to be a "U.S.-made end product." Instead, such products may be—as Acetris' products are—"manufactured" in the United States from foreign-made components.

42.     The Courts have already spoken—decades ago—to the level of complexity required of assembly and other production operations to constitute a "substantial transformation": the "treatment, labor and manipulation" applied to an article in a country must be sufficient to effect a "transformation; a new and different article must emerge, "having a distinctive name, character or use." *Anheuser-Busch Brewing Assn.*, 207 U.S. at 562. The test is commercial and qualitative— one that can be understood in commercial and common meaning and spoken to by business persons. Does a "new and different article" emerge from the processing? Does that article have a "name, character or use" different from its components? If an assembly or other manufacturing

operation results in the creation of a new and different article of commerce,[13] with a new name, character or use, that operation is, by definition, "sufficiently complex."

43.     The "substantial transformation" test does not specify some minimum quantum of working or processing needed to effect a change in origin under the marking statute. In *Gibson-Thomsen Co.*, supra, the operation performed in the United States was relatively simple—the drilling of holes in wood blocks and the insertion of bristles in the blocks to form brushes—and far simpler than the operations which CPSMI performs in the Philippines. However, the operation was commercially significant because it created new articles of commerce (*i.e.,* brushes) which would be introduced into domestic trade. The intent of the marking law was to inform the "ultimate purchasers" of those articles whether they had been made in a foreign country. As they emerged from a process working a change in name, character or use in the United States, they had been "substantially transformed", were not goods of "foreign origin" and no communication under 19 U.S.C. § 1304(a) was required.[14]

44.     Nor does it matter that components imported into the country where the "substantial transformation" occurs remain visible or recognizable in the finished product after that product has been created; this is clearly no barrier to finding "substantial transformation" in an assembly

---

[13] The importance of creating a new "article of commerce" is evident in cases applying the "substantial transformation" test to the Generalized System of Preferences, particularly whether an operation creates a "substantially transformed intermediate article". The focus is not merely on the "name, character and use" test, but on whether an "article of commerce" emerges. Thus, in *Torrington Co. v. United States*, 764 F.2d 1563 (Fed. Cir. 1985), "swage blanks" were recognized as new articles of commerce, since they had been the subject of at least two large commercial transactions. By contrast, in *Azteca Milling Inc. v. United States*, 12 C.I.T. 1153 (1988), the court declined to find that intermediate materials, such as "nixtamal" were "substantially transformed constituent materials, because they were not commercially cognizable as articles susceptible of trade.

[14] It may be observed that where Congress wishes to introduce a quantitative dimension into a rule of origin, it knows how to do so, for example specifying a "35% value added" requirement for preferential origin under the Generalized System of Preferences, US-Caribbean Trade Promotion Act, the Israel-United States Free Trade Agreement, and other trade preference regimes, or imposing "regional value content" requirements under the North American Free Trade Agreement (NAFTA) and United States-Canada-Mexico Agreement (USMCA). But no quantitative requirement, either as to value, time or number of processing operations, has been specified for origin marking determinations under 19 U.S.C. § 1304(a).

context. *See e.g., Sassy Inc.,* 24 C.I.T. at 704; *Carlson Furniture Industries v. United States*, 65 Cust. Ct. 474 (1970); *Adolphe Schwab Inc. v. United States*, 21 C.C.P.A. 116 (1933).

45.     By any measure, the assembly operations which CPSMI performs in the Philippines to create the UPS and SVP devices at bar are technically more complex than those in any of the cited cases, involving not only the careful assembly of large numbers of discrete and generalized components, downloading of firmware, and extensive electrical testing. But that is not the point: Cyber Power's UPS and SVP products have Philippine origin, for marking purposes, because they undergo manufacturing or processing which creates a new article with a different name, character or use.

46.     The Court should therefore conclude, on the basis of the evidence received at trial, that as a matter of law, all five (5) models of uninterruptible power supplies in this case, and all surge voltage protectors in this case are new and different articles of commerce resulting from processes of "substantial transformation" in the Philippines, each product having a name, character and use distinct and different from those of their constituent parts and materials.

47.     For purposes of the Tariff Act, the goods at bar are products of the Philippines, and required to be so marked under 19 U.S.C. §1304(a). Judgment should be entered for plaintiff, setting aside CBP's exclusion of its goods.

Respectfully submitted,

/s/ John M. Peterson
John M. Peterson
Patrick B. Klein
NEVILLE PETERSON LLP
*Counsel for Plaintiff*
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

/s/ Richard F. O'Neill
Richard F. O'Neill
701 Fifth Ave
Suite 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

Dated:  September 29, 2022