UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. LEO M. GORDON, *SENIOR JUDGE*

_____

|  |  |  |
|---|---|---|
| CYBER POWER SYSTEMS (USA) INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00124 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____:

### DEFENDANT'S PROPOSED JUDGMENT ORDER

Upon evaluation of the credible evidence from the trial held in this action; and upon reading plaintiff's proposed findings of fact and conclusions of law; defendant's proposed findings of fact and conclusions of law; and upon other papers and proceedings had herein, it is hereby

**ORDERED** that plaintiff's claim that the country of origin of the subject merchandise is the Philippines is denied;

**ORDERED** that U.S. Customs and Border Protection properly required that the subject merchandise be marked with a country of origin of the People's Republic of China;

**ORDERED** that U.S. Customs and Border Protection's deemed exclusion of the subject merchandise is sustained; and it is further

**ORDERED** that this action is dismissed.

_____
Leo M. Gordon, Senior Judge

Dated: _____
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. LEO M. GORDON, *SENIOR JUDGE*

| | | |
|---|---|---|
| CYBER POWER SYSTEMS (USA) INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00124 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

*Of Counsel*:                          BEVERLY A. FARRELL
Yelena Slepak                          Senior Trial Attorney
Office of Assistant Chief Counsel      LUKE MATHERS
International Trade Litigation          Trial Attorney
U.S. Customs and Border Protection     Civil Division, U.S. Dept. of Justice
                                       Commercial Litigation Branch
                                       26 Federal Plaza, Room 346
                                       New York, New York 10278
                                       Tel.: (212) 264-9230
                                       Attorneys for Defendant

Dated: September 29, 2022

**Table of Contents**

I.     JURISDICTION...............................................................................................................2

II.    STANDARD OF REVIEW ............................................................................................2

III.   LAW OF THE CASE .....................................................................................................4

   A.  Marking Statute...........................................................................................................5

   B.  Substantial Transformation.........................................................................................6

IV.    PERTINENT FACTS TO WHICH THE PARTIES HAVE PREVIOUSLY AGREED ....7

V.     ADDITIONAL FINDINGS OF FACT.............................................................................8

VI.    CONCLUSIONS OF LAW ...........................................................................................23

   A.  Cyber Power Failed To Meet Its Burden In This Action...........................................24

      1.   Mr. Huang's Testimony Was Not Credible .................................................24

      2.   Cyber Power Provided Deficient Documentation.........................................27

   B.  Recent Federal Circuit Guidance Warrants Affirming CBP's Determination That The
   Assembly In The Philippines Does Not Constitute A Substantial Transformation .................30

      1.   The Subject Merchandise Was Not Substantially Transformed In The Philippines,
      Especially In Light Of The *Meyer* Decision .........................................30

      2.   Cyber Power Failed To Show That The CP600LCDa's Main PCBA Was Manufactured
      In The Philippines .........................................................................32

      3.   Application Of Firmware Does Not Effect A Substantial Transformation, And
      Regardless, Cyber Power's Standard Operating Procedures Show That Firmware Is Burned
      In China...........................................................................................34

CONCLUSION.......................................................................................................................36

# Table of Authorities

## Cases

*Arizona v. California*,
  460 U.S. 605 (1983) .............................................................................................. 4

*Braude v. Zierler*,
  No. 22 CV 03586 (NSR), 2022 WL 3018175 (S.D.N.Y. July 29, 2022) ................................ 25

*Chrysler Corp. v. United States*,
  601 F. Supp. 2d 1347 (Ct. Int'l Trade 2009) .............................................................. 3

*Cyber Power Systems (USA) Inc. v. United States*,
  560 F. Supp. 3d 1347 (Ct. Int'l Trade 2022) ..................................................... passim

*Dow Chem. Co. v. Nova Chems. Corp. (Canada)*,
  803 F.3d 620 (Fed. Cir. 2015) ............................................................................... 4

*Ford Motor Co. v. United States*,
  992 F. Supp. 2d 1346 (Ct. Int'l Trade 2014) ............................................................. 4

*Heathcoat v. Potts*,
  905 F.2d 367 (11th Cir. 1990) ............................................................................... 4

*Intergraph Corp. v. Intel Corp.*,
  253 F.3d 695 (Fed. Cir. 2001) ............................................................................... 4

*Melco Clothing Co., Inc. v. United States*,
  804 F. Supp. 369 (Ct. Int'l Trade 1992) ................................................................... 3

*Meyer Corporation, U.S. v. United States*,
  43 F.4th 1325 (Fed. Cir. 2022) ....................................................................... 30, 31

*Nat'l Hand Tool Corp. v. United States*,
  16 C.I.T. 308 (1992) ........................................................................................... 30

*Park B. Smith, Ltd. v. United States*,
  347 F.3d 922 (Fed. Cir. 2003) ............................................................................... 2

*Torrington Co. v. United States*,
  764 F.2d 1563 (Fed. Cir. 1985) ............................................................................ 30

*United States v. Lopez*,
  No. 1:16-cr-136-MOC-WCM-1, 2022 WL 1446678 (W.D.N.C. May 6, 2022) .................. 3, 23

*United States v. White,*
  846 F.2d 678 (11th Cir. 1988) ............................................................. 4

*Vienna Metro LLC v. Pulte Home Corp.,*
  786 F. Supp. 2d 1090 (E.D. Va. 2011) ................................................. 3

*Wopsock v. Natchees,*
  454 F.3d 1327 (Fed. Cir. 2006) ............................................................ 4

**Statutes**

19 U.S.C. § 1581(a) ................................................................................ 2

28 U.S.C. § 2639(a) ................................................................................ 2

28 U.S.C. § 2640(a)(1) ............................................................................ 2

28 U.S.C. § 2641 ..................................................................................... 2

Section 301 of the Trade Act of 1974, 19 U.S.C. §§ 2101 *et seq.* ............... 5

**Rules**

USCIT Rule 52(a)(1) ............................................................................... 3

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. LEO M. GORDON, *SENIOR JUDGE*

| | | |
|---|---|---|
| CYBER POWER SYSTEMS (USA) INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 20-00124 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## **DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In accordance with the Court's August 11, 2022 Minute Order, Docket No. 148, defendant, United States (the Government), respectfully submits its Proposed Findings of Fact and Conclusions of Law.

The Court held a trial in this action from August 8 to August 11, 2022. Plaintiff, Cyber Power Systems (USA) Inc. (Cyber Power), presented direct testimony from three witnesses: (i) Chi-Ting Huang, general manager of Cyber Power Systems Manufacturing Inc. (CPSMI) and an employee of Cyber Power Systems Inc. (CPSI) (which is the Taiwanese parent company of Cyber Power, CPSMI, and the Cyber Power factory in Shenzhen, China, among others); (ii) Thomas L. Fuehrer, electrical project manager at Cyber Power; and (iii) Brent Alan Lovett, general manager and president of Cyber Power. The Government cross-examined each of Cyber Power's witnesses, and presented testimony from two witnesses: (i) Linda Horacek, a U.S. Customs and Border Protection (CBP) import specialist on the electronics enforcement team; and (ii) Karl Moosbrugger, a CBP national import specialist assigned to the computer and industrial controls line.

Cyber Power did not designate a trial witness from CPSI, the Taiwanese parent company, or Phisonic Technology Corporation, a related company co-located with CPSMI in the Philippines, or CPSI's Chinese factory.

As we demonstrate below, CBP correctly determined that the subject merchandise should have been marked "Made in China" because it had not undergone a substantial transformation in the Philippines that would support marking the goods as products of the Philippines. The deemed exclusion of the subject merchandise that resulted from this determination was therefore proper. And CBP's protest determination that Cyber Power failed to provide sufficient credible evidence to show that the country of origin for the imported merchandise was the Philippines is reinforced by Cyber Power's similar failure at trial.

## I.      JURISDICTION

The Court possesses jurisdiction under 19 U.S.C. § 1581(a) to hear this action that arises from plaintiff's timely challenge to CBP's protest denial.

## II.      STANDARD OF REVIEW

This Court reviews, *de novo*, decisions made by CBP. *See Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 924 (Fed. Cir. 2003). Pursuant to 28 U.S.C. § 2640(a)(1), the Court is charged with rendering its determinations based on the record properly made before the Court. Except for certain scenarios not at issue here, the Federal Rules of Evidence "apply to all civil actions in the Court of International Trade." 28 U.S.C. § 2641.

At trial, the burden is on the plaintiff to demonstrate through a preponderance of the evidence that CBP's country of origin determination is incorrect. *See* 28 U.S.C. § 2639(a) ("in any civil action commenced in the Court of International Trade under section 515, 516, or 516A

of the Tariff Act of 1930, the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision."); *Chrysler Corp. v. United States*, 601 F. Supp. 2d 1347, 1353 (Ct. Int'l Trade 2009) (section 2639(a) "allocates to plaintiff the burden of proof on contested factual issues that arise from the protest decision").

In a bench trial, "the court must find the facts specially and state its conclusions of law separately." USCIT Rule 52(a)(1).[1] In so doing, "a court's duty is to find the facts, weigh the evidence, and choose from among conflicting inferences and conclusions those which the court considers most reasonable." *United States v. Lopez*, No. 1:16-cr-136-MOC-WCM-1, 2022 WL 1446678, *6 (W.D.N.C. May 6, 2022) (citing *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957)). As the trier of fact, a court may "disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias." *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1090, 1092 (E.D. Va. 2011) (citing *Penn-Texas Corp.,* 242 F.2d at 247). Consistent with Rule 52, a court need not make findings in negatively responding to every issue of fact raised. *Vienna Metro*, 786 F. Supp. 2d at 1093. Instead, the "test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Id.*

---

[1] The Court may rely on judicial authority construing a Federal Rule of Civil Procedure when that rule, here Rule 52(a)(1), mirrors this Court's rule. *Melco Clothing Co., Inc. v. United States*, 804 F. Supp. 369, 371 (Ct. Int'l Trade 1992) (citing *Tomoegawa (U.S.A.), Inc. v. United States*, 763 F. Supp. 614, 617 (Ct. Int'l Trade 1991) (citing, in turn, *Zenith Radio Corp. v. United States*, 823 F.2d 518, 521 (Fed. Cir. 1987))).

## III.    LAW OF THE CASE

Prior to trial, this Court issued a decision in this action in response to cross-motions for summary judgment.  *Cyber Power Systems (USA) Inc. v. United States*, 560 F. Supp. 3d 1347 (Ct. Int'l Trade 2022).  "The doctrine of law of the case generally bars retrial of issues that were previously resolved."  *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697 (Fed. Cir. 2001).  Law of the case encompasses issues expressly decided or "decided by necessary implication."  *United States v. White*, 846 F.2d 678, 684 (11th Cir. 1988); *see also Ford Motor Co. v. United States*, 992 F. Supp. 2d 1346, 1355 (Ct. Int'l Trade 2014).

"With respect to law of the case, '[p]erhaps the most obvious justifications for departing . . . arise when there has been an intervening change of law outside the confines of the particular case.'"  *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 628 (Fed. Cir. 2015) (quoting 18B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 4478); *see Wopsock v. Natchees,* 454 F.3d 1327, 1333 (Fed. Cir. 2006) (where there was a change in the law, law of the case did not apply);  *see also Dow Chem. Co.*, 803 F.3d at 629 (citing 18B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 4478 (2d ed. 2002) ("The easiest cases [for departing from law of the case] occur when the law has been changed by a body with greater authority on the issue . . . .")).

Similarly, a significant change in evidence may also warrant a departure from the law of the case.  *See Arizona v. California*, 460 U.S. 605, 623–24 (1983) (in the context of the mandate rule, issue may be revisited due to changed circumstances that "could not be disposed of at the time of an initial decree"); *Heathcoat v. Potts*, 905 F.2d 367, 371 (11th Cir. 1990) (exception to doctrine of law of the case where subsequent trial elicited "substantially different evidence").

### A. **Marking Statute**

In its decision denying summary judgment, the Court noted that 19 U.S.C. § 1304(a) "requires all merchandise imported into the United States be marked permanently, legibly, indelibly, and in a conspicuous place, to indicate to the ultimate purchaser the English name of the product's country of origin." *Cyber Power*, 560 F. Supp. 3d at 1351. The term country of origin means "the country of manufacture, production or growth of any article of foreign origin entering the United States." *Id.* If further work or material is added to an article in another country, then, for the purpose of marking, that article would have the country of origin of the last country where it underwent a "substantial transformation." *Id.* Further, the Court recognized that when applying trade remedies such as Section 301, Section 232, or Section 201, determining the correct country of origin is necessary and "the substantial transformation analysis is applicable." *Id.*

Here, additional duties pursuant to Section 301 of the Trade Act of 1974, 19 U.S.C. §§ 2101 *et seq.*, would be applicable to the subject merchandise if its country of origin is China in the amount of 25 percent *ad valorem*. The Court observed that the stated purpose for imposition of Section 301 duties was two-fold: to promote change in China's acts, policies and practices related to technology transfer, intellectual property and innovation; and to encourage a partial de-coupling of China's economy from the Unites States by discouraging investment in, and trade with, China. *Id.* at 1352.

The Court then noted that "[p]laintiff['s parent], a Taiwanese company, **appears** to have in fact de-coupled from China, moving some of its production from China to the facility

established in the Philippines in 2018" to manufacture printed circuit board assemblies (PCBAs) in the Philippines. *Id.* (emphasis added).

## B. <u>Substantial Transformation</u>

In analyzing the concept of "substantial transformation," the Court held that "[a] 'substantial transformation' occurs 'when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process.'" *Cyber Power*, 560 F. Supp. 3d at 1350 (quoting *Torrington, Co. v. United States*, 764 F.2d 1563, 1568 (Fed. Cir. 1985)).

The Court noted that "'[s]ubstantial transformation' determinations are fact-specific and made on a case-by-case basis." *Id.* at 1350 (citing *Koru N. Am. v. United States*, 701 F. Supp. 229, 234 (Ct. Int'l Trade 1988)). However, although the "name, character, or use" test is disjunctive, a change in name is considered the least persuasive factor. *Id.*

Further, the Court recognized that "[t]here is no dispute that a 'simple assembly' does not substantially transform merchandise." *Cyber Power*, 560 F. Supp. 3d at 1353. The Court noted a dispute between the parties as to what constitutes "simple assembly." *Id.*

Also, the Court observed that the most recent pronouncements on substantial transformation by the U.S. Court of Appeals for the Federal Circuit have required that there be a "'new and different' article which emerges from the manufacturing process." *Id.* at 1350–51.

Finally, the Court was not persuaded that consideration of the essence of a completed article in determining whether a change in character has occurred, especially where the parts assembled are for a predetermined use, is particularly helpful in conducting a substantial

transcription analysis. *See id.* at 1353–55 & n.1 (distinguishing *Energizer Battery Inc. v. United States*, 190 F. Supp. 3d 1308 (Ct. Int'l Trade 2016)).

## IV. PERTINENT FACTS TO WHICH THE PARTIES HAVE PREVIOUSLY AGREED

As reflected in the August 8, 2022 Pretrial Order, the parties agreed to a set of uncontested facts. Docket No. 142 at 8 to 16. The most salient of these provide that:

1. The subject merchandise at issue in this action covered by Entry No. 791-2578496-2 are model numbers CBN50U48A-1, CST135XLU, OR500LCDRM1U, SX650U, CP600LCDa, which are uninterruptible power supplies (UPS), and HT1206UC2RC1, which is a surge voltage protector (SVP). Docket No. 142 at 8, ¶¶ 1–4.

2. The subject merchandise was packaged into retail boxes marked "Made in Philippines." Docket No. 142 at 8, ¶ 5.

3. CBP detained the subject merchandise and required Cyber Power to mark it as country of origin China, which Cyber Power declined to do, and the merchandise was deemed excluded. Docket No. 142 at 8-9, ¶¶ 6-10.

4. The main board printed circuit board assembly incorporated into each of (a) UPS Model No. OR500LCDRM1U, Docket No. 142 at 10, ¶ 18; (b) UPS Model No. SX650U, Docket No. 142 at 11, ¶ 26; (c) UPS Model No. CBN50U48A-1, Docket No. 142 at 12, ¶ 34; UPS Model No. CST135XLU, Docket No. 142 at 14, ¶ 50; and the printed circuit board assemblies of SVP Model No. HT1206UC2RC1, Docket No. 142 at 15, ¶ 58; are manufactured in China.

5. Cyber Power Systems, Inc., a Taiwanese entity and parent of plaintiff, has an enterprise resource planning (ERP) system from which it generated the information in the bill of materials. Docket No. 142 at 15, ¶ 64.

6. Cyber Power Systems, Inc. is in charge of purchasing the components that comprise the subject merchandise. Docket No. 142 at 16, ¶ 65.

# V.     ADDITIONAL FINDINGS OF FACT

1.     At trial, plaintiff presented no witness testimony from Cyber Power Systems, Inc.[2]

2.     At trial, plaintiff presented no witness testimony from Phisonic Technology Corporation.

3.     Mr. Chi-Ting Huang, with an address in New Taipei City, Taiwan, has continuously been the general manager of CPSMI since 2018, which requires the management of all the factory's departments; executing short-, medium-, and long-term plans of CPSMI; applying for relevant documents such as business licenses and Special Economic Zone ("PEZA") permits from the Philippines; and initially setting up CPSMI.  (Trial Vol. I at 46–48.)

4.     Six hundred people are employed at CPSMI of which approximately one hundred are involved in manufacturing products.  (Trial Vol. I at 48.)

5.     Mr. Huang provided testimony describing events in a demonstrative video that he made in July 2020.  (Trial Vol. I at 48–49.)

6.     Plaintiff elicited no testimony from Mr. Huang that the operations depicted in the July 2020 video demonstrative exhibit were substantially the same as those conducted when the merchandise in this case was manufactured.  (Trial Vol. I at 49–50.)

7.     The only model of the subject merchandise for which plaintiff claims the PCBAs were manufactured in the Philippines is CP600LCDa.  (Defendant's trial exhibit 14 (Plaintiff's Interrogatory Responses).)

8.     Mr. Huang testified, in relation to a demonstrative video and other matters, that:

    8.1.    CPSMI and Phisonic Technology Corporation share a factory.  (Trial Vol. I at 55–57);

    8.2.    The only entrance into Phisonic are the steps seen in the demonstrative video where the Phisonic sign was depicted on the outside wall of the factory.  (Trial Vol. I at 57);

    8.3.    Phisonic manufactures printed circuit boards and then assembles them into printed circuit board assemblies (PCBAs).  (Trial Vol. I at 57–58);

---

[2] Although Mr. Chi-Ting Huang stated that he is a paid employee of Cyber Power Systems, Inc., plaintiff described Mr. Huang as the general manager of CPSMI and circumscribed his testimony as authenticating CPSMI's business records and testifying as to the manufacturing operations performed at the CPSMI factory in the Philippines.  Docket No. 142 at 57.

8.4.    "We"[3] have to use the surface mount technology for the printed circuit boards. (Trial Vol. I at 58);

8.5.    Phisonic uses SMT, AI (auto insertion), DIP (dual in-line process for double rows of insertions done by hand), wave soldering so that the currents are connected.  (Trial Vol. I at 58–63);

8.6.    Phisonic then tests the PCBAs after wave soldering and may perform repairs such as soldering for PCBAs that do not pass ICT testing which confirms whether the currents on the PCBA can be detected.  (Trial Vol. I at 64–67);

8.7.    For companies subject to PEZA, different companies have to be partitioned or have a gate to separate them.  (Trial Vol. I at 68);

8.8.    A door at the Phisonic SMT workshop reflects ISO certifications (14001 and 9001) that "we" obtained.  (Trial Vol. I at 68–69);

8.9.    There is a bigger surface mount machine and a smaller surface mount machine that is used depending on the research and development from Taipei (CPSI) as the design of each finished product would be different because the layout of the board is different.  (Trial Vol. I at 72–73);

8.10.   Main board PCBAs are bigger than USB or charger boards.  (Trial Vol. I at 74–75);

8.11.   The PCBAs start with surface mount technology and auto insertion, and then proceed to the DIP station for preprocessing such as cutting resistors that are too long and then move to the DIP phase.  (Trial Vol. I at 78–80, 83);

8.12.   During the DIP phase, workers place larger pieces and electrical wires into the board and confirm visually that no parts are omitted prior to placing it into the wave soldering machine.  (Trial Vol. I at 88–89);

8.13.   During the wave soldering, tin will be plated onto the pins on the bottom of the board so that electricity can go through them, "that way the device can work."  (Trial Vol. I at 90);

8.14.   After wave soldering, if some pins are too long, they will be trimmed, and where some items were not tin-plated, manual soldering is performed.  (Trial Vol. I at 92);

---

[3] As noted below, Mr. Huang's use of the pronoun "we" suggests that Phisonic is, in reality, not a separate entity from CPSMI.

8.15. During DIP manufacturing of the PCBAs, their structure or composition is reviewed to set parameters such as temperature and the angle or degree of the slope for the board to go into the track. (Trial Vol. I at 94-95);

8.16. There is an 8.5 x 11 inch piece of paper containing the word Cyber and the image of a person attached to a soldering machine that depicts the operator of the machine. (Trial Vol. I at 99–100);

8.17. No other machinery depicted in the demonstrative video possesses an image of the machine's operator. (See demonstrative video);

8.18. The workers depicted in the demonstrative video wear shirts with differing colors and logos, reflecting the various human resources agencies that provide workers. (Trial Vol. I at 102–03);

8.19. The PCBA manufacturing process is completed after the PCBAs have completed ICT and ATE testing and then a sight inspection. (Trial Vol. I at 105);

8.20. Thereafter, an "in-stock" order is generated, the PCBAs are recorded in a ledger and then "we" (clarified to mean Phisonic) deliver them to CPSMI's warehouse. (Trial Vol. I at 105–06);

8.21. The plain brown boxes in the Phisonic section of the building, without the name Cyber Power, contain PCBAs that have passed audit control and can go into the CPSMI warehouse. (Trial Vol. I at 108);

8.22. The brown cardboard boxes with "Cyber Power" printed on them located throughout the Phisonic section of the building, in some instances palletized and wrapped in plastic, contain defective PCBAs that have been returned to Phisonic by CPSMI. (Trial Vol. I at 109, 111–13, 121);

8.23. When "we" started the manufacturing, the rate of a good part was in the range of 70-something percent with roughly 30 percent defective. (Trial Vol. I at 113);

8.24. Phisonic is a subsidiary of CPSI, and Mr. Huang is hired by CPSI and has a pass to visit CPSMI's sister company, Phisonic, at any time. (Trial Vol. I at 114–15);

8.25. Phisonic started manufacturing PCBAs in September 2019. (Trial Vol. I at 118);

8.26.   From the end of 2020 to 2021, "we have improved our testing equipment and the skills of the manpower." "So right now 'we' have reduced the defective rate to about 10 percent." (Trial Vol. I at 118–19);

8.27.   The finished PCBAs are placed in trays on carts and rolled from the Phisonic portion of the factory to the CPSMI portion of the factory along an outdoor covered walkway exposed to the elements. (Trial Vol. I at 119);

8.28.   There is a board with an arrow (red) pointing to CPSMI and another arrow (blue) pointing to Phisonic that also contains a CPSMI "Production Organization Chart" depicting CPSMI employees, but there is no similar organization chart for Phisonic on that board. (Trial Vol. II at 133–35);

8.29.   CPSMI workers assemble a surge protector by soldering/welding objects such as a power cord to attach them to the PCBA, placing a USB board and the charger board at the bottom of the shell, screwing the bottom shell tightly, and conducting Hi-Pot testing to see if it will short circuit and to confirm that the ground is connected properly. (Trial Vol. II at 141–42, 146);

8.30.   If an SVP or a UPS fails the Hi-Pot test, it is placed in a box and then evaluated for repair conducted by CPSMI workers unless the failure is due to a PCBA. Then the main board would be removed and returned to the supplier, either Cyber Power China or Phisonic. (Trial Vol. II at 150–51, 153);

8.31.   CPSMI workers also preprocess the USB rear panel, including placing a terminal in the rear panel, terminal spot welding/soldering, and conducting a two-hour burn-in test for the charging capacity of the SVP's USB board. (Trial Vol. II at 154, 156–57, 163–64);

8.32.   The demonstrative video reflected a worker known as Lito in a Phisonic shirt working on the CPSMI assembly line who was identified as the CPSMI supervisor for the UPS manufacturing line. Mr. "Lito" initially worked at Phisonic but "we" transferred him from Phisonic to CPSMI through the human resources agency. (Trial Vol. II at 165–67);

8.33.   Mr. Lito was hired by Phisonic in 2019 and transferred to CPSMI in July 2020, but learned how to assemble UPSs at Phisonic, a company that does not assemble UPSs. (Trial Vol. II at 170–71);

8.34.   The demonstrative video showed the preassembly of the rear of a UPS and then the main body. (Trial Vol. II at 172, 175–76);

11

8.35.   The demonstrative video showed a man at the assembly line behind whom were stacked boxes, one of which was open and contained Styrofoam.  When asked what was in that box, Mr. Huang explained that this box is just to hold Styrofoam.  (Trial Vol. II at 176, 178);

8.36.   In the next few frames of the demonstrative video, a box is being opened and a plastic case from Cyber Power China, protected by Styrofoam, is removed.  The plastic case is placed open on the assembly line and reveals a white wire for electronic data.  (Trial Vol. II at 179);

8.37.   When asked if the plastic case contained anything else other than the white wire for electronic data, Mr. Huang testified there are no other items.  It only contains the electronic data line and the plastic case.  (Trial Vol. II at 181);

8.38.   A few frames later in the demonstrative video, there is a yellow item seen in the case, which is revealed to be a small PCBA connected to the white wire.  (Trial Vol. II at 183–84);

8.39.   The demonstrative video further reflects a worker inserting the PCBA into the case and then connecting the white wire to the PCBA along with a transformer and then using glue to attach the parts.  (Trial Vol. II at 192);

8.40.   Next, a worker registers the battery's voltage in a ledger prior to the battery being inserted into the case.  (Trial Vol. II at 195–96).  The DC current is tested to determine whether the machine can be turned on.  (Trial Vol. II at 198).  The battery, which possesses a serial number, is then placed in the UPS case and the cover over the battery is locked.  (Trial Vol. II at 197, 199);

8.41.   Next, the UPS undergoes a Hi-Pot test, similar to that done for the SVP, then the ATE (automatic testing equipment) test to correct parameters and check voltage and current, and then the USB is tested similar to the testing done for the SVP.  (Trial Vol. II at 201–04);

8.42.   Next the L, N, G wires are tested to make sure they are not reversed and then the RJ45 hole for connection to a network wire is tested.  (Trial Vol. II at 207–09);

8.43.   A worker shakes the unit to make sure there are no loose parts, and the item is packaged in a retail color box along with the user manual.  (Trial Vol. II at 210–11);

8.44.   The Phisonic factory is known as Building A, Unit A.  The CPSMI assembly facility is Building A, Unit B.  Prior to the incorporation of Phisonic,

CPSMI's warehouse filled the Building A, Unit A portion. (Trial Vol. II at 217–18). Building B was built in June 2019. (Trial Vol. II at 218);

8.45. Mr. Huang's signature (printed "Huang Chi Ting") on plaintiff's trial exhibit 6 is not the same as that for his January 13, 2021 affirmation ("Tim"), Docket No. 67-1 at 5. (Trial Vol. II at 266, 271). Similarly, his August 3, 2022 certification ("Tim Huang"), Docket No. 133-1 at 4, is different from his November 19, 2020 affirmation (Chinese characters), Docket No. 48-4 at 43, and both of these are different from plaintiff's trial exhibit 6 and the January 13, 2021 affirmation. (Trial Vol. II at 280–82);

8.46. Mr. Huang's signature on plaintiff's trial exhibit 6 is different because it was required to match his passport name. His subsequent signature of "Tim" was the signature that he used for his company check and then the signature on his company checks changed to Tim Huang in 2020 and "[t]herefore I am using the same signature that I signed on company checks." (Trial Vol. II at 280–81);

8.47. The tax-free period for CPSMI ends in the year 2022. (Trial Vol. II at 289–90);

8.48. The tax-free period for Phisonic began in 2019 and would last for four years. (Trial Vol. II at 289-90);

8.49. CPSMI's electrical and mechanical permits ran out on October 23, 2019 and plaintiff produced no permits covering the time period when the subject merchandise was manufactured. (Trial Vol. II at 294-297);

8.50. CPSMI is qualified by SGS and the certificate is posted on the wall of his office. (Trial Vol. II at 306);

8.51. Phisonic obtained an SGS ISO certificate in February 2020. (Trial Vol. II at 306);

8.52. Documents reflecting Phisonic's SGS ISO certifications were not provided to the Government as part of plaintiff's document production. (Trial Vol. II at 307–08);

8.53. As part of the last documents attached to plaintiff's complaint, Docket No. 13-1 at 89 and 91, are SGS certifications provided to CPSMI for ISO 14001 and 9001 for the assembly of products. Both certificates are valid until May 20, 2022. (Trial Vol. II at 308–09);

8.54.    The rent paid by CPSMI and Phisonic to the landlord, a Chinese person in the Philippines named Robert, whose full name Mr. Huang did not know, is included as part of the processing fees paid by CPSI.  (Trial Vol. II at 310–11);

8.55.    In comparing plaintiff's trial exhibit 23 (production timeline for CBN0U48A-1) with plaintiff's trial exhibit 21 (bill of materials), the man hours for China do not account for the hours to manufacture the bare printed circuit board, the parts incorporated into the PCBA, the testing of the PCBA or the packing of the PCBA to send it to CPSMI.  (Trial Vol. II at 314–19);

8.56.    For bills of materials containing percentages assigned to more than one potential country of origin, a person reviewing the document would need to obtain the procurement order to determine which of the countries actually supplied the item as to the subject merchandise.  (Trial Vol. II at 323–26);

8.57.    Similarly, where the bills of materials have more than one country of origin for the battery, because the batteries possess serial numbers, it is possible to determine which country provided the battery for the subject merchandise detained by CBP.  But the bills of materials produced in this action fail to do so.  (Trial Vol. II at 323–26);

8.58.    Mr. Huang agreed that for plaintiff's trial exhibit 32, the CST135XLU Production Timeline, the production quantity is 1800 and the production time for 1800 pieces is calculated, but the man-hours and total man-hours are listed as being for 1440 pieces—even though the same man-hours are provided for 1440 pieces as part of its calculation (production time x numbers of manpower) as for 1800 pieces.  (Trial Vol. II at 340–46);

8.59.    The discrepancy was due to a 20 percent rate of defective issues due to different versions of firmware applied to the PCBA and that when they came CPSMI had to rework them.  Therefore only 1440 were assembled, notwithstanding that the production quantity for the Philippines is listed as 1800.  (Trial Vol. II at 345–50.)

9.    In his direct testimony by deposition, (Huang Dep.), Mr. Huang testified that Phisonic is a subsidiary of CPSMI.  (Huang Dep. at 28:6–14.)

10.   In responding to questions about plaintiff's trial exhibit 13 (the manufacturing timeline for the CP600LCDa), Mr. Huang testified that only one person is needed to perform surface mounting because "[w]e only need one person to monitor the machine."  (Huang Dep. at 43:12–21.)

11.     The Court admitted into evidence plaintiff's trial exhibits numbered 6 to 63 and the direct testimony transcript of Mr. Huang dated August 5, 2022.  (Trial Vol. II at 247-48.)

12.     At trial, plaintiff failed to present any invoices, purchase orders, proofs of payment, or bills of lading relating to the subject merchandise.  (*See generally* plaintiff's trial exhibits 6 to 63.)

13.     At trial, plaintiff failed to present any of the procurement documents discussed by Mr. Huang to establish which of multiple countries listed on the bills of materials actually supplied the specific part.  (*See generally* plaintiff's trial exhibits 6 to 63.)

14.      At trial, plaintiff provided representative testimony and documents about the composition and manufacture of its UPSs and SVPs, but not the specific UPSs and SVPs detained by CBP that constitute the subject merchandise at issue in this action.

15.     Thomas Fuehrer is an electrical project manager at Cyber Power whose responsibilities include providing technical expertise for product marketing and analysis of Cyber Power products that fail.  (Trial Vol. III at 362–63.)

16.     Mr. Fuehrer is familiar with Cyber Power's SVPs and UPSs.  (Trial Vol. III at 366–67.)

17.     Generally, a UPS provides battery power to a connected device when power from a wall socket is unavailable.  (Trial Vol. III at 368–69.)

18.     The main PCBA within a Cyber Power UPS is functional after being installed in a chassis and "completely wired together so it has power coming in from the wall inlet utility power."  (Trial Vol. III at 376–77.)

19.     Firmware, which is a list of instructions for a microcontroller chip's (or custom program chip's) operation, is custom-coded by Cyber Power Taiwan for specific models of UPSs and loaded or "burned" onto the microcontroller during production.  (Trial Vol. III at 377–80.)

20.     A UPS would not function without firmware burned onto its microcontroller.  (Trial Vol. III at 390.)

21.     The microcontroller is a part of the PCBA within a UPS.  (Trial Vol. III at 392.)

22.     There are two PCBAs within the CP600LCD UPS, one PCBA within the CBN50U48A-1 UPS, three PCBAs within the CST135XLU UPS, two PCBAs within the OR500LCDRM1U UPS, and two PCBAs within the SX650U UPS.  (Trial Vol. III at 399, 404, 408–09, 418, 424.)

23. Generally, an SVP protects connected devices from surge voltages, lightning strikes, and power disruptions by acting as a "buffer" between excessive incoming voltage and any connected devices. (Trial Vol. III at 426–31.)

24. There are at least five PCBAs within the HT1206UC2RC1 SVP, but no firmware. (Trial Vol. III at 435–36.)

25. The CBN50U48A-1 "went into production in March of 2020" and "entered the marketplace" during that same time. (Trial Vol. III at 452, 454.)

26. Cyber Power's products have more than just a main PCBA as a result of upgrades or adding additional functionality to its products. (Trial Vol. III at 458.)

27. Mr. Fuehrer could not explain why the schematic for the CST135XLU UPS shows two item number fives, which "would cause confusion in production." (Trial Vol. III at 460–61.)

28. Once firmware is burned onto a Cyber Power microcontroller, "the door is shut," because new firmware cannot be burned unless one has the necessary equipment to connect to the PCBA and uses the right "protocol" to go over the electrical interface, which Cyber Power does not do. (Trial Vol. III at 462–63.)

29. Regarding the six devices at issue in this case, Mr. Fuehrer dealt with only a "handful, one or two, maybe up to four" returns of products from customers per year from 2018 to 2021 for "failure during functioning." (Trial Vol. III at 469–74.)

30. Brent Lovett is the general manager and president of Cyber Power and is responsible for leading its executive team and the direction of the company. (Trial Vol. III at 478.)

31. If a Cyber Power product that fails is returned to Cyber Power, it will replace the product or, in limited circumstances, will repair it. (Trial Vol. III at 485.)

32. Cyber Power's consumers care about price; they only "might" care about the country of origin of merchandise. (Trial Vol. III at 518, 564.)

33. Cyber Power Taiwan orders and tracks all the parts used in Cyber Power's manufacturing operations worldwide. (Trial Vol. III at 525.)

34. Cyber Power Taiwan controls about four factories in the People's Republic of China. (Trial Vol. III at 528–30.)

35. Cyber Power Taiwan's factory in Shenzhen, China, is capable of manufacturing all of the six products at issue in this action. (Trial Vol. III at 528.)

36.	It is cheaper to produce all six products at issue in China rather than the Philippines, and Cyber Power Taiwan produces more units in China because of this cheaper production cost.  (Trial Vol. III at 534–39.)

37.	Mr. Lovett has personally taken big customers, who "like to see where things are being made," to see the Shenzhen facility and its DIP and surface mount machines, but has not personally taken any customer to see Cyber Power's Philippine facility or even been to the Philippines. (Trial Vol. III at 541–44.)

38.	Linda Horacek has been an import specialist with U.S. Customs and Border Protection for fourteen years, and has been on the electronics enforcement team for four years. (Trial Vol. III at 596.)

39.	In her work as in import specialist, Ms. Horacek has determined the country of origin of one-hundred different products, and has also conducted some overseas country of origin verifications.  (Trial Vol. III at 597–98.)

40.	Ms. Horacek's work on the electronics enforcement team requires her to conduct "a very thorough," "in-depth review" to determine whether an electronic article is counterfeit. (Trial Vol. III at 599–600.)

41.	There are "lots of times when country of origin will be an issue," including when determining duty, "to see if foreign trade programs are correct," and in USMCA matters. (Trial Vol. III at 600–01.)

42.	Ms. Horacek's job as an import specialist "is to get it right"; she does not "get any bonuses" for "income received."  (Trial Vol. IV at 782–83.)

43.	An import specialist will typically determine country of origin through a document-intensive review of an importer's records to see if there is a "flow" documenting "raw materials going in," merchandise "being processed while it's in the factory," and "goods coming out and having been produced, examined, quality control done."  (Trial Vol. III at 601–04.)

44.	Import records should show that specific raw materials are going into a particular factory, production records should show that certain merchandise is being produced within that factory, and quality records should show that a particular number of units were made by a particular employee at that factory.  (Trial Vol. III at 602–03.)

45.	Production records, such as bills of materials, should establish traceability, that is, track a particular unit through a production process, who performed that process, what happened, and when the unit was produced.  (Trial Vol. III at 603–04.)

46. There should be no problem providing adequate production records establishing traceability for a vertically integrated company that controls the whole supply chain for a particular article. (Trial Vol. III at 605–06.)

47. Unless one is present at a factory on the day than an article is produced, "a factory visit would not determine country of origin" of that article because it does not provide a "snapshot" of the article being made; there must still be a "document review" process to verify that the article was actually produced in that factory. (Trial Vol. III at 606–07.)

48. Ms. Horacek first became involved with Cyber Power in August 2019, when Cyber Power filed a prior disclosure regarding a country of origin issue. (Trial Vol. III at 608.)

49. Before Cyber Power filed its final prior disclosure, Ms. Horacek asked Cyber Power how it differentiated its Chinese and Philippines goods, and was told "that Chinese goods were shipped out of China and Philippine goods were shipped out of the Philippines." (Trial Vol. III at 609–10.)

50. Cyber Power's final prior disclosure, however, revealed that certain "cables and batteries and some rack servers . . . were coming out of the Philippines that were country of origin to China." (Trial Vol. III at 610.)

51. Ms. Horacek asked Cyber Power (USA) for the production records for one UPS unit and one SVP unit (not at issue in this case) in September or October of 2019. (Trial Vol. III at 611–12.)

52. In response, Ms. Horacek expected to receive documentation like bills of materials and other records showing "raw materials incoming, production going on within the facility, dates, times, employees, quality control records, outgoing, those types of things." (Trial Vol. III at 613–14.)

53. Ms. Horacek did receive "several bills of materials" in response, "but sometimes they changed." (Trial Vol. IV at 734–35.)

54. Cyber Power also identified "the location where the assembly of the UPS" took place, but that information "kept conflicting." (Trial Vol. IV at 736.)

55. Cyber Power did not provide sufficient documentation to Ms. Horacek's satisfaction, so she conferred with National Import Specialist Karl Moosbrugger. (Trial Vol. III at 614–15.)

56. Based on the information it provided to CBP, Cyber Power was eventually instructed to remark all of its merchandise as "Made in China," but it refused to do so for the six products contained in the entry at issue in this case, resulting in their detention. (Trial Vol. III at 616–17.)

57. By March 18, 2020, Ms. Horacek was finally "given a date" as to when Cyber Power began soldering circuit boards in the Philippines, but she was "not given any models," so she "had no idea which units were supposedly being done in the Philippines." (Trial Vol. IV at 755.)

58. Cyber Power ultimately protested CBP's detention of its merchandise, arguing that the six products' PCBAs were made in the Philippines, providing "representative records," and offering to provide actual records for the products at issue "upon request." (Trial Vol. III at 617–25.)

59. In her experience determining the country of origin of approximately one-hundred products, Ms. Horacek has never received "representative records" from an importer. (Trial Vol. III at 621.)

60. It "makes no sense" to provide "representative records" because an import specialist determining country of origin wants "to know what happened with that shipment" at issue, "not shipments in general." (Trial Vol. III at 621–22.)

61. Ms. Horacek could have denied Cyber Power (USA)'s protest outright for lack of sufficient documentation, but instead gave it "every opportunity to give [CBP] the information so [CBP] had the best information to make" a country of origin decision. (Trial Vol. III at 625–26.)

62. Ms. Horacek then requested actual records from Cyber Power. (Trial Vol. III at 626.)

63. In response, Cyber Power provided untranslated, redacted records that were "not tied to this particular order" contained in the entry at issue and left Ms. Horacek unable to "tie" raw materials going to the Philippines "to the units in question." (Trial Vol. III at 641–44.)

64. In her experience determining the country of origin of approximately one-hundred products, Ms. Horacek does not recall ever receiving redacted records. (Trial Vol. III at 642.)

65. When providing actual records, Cyber Power also claimed that instead of all six products' PCBAs having been produced in the Philippines, only three were produced there, with one being produced in Taiwan and two in China. (Trial Vol. III at 626, 649–50.)

66. The actual records that Cyber Power did provide "conflict[ed] with each other," making it "difficult to make a determination," and offered only "bits and pieces of the story, not the whole story." (Trial Vol. IV at 767–69.)

67. Ms. Horacek asked follow-up questions concerning the country of origin of the six products at issue, to which Cyber Power responded by claiming that five products had

PCBAs produced in China, and one product—the CP600LCDa—had a PCBA produced in the Philippines.  (Trial Vol. III at 648–52.)

68.    Ms. Horacek was "a bit skeptical" that the CP600LCDa's main PCBA could have been made in the Philippines because the unit shipped out a day after the PCBA was finished, even though the "rest of the production had not been done yet."  (Trial Vol. III at 647, 652.)

69.    After consulting with her supervisor, Ms. Horacek testified that "as much as we would have liked to have granted" Cyber Power's protest, they could not; after reviewing Cyber Power's actual records, seeing the claimed country of origin of the products' PCBAs change over time, and noticing that the "dates were not matching on anything" with respect to the CP600LCDa, Ms. Horacek was more confident that the six products at issue were of Chinese origin.  (Trial Vol. III at 651.)

70.    Ms. Horacek also reviewed documents that Cyber Power produced during this litigation, including an ISO audit report from an independent company (SGS) documenting an audit that was performed at Cyber Power's Philippine facility "within two weeks of the shipment in question before the Court."  (Trial Vol. III at 683–84.)

71.    The audit report is addressed to Cyber Power Systems Manufacturing at Units A and B, Block 1, Lot 6, 7, 8, Phase 2 Golden Gate Business Park, Philippines.  (Trial Vol. III at 684, 688–89.)

72.    The audit report made several "Critical audit findings" about Cyber Power's Philippine facility, specifically that (1) the "front line process, manual insertion processing," and "solder dipping process" were not covered in the "Control Plan," (2) "Risks and opportunities pertaining to the new process were not determined," such as the "risk of having component defects, risk of not having highly skilled personnel for the processes, risks of not meeting volume requirements," and others, (3) "There were no quality objectives set for SMT/mounters, Front Line, Manual Insertion, and Solder DIP Process," and (4) there were only "some work instructions for SMT, solder DIP processing and reflow, but none for Front line."  (Trial Vol. III at 684–86.)

73.    The audit report also made several noncritical findings about Cyber Power's Philippine facility, including that "Personnel deployed in the new processes are still undergoing qualification process," and "Although responsibilities for the new processes were assigned, there were no records to demonstrate who was assigned to specific processes, who were the SMT/Mounters, Manual Insertion, Front Line, and DIP solder process. Moreover, job descriptions for those processes were not available."  (Trial Vol. III at 687–88.)

74.    These audit findings indicated to Ms. Horacek that the processes described in the report must have been "fairly new" or "very, very new" because there were no "control plans,"

"job descriptions," qualified employees, or "front line work instructions to tell the employees how that soldering operation should be performed." (Trial Vol. III at 686–88.)

75.     The audit report does not mention Phisonic. (Trial Vol. III at 688–89.)

76.     A CPSI invoice billing Cyber Power for over $100,000-worth of UPSs and power distribution units shipped from Manila North, Philippines, lists a ship date of October 11, 2018, (defendant's trial exhibit 3); however, CPSMI was not issued a certificate of occupancy, mechanical permit to operate, or electrical permit to operate until October 27, 2018, and was not issued a fire safety inspection certificate until October 25, 2018 (plaintiff's trial exhibit 6).

77.     A bill of materials listing components for the CP600LCDa's "Main Board" lists a part with the part number A12-0000036-00 (defendant's trial exhibit 4); however, an invoice listing part number A12-0000036-00 indicates that this part was shipped to CPSI's factory in Shenzhen, China, rather than the Philippines (defendant's trial exhibit 5).

78.     The Court admitted into evidence defendant's trial exhibits numbered 1 (Trial Vol. III at 666), 2 (Trial Vol. III at 668), 3 (Trial Vol. III at 672), 4 (Trial Vol. III at 674), 5 (Trial Vol. III at 677), 6, (Trial Vol. III at 679), 7 (Trial Vol. III at 646), 8 (Trial Vol. III at 680), 9 (Trial Vol. III at 681-82), 10, (Trial Vol. III at 683), 11 ((Trial Vol. III at 654), 12 (Trial Vol. III at 656-57), 13, (Trial Vol. III at 620), 14 (Trial Vol. III at 533), 15, (Trial Vol. III at 627), 15A, B, C, D, E, F, and G (Trial Vol. III at 640).

79.     Mr. Karl Moosbrugger, a national import specialist (NIS) assigned to the computer and industrial controls line, testified that while serving in the Navy he received training in electronics, including removing an integrated circuit from a board and soldering a new chip to a board. (Trial Vol. IV at 790–97, 824.)

80.     Among Mr. Moosbrugger's duties as an NIS is to issue rulings, including on country of origin. (Trial Vol. IV at 825–26.)

81.     Mr. Moosbrugger's area of responsibility as an NIS covers, among other things, automatic data processing machines, electric motors, electric generators, power supplies, static converters, electrical switches, and industrial controls. A power supply is a device that supplies primary or secondary power to a machine. (Trial Vol. IV at 827–28.)

82.     Sometime in 2019, Mr. Moosbrugger became involved in a Cyber Power matter after being contacted by import specialist Linda Horacek, who then submitted an official inquiry through CBP's QUICS system. The QUICS system is a method to provide an official advisory to import specialists with similar issues, but it is not a binding ruling. (Trial Vol. IV at 829–30, 845.)

83.     After Ms. Horacek provided Mr. Moosbrugger with documents provided by plaintiff, Mr. Moosbrugger responded in QUICS 45537 that Cyber Power's M550L/550VA model of UPS was of Chinese origin because the assembly processes described did not constitute a substantial transformation. Shortly after this official advisory was issued, Ms. Horacek contacted Mr. Moosbrugger about a country of origin issue for a Cyber Power SVP. Mr. Moosbrugger requested that this inquiry be made via QUICS, which generated QUICS 45791. (Trial Vol. IV at 847–50, 854.)

84.     In connection with QUICS 45791, Mr. Moosbrugger submitted his outline on this issue to Monika Brenner, the branch chief of the Valuation, Origin, and Special Programs Branch to confirm that his approach to substantial transformation employed the correct logic. The analysis in Mr. Moosbrugger's official advisory provided in QUICS 45791 was consistent with that in QUICS 45537. (Trial Vol. IV at 854–57.)

85.     Mr. Moosbrugger's analysis focused on the PCBA manufactured in China and sent to the Philippines for assembly into a finished UPS, noting that a PCBA needed the circuitry to accept the application of firmware, but ultimately the assembly process described as occurring in the Philippines for a plastic shell, terminal strips ready to be attached to the PCBA, a prepared power cord to be attached, and a lighted power switch ready to be inserted into the shell, all of which were made in China, was not sufficient to transform the components into a new article. The assembly process of soldering ground terminal strips to the PCBA, inserting the power switch, and screwing the outer parts of the shell together is not sufficiently complex to constitute a substantial transformation. (Trial Vol. IV at 859–66.)

86.     Mr. Moosbrugger testified that PCBAs are complex devices put together through a process widely accepted as complex. (Trial Vol. IV at 878.)

87.     Mr. Moosbrugger testified that an uninterruptible power supply does not have a different name than a printed circuit board assembly where that PCBA, based on the arrangement, type and number of components soldered to it, can function as a power supply. This is so because, for classification purposes, a power supply PCBA is a power supply whereas an uninterruptible power supply is also a power supply. (Trial Vol. IV at 912–13.)

88.     Mr. Moosbrugger testified that a PCBA that functions as a power supply is the power supply. Adding a battery supplies a different feature but does not change the function of the power supply PCBA. An imported PCBA designed to function as a power supply may be classified the same as an uninterruptible power supply having the same logical parameters. (Trial Vol. IV at 915–16.)

89.     Mr. Moosbrugger testified that the PCBA may not confer the country of origin in all cases because this would result in a cookie cutter approach to country of origin determinations. Further, if there were multiple PCBAs in a device, CBP would have to look at the totality of the circumstances. There is always the possibility that the

22

complexity of an assembly operation confers the functionality of the machine.  (Trial Vol. IV at 933–34.)

90.     The Court admitted into evidence defendant's trial exhibit A, the designated portions of the Rule 30(b)(6) deposition of plaintiff, (Trial Vol. IV at 938), defendant's trial exhibit B, the entire deposition transcript of Mr. Denver Langama (Trial Vol. IV at 941), and defendant's trial exhibit C, the entire deposition transcript of Mr. James S. Anglemyer (Trial Vol. IV at 942).

91.     On July 23, 2020, U.S. Department of Homeland Security, Homeland Security Investigations Investigator Denver B. Langaman and Assistant Attaché Jim Anglemeyer (the "HSI Agents"), with office addresses at the U.S. Embassy in Manila, Philippines, arrived for an unannounced visit to the Philippine facilities of CPSMI and Phisonic, at Units A & B Lot 6, Block 1, Phase 2 Buenavista I General Trias Cavite, Philippines. (Defendant's trial exhibits B and C.)

92.     During their visit on July 23, 2020, the HSI Agents toured the Cyber Power facilities, observing the assembly of products and other activities in the CPSMI area of the facility. (Defendant's trial exhibits B and C.)

93.     HSI Agents Anglemyer and Langaman were unable to enter the Phisonic portion of the facility because it was closed and no one was there at that time.  (Defendant's trial exhibits B and C.)

## VI.     CONCLUSIONS OF LAW

At trial, it was Cyber Power's burden to demonstrate through a preponderance of the evidence that CBP's country of origin determination is incorrect.  *See* 28 U.S.C. § 2639(a). When evaluating evidence, a trial court "weigh[s] the evidence, and choose[s] from among conflicting inferences and conclusions those which the court considers most reasonable." *Lopez*, 2022 WL 1446678, at *6 (citing *Penn-Texas Corp.*, 242 F.2d at 247).  If a court concludes that a witness is untruthful or that testimony is improbable because it is tainted with "inaccuracy, uncertainty, interest or bias," as the trier of fact it may disregard that testimony.  *Id.*

## A.  Cyber Power Failed To Meet Its Burden In This Action

Cyber Power's evidence falls short in satisfying its burden of proof because it is improbable, inconsistent, inaccurate and incomplete.

### 1.  Mr. Huang's Testimony Was Not Credible

Portions of Mr. Huang's testimony, the only witness proffered by Cyber Power to explain the manufacturing process in the Philippines, were sufficiently questionable, and at times improbable, to find its credibility lacking.  For example, although not employed by Phisonic, when describing its activities, Mr. Huang repeatedly used the word "we" rather than Phisonic. *See, e.g.*, Trial Vol. I at 58 ("We" have to use the surface mount technology for the printed circuit board).  This seems to suggest that, although incorporation documents exist for Phisonic, Phisonic may simply be a proxy for CPSMI.

Further calling into question the relationship between CPSMI and Phisonic was the presence of Mr. Lito, wearing his Phisonic shirt, working as a supervisor on CPSMI's UPS production line in Mr. Huang's demonstrative video.  Mr. Huang testified that Mr. Lito initially worked at Phisonic, but "we" transferred him from Phisonic to CPSMI through the human resources agency.  Trial Vol. II at 165–67.  The transfer occurred in July 2020, the very month when Mr. Huang decided to make his demonstrative video.  Yet, Mr. Lito learned how to assemble UPSs at Phisonic, a company that does not assemble UPSs.  Trial Vol. II at 170–71. This testimony, like much of Mr. Huang's testimony, lacks credibility.

When Mr. Huang was asked why he used four different signatures (printed "Huang Chi Ting" on plaintiff's trial exhibit 6; "Tim" on his January 13, 2021 affirmation, Docket No. 67-1 at 5; "Tim Huang" on his August 3, 2022 certification, Docket No. 133-1 at 4; and Chinese

characters on his November 19, 2020 affirmation, Docket No. 48-4 at 43), he provided two explanations.  First, he explained that his signature on plaintiff's trial exhibit 6 is different because it was required to match his passport name.  But it seems strange that a printed name rather than a cursive signature would be present in a passport.

Next, he explained that his "Tim" cursive signature was the signature he used for his company check, and then the signature of his company checks changed to Tim Huang in 2020, and "[t]herefore I am using the same signature that I signed on company checks."  Trial Vol. II at 280–81.  But his November 2020 affirmation signature used Chinese characters, not Tim or Tim Huang; and his January 2021 affirmation signature used "Tim," not the 2020 company check signature "Tim Huang."  This tale is not believable.  If a witness fails to give a straight answer on something as simple as his signature, query how his testimony concerning the possible imposition of an extra 25 percent tariff can be trusted.  It cannot.  *See Braude v. Zierler*, No. 22 CV 03586 (NSR), 2022 WL 3018175, at *3 (S.D.N.Y. July 29, 2022) (finding that a witness's inconsistent, "evasive," and "unpersuasive" testimony "call[ed] into question the veracity of his entire testimony").

Inexplicably, even though Mr. Huang prepared and edited the demonstrative video shown to the Court, when asked simple questions about events depicted in the video, Mr. Huang's answers were wrong.  For example, the demonstrative video showed a man at the assembly line behind whom were stacked boxes, one of which was open and contained Styrofoam.  When asked what was in that box, Mr. Huang explained that the box was just to hold Styrofoam.  Trial Vol. II at 176, 178.  Yet, in the next few frames, we see a box being opened and a plastic shell from Cyber Power China, protected by the same Styrofoam, is removed.  That case is then

opened and placed on the assembly line revealing a white wire for electronic data. Trial Vol. II at 179. When asked if that shell contains anything other than the white wire, Mr. Huang testified that there are no other items. Trial Vol. II at 181. Once again, that statement was immediately proved inaccurate, as a few frames later we see a yellow item revealed to be a small PCBA. Trial Vol. II at 183–84.

Mr. Huang testified that brown cardboard boxes with "Cyber Power" printed on them that were seen in the demonstrative video located throughout the Phisonic section of the building (and in several instances were palletized, stacked several feet high, and wrapped in plastic) contained defective PCBAs that CPSMI returned to Phisonic. Trial Vol. I at 109, 111–13, 121. Mr. Huang explained that when "we" started the manufacturing, the result was about 30 percent defective PCBAs. Trial Vol. I at 113. It is implausible that all of the "Cyber Power" boxes seen at Phisonic represented defective returns from CPSMI. CPSMI treated these purportedly defective PCBAs better (by boxing them, placing them on a pallet and wrapping them in plastic) than they treated new in-stock PCBAs, which are placed in a cart, exposed to the elements, and rolled over to CPSMI. Trial Vol. I at 119. Again, Mr. Huang's testimony is not credible.

In his direct testimony via deposition, when asked why CPSMI would have Phisonic's incorporation documents and Economic Zone papers, Mr. Huang claimed that Phisonic was a subsidiary of CPSMI. Huang Dep. at 28:6–14. At trial, Mr. Huang testified that Phisonic is a subsidiary of CPSI. Trial Vol. I at 114–15. Mr. Huang is an employee of CPSI and the general manager of CPSMI. He would know whether or not Phisonic was a subsidiary of the company he was running. This testimony is not credible.

26

A final example of implausible testimony was that provided by Mr. Huang in response to the Court's inquiry about plaintiff's trial exhibit 32, the CST135XLU Production Timeline. In that document, the Court noted that the production quantity is 1800 and the production time for 1800 pieces is calculated, but the man-hours and total man-hours are listed as being for 1440 pieces—even though the same man-hours are provided for 1440 pieces as part of its calculation (production time x numbers of manpower) as for 1800 pieces. Trial Vol. II at 340–46. Rather than admit that it appears there is an obvious error in the document, Mr. Huang proceeded to testify that the discrepancy was due to a 20 percent rate of defective issues from different versions of firmware applied to the PCBA and that when they came to CPSMI, CPSMI had to rework them.[4] Therefore, according to Mr. Huang, only 1440 pieces were assembled, notwithstanding the fact that that the production quantity for the Philippines is listed as 1800. Trial Vol. II at 345–50.

These examples of implausible testimony reveal a witness whose testimony should be seen as untrustworthy and, thus, not credited unless corroborated by other, unimpeachable evidence. Given, as discussed below, the deficient documentation offered by plaintiff at trial, such corroborative information is unavailable to rehabilitate this witness.

2. Cyber Power Provided Deficient Documentation

At trial, Ms. Horacek explained that an import specialist will typically determine country of origin through a document-intensive review of an importer's records to see if there is a "flow" documenting "raw materials going in," merchandise "being processed while it's in the factory,"

---

[4] We note that this response supports the Government's position that firmware is installed in China, not the Philippines.

and "goods coming out and having been produced, examined, quality control done."  Trial Vol. III at 601–04.  Such documentation can lend credence to an importer's country of origin claim.

Moreover, import records should be able to establish that specific raw materials are going into a particular factory, production records should show that certain merchandise is being produced within that factory, and quality records should show that a particular number of units were made by a particular employee at that factory.  Trial Vol. III at 602–03.  Indeed, the demonstrative video provided by plaintiff at trial supports this point in its depiction of recordkeeping by manufacturing workers, such as filling in ledgers or producing in-stock orders. Trial Vol. I at 105–06; Trial Vol. II at 195–96.

Ms. Horacek explained that production records such as bills of materials should establish traceability, that is, that a particular unit can be tracked through a production process, who performed that process, what happened, and when the unit was produced.  Trial Vol. III at 603– 04.  There should be no problem providing adequate production records establishing traceability for a vertically integrated company that controls the whole supply chain for a particular article. Trial Vol. III at 605–06.  With respect to relying on a video purporting to represent manufacturing events, Ms. Horacek explained that unless one is present at a factory on the day than an article is produced, "a factory visit would not determine country of origin" of that article because it does not provide a "snapshot" of the article being made; there must still be a "document review" process to verify that the article was actually produced in that factory.  Trial Vol. III at 606–07.

Given the critical importance of documentary evidence to provide the traceability of the entire supply and manufacturing chain in establishing country of origin, it is telling that Cyber

Power failed to provide at trial the invoices and purchase orders for the raw materials used in manufacturing the subject merchandise and the production records for that merchandise. Instead, Cyber Power provided documents such as spec sheets, flowcharts, schematics, and user manuals that generally describe the six models at issue, but not specifically the subject merchandise. Plaintiff's trial exhibits 9, 10, 13, 14, 15, 17, 18, 19, 20,[5] 23, 24, 25, 26, 27, 28, 29, 32, 33, 34, 35, 36,[6] 37, 38, 41, 42, 43, 44, 45, 46, 47, 50, 51, 52, 53, 54, 55, 56, 59, 60, 61, 62, and 63. Only the bill of materials documents are among those Ms. Horacek noted as necessary to conduct a country of origin analysis. Yet these documents are marred by line items for parts whose country of origin information is non-specific and reflects more than one possible country of origin. *See* plaintiff's trial exhibits 11, 12, 21, 22, 30, 31, 48, 49, and 57. Such documentation is deficient for the task of traceability to the actual goods at issue. Accordingly, Cyber Power has not provided sufficient documentation to support its claim.

Yet, even if the Court were to credit plaintiff's questionable testimony and deficient documentary evidence, for the reasons that follow, the assembly process occurring in the Philippines falls short of establishing that a substantial transformation sufficient to confer country of origin status has occurred.

---

[5] Mr. Fuehrer testified that model CBN50U48A-1 "went into production in March of 2020" and "entered the market place" during the same time. Trial Vol. III at 452 and 454. Given this information, it is telling that, unlike the other models, plaintiff provided no user manual for this model as part of its trial exhibits. *See* plaintiff's trial exhibits 20–27.

[6] Mr. Fuehrer testified that he could not explain why the schematic for CST135XLU UPS model shows two item number fives as this "would cause confusion in production." Trial Vol. III at 460–61.

**B. Recent Federal Circuit Guidance Warrants Affirming CBP's Determination That The Assembly In The Philippines Does Not Constitute A Substantial Transformation**

1. The Subject Merchandise Was Not Substantially Transformed In The Philippines, Especially In Light Of The *Meyer* Decision

After the Court issued its decision denying summary judgment and during the trial of this case, the U.S. Court of Appeals for the Federal Circuit issued *Meyer Corporation, U.S. v. United States*, 43 F.4th 1325 (Fed. Cir. 2022), a decision addressing, among other things, substantial transformation in the context of country of origin for duty-free treatment under the Generalized System of Preferences. The Federal Circuit explained that "[t]o find a substantial transformation, we consider whether an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Id.* at 1330 (internal quotes and citation omitted). It considered the name element to be "the weakest evidence of substantial transformation." *Id.* (internal quotes and citation omitted).

Next, the Federal Circuit agreed that "the trial court correctly focused its inquiry on manufacturing steps that changed the shape, form, chemical properties." *Id.* at 1331. The appellate court held that for an article to change from a producer's good to a consumer's good, it must undergo "substantial changes in shape, form, chemical properties and mechanical properties." *Id.* Citing *Torrington*[7] and *National Hand Tool*,[8] the Federal Circuit held that the trial court's determination that there was "'no change in use' because 'the use of the [shells] [was] predetermined; they [would] be finished and used as a specific pot or pan,'" correctly

---

[7] *Torrington Co. v. United States*, 764 F.2d 1563, 1566 (Fed. Cir. 1985).
[8] *Nat'l Hand Tool Corp. v. United States*, 16 C.I.T. 308, 311 (1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993).

applied the test. *Id.* (quoting *Meyer Corp., U.S. v. United States*, No. 13-00154, 2021 WL 777788, at *31 (Ct. Int'l Trade Mar. 1, 2021)).

The same situation exists here. The intermediate producer's good for each UPS and the SVP constituting the subject merchandise is its respective main PCBA. As Mr. Moosbrugger testified, if the PCBA for a power supply, for example, had been imported into the United States without further assembly in the Philippines, it would have been classified as a power supply because the complex design of the circuits and components provided its functionality as a power supply. Trial Vol. IV at 912–13. For the main PCBA, like the articles in *Meyer* (shell), *Torrington* (swage), and *National Hand Tool* (hand tool component), its character and use are known prior to importation to the Philippines, and it is simply to be finished in the Philippines.

The question is whether the finishing assembly processes could rise to the level of a substantial transformation of the PCBAs manufactured in China. Among the finishing operations conducted in the Philippines are gluing or soldering parts to the PCBA, inserting batteries and power cords, conducting various testing to confirm that the parts are operating properly, and packaging the item. None of these activities, individually or in combination, can be considered to be complex. *See* Trial Vol. IV at 859–66. Indeed, the demonstrative video provided by Cyber Power, albeit not established as reflective of either CPSMI's operations at the time the subject merchandise was produced or the operations used for the subject merchandise, reveals how lacking of complexity the assembly steps conducted in the Philippines are. Take for instance the fact that Mr. Lito, who was transferred from Phisonic to CPSMI in July 2020 just before Mr. Huang took the demonstrative video, was apparently capable of supervising the assembly of UPSs—even though Phisonic does not manufacture UPSs—after such a short time

on the job.  *See* Trial Vol. II at 165–71.  Or consider the fact that the demonstrative video showed that most of CPSMI's and Phisonic's workers were from human resources agencies, rather than hired as long-term CPSMI or Phisonic employees.  *See* Trial Vol. I at 102–03.  Gluing, soldering, and inserting components cannot be sufficiently complex if workers from staffing agencies can complete those simple tasks and brand new employees can supervise them.

    2.   Cyber Power Failed To Show That The CP600LCDa's Main PCBA Was
            Manufactured In The Philippines

With respect to UPS model CP600LCDa, Cyber Power claims that the main board PCBA is manufactured in the Philippines.  However, Cyber Power's failure to provide sufficient documentation actually tied to the articles comprising the subject merchandise detained by CBP leaves the Court with no ability to evaluate this claim with confidence.  Indeed, Mr. Huang testified that the information in the bills of materials could be tied to the subject merchandise if certain procurement documentation had been provided.  Cyber Power seems to acknowledge its need to provide such information in its Schedule H-1 to the Pretrial Order, Document No. 142 at 61 (Ex. 3) and 63 (Exs. 71-76).

Moreover, Cyber Power's failure to provide SGS certifications for Phisonic is disconcerting.  This is particularly true in the face of an SGS audit of "CPSMI," defendant's trial exhibit 9, performed at Cyber Power's Philippine facility "within two weeks of the shipment in question before the Court" that revealed critical deficiencies.  Trial Vol. III at 683–84.  This audit report addresses SMT and DIP procedures, *i.e.*, those associated with manufacturing PCBAs—yet does not even mention Phisonic, the company Mr. Huang testified manufactures PCBAs for CPSMI.

Among the critical audit findings were that (1) the "front line process, manual insertion processing," and "solder dipping process" were not covered in the "Control Plan," (2) "Risks and opportunities pertaining to the new process were not determined," such as the "risk of having component defects, risk of not having highly skilled personnel for the processes, risks of not meeting volume requirements," and others, (3) "There were no quality objectives set for SMT/mounters, Front Line, Manual Insertion, and Solder DIP Process," and (4) there were only "some work instructions for SMT, solder DIP processing and reflow, but none for Front line." Trial Vol. III at 684–86; defendant's trial exhibit 9.

The audit report also contained several noncritical findings including that "Personnel deployed in the new processes are still undergoing qualification process," and "Although responsibilities for the new processes were assigned, there were no records to demonstrate who was assigned to specific processes, who were the SMT/Mounters, Manual Insertion, Front Line, and DIP solder process. Moreover, job descriptions for those processes were not available." Trial Vol. III at 687–88; defendant's trial exhibit 9.

Ms. Horacek testified that these audit findings indicate that the processes described in the report must have been "fairly new" or "very, very new" because there were no "control plans," "job descriptions," qualified employees, or "front line work instructions to tell the employees how that soldering operation should be performed." Trial Vol. III at 686–88.

Moreover, Cyber Power provides no purchase orders, invoices, bills of lading, or proofs of payment to substantiate that any of the components referenced in plaintiff's trial exhibit 12, the bill of materials for all components of CP600LCDa's main board, arrived at Phisonic to be used in the manufacture of the main board incorporated into the CP600LCDa units that are

detained as part of the subject merchandise in this action. In fact, the evidence suggests that

components for the CP600LCDa's main board were sent to CPSI's factory in Shenzhen, China,

rather than the Philippines. A bill of materials listing components for the CP600LCDa's "main

board lists a part with the part number A12-0000036-00 (defendant's trial exhibit 4); however,

an invoice listing part number A12-0000036-00 indicates that this part was shipped to CPSI's

factory in Shenzhen, China, rather than the Philippines (defendant's trial exhibit 5).

   3.   <u>Application Of Firmware Does Not Effect A Substantial Transformation, And
        Regardless, Cyber Power's Standard Operating Procedures Show That Firmware Is
        Burned In China</u>

Cyber Power cannot rely on the application of firmware to support a claim that

substantial transformation occurred in the Philippines. This is because, even if firmware was

installed in the Philippines to the main boards of the five subject UPS models,[9] such installation

does not change the character of the PCBA—it simply facilitates its use. It is akin to adding a

battery and a cord as part of the finishing process of the devices' simple assembly. Additionally,

the bills of materials for the UPS models state that their firmware has no associated unit price,

and it is not part of the total material cost for these devices, *see, e.g.*, plaintiff's trial exhibit 11

(item number 108), which suggests that firmware burning is an insignificant (and insufficiently

transformative) step in the manufacturing process. *Cyber Power*, 560 F. Supp. 3d at 1351

(noting that courts have considered "the cost or value added by specified processes" in applying

the test for substantial transformation).

Moreover, the evidence shows that the firmware was installed in China, not in the

Philippines. Mr. Thomas Fuehrer, an electrical project manager at Cyber Power, explained that

---

[9] The SVP at issue does not have firmware. Trial Vol. III at 435–36.

firmware, which is a list of instructions for a microcontroller chip's (or custom program chip's) operation, is custom-coded by Cyber Power Taiwan for specific models of UPSs and loaded or "burned" onto the microcontroller during production. Trial Vol. III at 377–80. He further noted that the microcontroller is a part of the PCBA. Trial Vol. III at 392. Once firmware is burned onto a Cyber Power microcontroller, "the door is shut," because new firmware cannot be burned unless one has the necessary equipment to connect to the PCBA and uses the right "protocol" to go over the electrical interface, which Cyber Power does not do. Trial Vol. III at 462–63.

But the standard operating procedures for UPS Models OR500LCDRM1U (plaintiff's trial exhibit 42 at Bates No. 1170), SX650U (plaintiff's trial exhibit 51 at Bates No. 1210), CBN50U48A-1 (plaintiff's trial exhibit 24 at Bates No. 1032), and CST135XLU (plaintiff's trial exhibit 33 at Bates No. 1122), reveal that the firmware is burned onto the main PCBA in China. And given Mr. Fuehrer's testimony, firmware could not have been subsequently burned in the Philippines.[10]

In sum, Cyber Power has failed to show that the subject merchandise was substantially transformed in the Philippines. The Court should accordingly enter judgment in our favor and uphold CBP's determination that the country of origin of the subject merchandise is the People's Republic of China.

---

[10] That firmware is custom-coded for particular models of UPSs, cannot be replaced once burned, and is burned onto the microcontroller on the PCBA in China also bolsters the conclusion that the use of the PCBA is predetermined before importation into the Philippines and is thus not substantially transformed there.

35

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that judgment be entered denying plaintiff's claim that the country of origin of the subject merchandise is the Philippines; sustaining CBP's determination that the subject merchandise be marked with a country of origin of the People's Republic of China; sustaining CBP's deemed exclusion of the subject merchandise; dismissing this action in its entirety, and granting defendant such other and further relief as may be just and appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Justin R. Miller
       JUSTIN R. MILLER
       Attorney-in-Charge
       International Trade Field Office

       /s/ Beverly A. Farrell
*Of Counsel*:                              BEVERLY A. FARRELL
Yelena Slepak                              Senior Trial Attorney
Office of Assistant Chief Counsel          LUKE MATHERS
International Trade Litigation             Trial Attorney
U.S. Customs and Border Protection         Civil Division, U.S. Dept. of Justice
                                           Commercial Litigation Branch
                                           26 Federal Plaza, Room 346
                                           New York, New York 10278
                                           Tel.: (212) 264-9230
                                           Attorneys for Defendant

Dated: September 29, 2022